COMMITTEE ON FOREIGN AFFAIRS,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:   JAYNE HOWELL

Friday, July 28, 2023

Washington, D.C.

The interview in the above matter was held in 5480, O'Neill House Office Building, commencing at 10:02 a.m.

Appearances:

For the COMMITTEE ON FOREIGN AFFAIRS:



For the U.S. DEPARTMENT OF STATE:

████████████████████████, DEPARTMENT OF STATE



████████. So this is transcribed interview of Ms. Jayne Howell. Chairman McCaul has requested this interview as part of the committee's investigation of the Afghanistan withdrawal.

Would the witness please state your name for the record.

Ms. Howell.    My name is Jayne Howell.

████████.    On behalf of the committee, I want to thank you for appearing here today to answer our questions.    The chairman also appreciates your willingness to appear voluntarily.

My name is ████████.    I am ██████ on Chairman McCaul's staff on the House Foreign Affairs Committee.    I'll now have everyone else from the committee who's here at the table, from both the majority and the minority, introduce themselves as well.

████. ██████, I'm the ██████████████ for the Oversight and Accountability Subcommittee.

████. ██████████.    I'm ████████ with the House Foreign Affairs Committee.

████. ██████, ████████████ on the Oversight and Accountability Subcommittee.

████. ████████.    I'm the ████████████ on the House Foreign Affairs Committee.

████. ████████ I'm the ████████ on the minority side of the House Foreign Affairs Committee.

████. ████████, ████████ Oversight and Investigations on the minority side.

████. ████████████, Department of State.

████████. Great. I'd like to now go over the ground rules and guidelines that we'll follow during today's interview. Our questioning will proceed in rounds. The majority will ask questions for the first hour. Then the minority will have an opportunity to ask questions for an equal period if they so choose.

We will alternate back and forth until there are no more questions and the interview is over. Typically, we'll take a short break at the end of each hour, but if you'd like to take a break apart from that, Ms. Howell, just please let us know. We're happy to accommodate.

As you can see, there's an official court reporter taking down everything we're saying to make a written record, so we ask that you give verbal responses to all questions. Does that all make sense?

Ms. Howell. Yes.

████████. So the court reporter can take a clear record, we'll do our best to limit the number of people directing questions at you during a given hour to just those people on the staff whose turn it is.

Please try and speak clearly so the reporter can understand and so everyone can hear you. It's important that we don't talk over one another or interrupt each other if we can help it, and, of course, if there's any sort of head nodding, et cetera, we'd appreciate just sort of a verbal confirmation.

Witnesses who appear before the committee have the opportunity to freely consult with counsel if they so choose. It's my understanding today that you're appearing here today with agency counsel. Is that correct?

Ms. Howell. That is correct.

████████. Ms. Howell, do you understand that agency counsel represents

the State Department and not you personally?

Ms. Howell.    I do understand.

███████████.    Could the agency counsel -- I believe you've already made a record -- and please identify yourselves and state your names for the record as well.

████.    ██████████████, Department of State.

██████.    ████████████████████████████.

███████████.    Okay.    Thank you.

We want you to answer our questions in the most complete and truthful manner as possible, so we'll take our time.    If you have any questions or if you don't understand one of our questions, please let us know.    We'll cover a wide range of topics, so if you need any clarification at any point, please just feel free to say so.

If you don't know the answer to our question, do not remember, it's best not to guess.    Please give us your best recollection, and it's okay to tell us if you learned that information from someone else.    Just indicate how you came to know the information.

If there are things you don't know or can't remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer.

You should also understand that this interview is not under oath, but by law, you are required to answer questions from Congress truthfully.    Does that make sense, Ms. Howell?

Ms. Howell.    Yes, it does.

███████████.    This also applies to questions posed by congressional staff in interviews.    Do you understand this?

Ms. Howell.    Yes.

_____. Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements under 18 U.S.C. 1001.    Do you understand this?

Ms. Howell.    I do.

_____. Is there any reason you are unable to provide truthful answers to today's questions today?

Ms. Howell.    No.

_____. Finally, I'd like to make note that the content that we discuss here today is confidential.    We ask that you not speak of what we discuss in the interview to any outside individuals to preserve the integrity of our investigation.    Does that make sense?

Ms. Howell.    Yes.

_____. For the same reason, the marked exhibits we'll use today will remain with the court reporter so that they can go in the official transcript, and any copies of those exhibits will be returned to us when we wrap up.

Okay.    That is the end of my preamble.    Is there anything my colleagues for the minority would like to add?

_____. Nothing.    Thanks.

_____. Great.    The clock now reads 10:19, and we'll start the first hour of questioning.

EXAMINATION

BY _____:

Q    Ms. Howell, what is your current position at the State Department?

A    I'm currently in between positions.    I've just concluded an assignment as the minister counselor for Consular Affairs for Mission Turkiye, and tomorrow, I will take

up a new position as the minister counselor for Consular Affairs for Mission Pakistan.

Q     Thank you.

What was your position at the time of the Afghanistan withdrawal?

A     I was the minister counselor for Consular Affairs in Turkiye.

Q     When did you assume that position?

A     August of 2020.

Q     When did you leave that position?

A     Around the 1st of June of 2023.    I can't remember the exact day.

Q     Why did you leave that position?

A     It was the end of my assigned tenure there.

Q     Were you involved in any of the Afghanistan withdrawal efforts at that time, during your time in Ankara?

A     Just to make sure I understand the question correctly, are you asking beyond the TDY that I did during the evacuation?

Q     Correct.

A     Yeah.    So, no, my only involvement during my tenure in Turkiye with the Afghanistan withdrawal and evacuation efforts was the temporary duty assignment that I did.

Q     What was your role in the August 2021 evacuation from Afghanistan?

A     So I was a volunteer TDY-er to go and assist with the evacuation.    And I went and I was one of the -- I was the senior consular officer on the ground, and I had the day-to-day operational management of the team of consular officers assisting the NEO.

Q     When did you first learn of the opportunity to assist with the evacuation?

A     I don't think I could recall the exact date, but it -- I know that I departed on August the 17th, so a day or two prior to that there was a call for volunteers, and I

volunteered.

Q    How did you learn of it?

A    There was an email sent to consular officers worldwide, seeking volunteers to travel.

Q    Why did you think you were selected to serve as the consular team lead during the evacuation?

A    I would be speculating to say why they selected me, but I -- yeah, I'm not really sure.    I believe it was because I was very qualified.

Q    Was anyone else responsible for consular functions during that period in Afghanistan?

A    Yes.    There was a team of consular officers on the ground in Afghanistan.

Q    Can you please provide some of the names of the individuals you worked with on the ground?

A    The consular section chief in the mission in Afghanistan is Greg Floyd.

Q    Okay.

A    And then there were, I think, 34, if I remember the number correctly -- it may be plus or minus a few because it varied day to day based on who was on the ground, but there were about 34 consular officers who were on the ground.

There were three other fairly senior consular officers -- Jean Akres, Conn Schrader, and -- hold on, I'm missing somebody.    No, it was the three of us.    We were the three senior ones augmenting Greg.    So there were kind of four senior managers on the ground.

Q    Okay.    Great.

Let's focus on Jean Akres.    What position did she hold prior to joining the evacuation efforts?

A    At the time that Jean also volunteered to travel, she was the consular section chief in Montreal, Canada.

Q    Did she also volunteer for the role?

A    Yes.

Q    Do you know when she volunteered?

A    No.   In the same window that I did, because after the call for volunteers went out, but I don't know the exact day.

Q    As consular team lead, who did you report to in that role?

A    So obviously it was a broad group of people on the ground running this, but day-to-day operation, I reported to Ambassador Bass, John Bass.   But I was very much aware of the fact that Greg was the consular section chief and the overall consular manager, and we were in constant communication.

Q    So with respect to Ambassador Bass, was he responsible for consular decisionmaking?

A    It's kind of a difficult question to answer in a certain way.   Ambassador Bass is not a consular officer.

Q    Of course.

A    So day to day I got operational guidance and input from Ambassador Bass kind of representing the country team on the ground, but he did not make consular adjudicatory decisions.

Q    Okay.   Who did?

A    The consular officers.

Q    Okay.   Who communicated with Washington on consular issues?

A    Again, that's not kind of a singular point of contact, it was such a big and sprawling operation, but the primary lead on communication on consular issues was

Greg Floyd --

Q    Okay.

A    -- the consular section chief.    But certainly many of us had communications with Washington with the consular officials in Washington, including myself.

Q    Okay.    What was Greg Floyd's role then as sort of the more consular section chief at the embassy?

A    Well, as the consular section chief, I think, as any of the consular section chiefs do, he's the senior consular advisor to the Ambassador, Ambassador Wilson, and had the overall responsibility for the consular operation in the country.

But somewhat due to the two locations where we were working on the day that I arrived, Greg and I agreed that as the two senior consular officers on the ground, that we would kind of divide responsibilities and he would maintain most of the traditional roles, participating in the Emergency Action Committee, providing kind of the overall advice and information to Ambassador Wilson on what was happening, and that where we were located, embedded in HKIA with a MEU and the 82nd Airborne, that I would do kind of the day-to-day operational assignments, so it was like what consular officers went where and how we implemented the decisions.

I think Greg played very much the traditional role of consular section chief.

Q    Can you speak a bit more as to where you were located?    You said you were in separate parts of HKIA.    So were you at the JOC and if you were with Ambassador Bass and --

A    Yes.    Yeah.

Q    -- Mr. DeHart?

A    Embedded with the MEU.

Q    Okay.    And where was Mr. Floyd?

A    Greg was based at the KAC, Kabul Airport Compound.

Q    Okay.    When you said traditional responsibilities, can you speak more to what those responsibilities were for Mr. Floyd?

A    I mean, what Greg was doing on a day-to-day basis, because I was not physically co-located with him, would be very, I think, speculative of me to tell you.    I could speak more broadly about generally what consular section chiefs do, but what -- I was very focused on what I was doing and making sure that I was providing information to Greg about what the team of consular officers that I was working with were doing.

But I'm not really in a position to tell you what Greg did on a day-to-day basis.

Q    Okay.    Beyond just sort of the functionalities of being in separate parts of HKIA, why do you think you weren't reporting to him, or why do you all -- was it -- so why didn't you report to Greg Floyd specifically?

A    I want -- I don't -- I want to be maybe clear and reframe the question just a little bit.    Greg was the -- was the accredited bilateral consular section chief for the mission, and that was very clear.

When I have said I was the senior consular officer on the ground, that is in reference to the rank that I hold.    My personal rank is higher than Greg's personal rank, right, but very much Greg was the section chief, and he had the overall responsibility for the consular mission.

I, in a sense, reported to Greg in that way, but operationally on a day-to-day basis, he had delegated a piece of the consular function, the specific evacuation piece and operationally how that happened, and I took the lead to do that as the team lead for that, but I did not, quote/unquote, not report to Greg.

Q    Okay.

A    I want to be very specific about that.

Q    That's very helpful.    Thank you.

A    Yeah.    Okay.

Q    Thank you for that.

A    Yeah.

Q    So approximately how many on-the-ground staff were under your leadership during the evacuation?

A    It did fluctuate from day to day based on arrivals and departures, but for the most part, it was just over 30 consular officers, I think, was about the average.

Q    Okay.    Can you speak a bit more as to who these individuals were?    I know there's a larger quantity, but specifically sort of, were they consular officers previously? Did they come to TDY as well or just a bit more information there?

A    There were kind of three categories of consular officers who were there. There were some consular officers who had been assigned and were part of a normal diplomatic mission prior to the evacuation, the drawdown of the embassy.    So there were still some people who had been, like, assigned there as a Foreign Service assignment.

There were a couple of consular officers who had been sent TDY again, prior to the drawdown of the embassy to assist with the surge on processing Afghan SIVs who chose to remain and assist with the evacuation.

And then there were other volunteer TDY-ers like me, who went in after the evacuation began, to assist.

Q    And how did you typically communicate with them, sort of emails, texts, calls, formal meetings, all of the above?

A    Communications were a challenge with technology for many reasons, I'm sure you understand.    Most of the communication with the consular officers we did in a

brief standup meeting at a shift change.

So twice a day, we would shift and when the consular officers who were coming onto shift would come, we would do like a standup meeting for about 15 minutes. And we tried very hard to never go longer than that because if they were talking to me, they weren't processing evacuees.

And we would communicate anything that had changed or updates or information they needed, and give them their assignments for which location they would need, and then they would go out.

Then the shift coming off, I would do a second kind of meeting with them, and I tried very much to talk to each one individually, even if just for a moment, to get feedback about what was happening at the different locations, and provide them information about what might have been happening where they didn't have visibility.

But with the consular officers themselves, the communication was primarily through those short standup meetings every day.

Q    And can you please provide us a brief description of any prior professional experience with or in Afghanistan?

A    That I have?

Q    Uh-huh.

A    Yeah.   I have been assigned to two different tours -- two prior tours in Afghanistan.   I was the cultural affairs officer in 2004, 2004 to 2005.   It was a 1-year assignment.   And then I was assigned to Afghanistan as the consular section chief from 2011 to 2012.

Q    Do you believe those experiences prepared you for what you faced in the evacuation?

A    I think they certainly contributed to my preparation, yes.

Q    Is it a fair characterization to say you have regional, sort of, in-country expertise?

A    I would choose the word "experience" over "expertise," but yes, I definitely have some familiarity with Afghanistan and the region.

Q    I'm going to list the names of and ask some questions about a few Department leaders who were involved in the withdrawal and evacuation efforts in Afghanistan.    I'd appreciate if you can answer my questions to the best of your recollection.    If you're unsure, of course, please say so.

So beginning with Ambassador Wilson, what was his position at the time of the withdrawal?

A    Ambassador Wilson was the U.S. Ambassador to Afghanistan.

Q    He was the charge, correct?

A    Yes.    Chief of mission.

Q    Okay.    What were his duties in that role?

A    The personal representative of the President of the United States to the Government of Afghanistan.

Q    Did those duties appear to change throughout the course of, sort of, the withdrawal and evacuation?

A    To be fair, I'm not really in a position to comment on that.    My interaction, because Ambassador Wilson was primarily based at the KAC, the Kabul Airport Compound, I didn't interact with him directly on a day-to-day basis.

He would periodically come to the JOC for meetings, or I went, I think twice, to the Kabul Airport Compound where I interacted with him directly.

But I really couldn't comment on his role day to day.

Q    Do you recall who Ambassador Wilson reported to, or did he report to any --

A    My impression that he reported to the President of the United States.

Q    Okay.    So you noted that you would meet sort of more regularly.    Did you work with him at all on any sort of substantive issues while in Afghanistan?

A    During the evacuation?

Q    Correct.

A    Yeah.    Well, we attended a couple of planning meetings together, but on a day-to-day basis, I did not interact with him directly.

Q    Did he work primarily with Greg Floyd?

A    Yes.    Greg was co-located with Ambassador Wilson --

Q    Okay.

A    -- at the Kabul Airport Compound.

Q    Given Greg Floyd's role as sort of the consular section chief, did he report to Ambassador Wilson directly?

A    Yes.    Definitely.

Q    I'd like to ask a few questions about Ambassador John Bass, now Under Secretary Bass.    At the time of the withdrawal, what was Ambassador Bass' official position?

A    I'm not sure what he was assigned, but like many of us, he, as I understand it, volunteered to come in and assist with the evacuation and the drawdown of our presence in Afghanistan.

Q    Can you speak a bit more as to what his role in the evacuation was?

A    I can speak to what my interaction with him in the evacuation was.    I want to be clear, maybe for a lot of these questions, I felt like the task I was doing was very -- was very big, and I was very focused on what I was doing and not a lot of what everybody else was doing.

But Ambassador Bass was the kind of representative of the country team to me, so he was the day-to-day operational State Department lead where I was in the JOC, and he provided kind of that level of, kind of, senior oversight and guidance when we required it.

Q    Did Ambassador Bass work with Ambassador Wilson in any capacity?

A    Yes.    I mean, my impression was very much that they were in constant communication.    Periodically the way that I would understand what the decision had been made about how we were doing something was relayed to me by Ambassador Bass or Jim DeHart who we also worked closely with, as being a -- like a mission leadership decision to include Ambassador Wilson's input or decisionmaking.

Q    To the best of your recollection and experience, did their duties appear to overlap at all?

A    In my experience?    No.    I viewed them very much as a team.

Q    Can you speak to why Ambassador Bass was asked to go to Afghanistan?

A    I have no visibility on that.

Q    There's already a chief of mission on the ground, Ambassador Wilson, as we noted.    Did it seem sort of out of the ordinary to send a second ambassador to the country in a senior role?

A    For me, no.    When I had served prior in Afghanistan in 2011, there were five ambassador-rank officials on the ground.    I think it was a big and complex mission that required a lot of senior people to help do it effectively.

Q    At any point was there a lack of confidence expressed in Ambassador Wilson by the Department?

A    Not anywhere that I was present.

Q    At the time of the withdrawal, what was Rena Bitter's position?

A    The assistant Secretary Of State for Consular Affairs.

Q    What were her duties in that role?

A    I mean, just the overall director of the Bureau of Consular Affairs, but on day to day I wasn't -- I was in Kabul, not in Washington, so I couldn't say exactly what she was doing.

Q    What was her role in the Afghanistan withdrawal and sort of later evacuation?

A    As the assistant secretary for Consular Affairs, I mean, she had over- -- overall responsibility for the consular piece of it, but on her day-to-day responsibilities or what was he was doing, I do not know.

Q    Did you engage with her at all as consular team lead?

A    Not directly.    Most of the time I understood that she was speaking to Ambassador Wilson and Ambassador Bass directly.    Sometimes they would relay things I needed to know, but I was also interacting with senior counselor Bureau leadership either via Greg's feedback, or we had a, like, a Teams channel where we would provide chat, so. I was interacting with Rena usually via these other channels, not directly.

Q    Do you know if Greg Floyd reported to her directly at that point, or was it mostly through Ambassador Bass?

A    Greg Floyd reported to the ambassador, the chief of mission.    That is how we all work overseas.    But I definitely think that he was in communication with Washington.    I do not know if he was in personal communication with the assistant secretary.

Q    So moving on to Ian Brownlee, at the time of the withdrawal, what was his position in the Department?

A    I believe he was still PDAS, principal deputy assistant secretary.    I have to



be honest, I'm not -- I don't remember exactly what his departure date was, but I know he departed that summer.

Q    And what was his role in the Afghanistan withdrawal and evac?

A    I personally did not have any interaction with Ian directly during that time.

Q    And Ian Hillman, do you know what his position was at the time of the withdrawal?

A    No.

Q    Do you know what his role in the Afghanistan withdrawal was?

A    During the withdrawal?

Q    Yeah.

A    He wasn't on the ground.    My lens was very much focused on what was happening on the ground.    I know what Ian has done since then, but what he was actually doing during the evacuation, no, I don't know.

Q    And did you work with him in your capacity as consular team lead?

A    No.

Q    Do you know if Greg Floyd worked with him?

A    No.    I couldn't comment.

Q    So is it fair to say that in your capacity as consular team lead, you interacted mostly with Rena Bitter?

A    No.

Q    Okay.

A    Can you --

Q    I'm sorry.    Let me reframe that question.

A    Yeah, yeah.

Q    My apologies.

So in terms of Washington, D.C. as points of contact, if you did speak with anyone, you spoke with Rena Bitter, not the --

A    No.    Thank you for saying that again.    I clearly did not say that correctly, so I want to reframe that.    I never spoke to Rena directly from Kabul.

Q    Okay.

A    I knew that the assistant secretary was speaking to other people on the ground.    I knew that she spoke frequently with Ambassador Bass or Ambassador Wilson. She may have had interactions with other people.    I believe that she interacted with Greg.    I cannot say that categorically, but I was directly in contact with other people who were reporting to Rena in Washington via usually text or -- or other channels.

And I was receiving direction from the assistant secretary, either via the mission leadership on the ground or from people in Washington, but I never interacted with her directly during that time.

Q    Thank you for that clarification.

BY ▬▬▬▬▬:

Q    Who were those other officials that you were interacting with?

A    Like the DAS for Overseas Citizen Services, Karin King, the principal deputy assistant secretary of state for Consular Affairs, Douglass Benning.    I spoke to managing director of the Office of Overseas Citizen Services, Shane Myers, so the senior people working on American citizens.

Q    And what were their roles and involvement with the emergency evacuation specifically?

A    So my interaction with Washington, because my role was very operational, usually it was when I needed a specific thing to happen or to understand very specifically why something wasn't happening.

So for the most part, my job that I had was to make a -- it was just very operational.    So whatever was happening in Washington, whatever interaction was happening with those -- the people working on the task force, it was very opaque to me to a large degree, other than the specific inputs that we needed to make the best decision on the ground about how to get more of our priority, our travelers, that we were trying to access, onto the compound and onto planes.

So we had kind of an open chat group via Teams where we were constantly providing inputs to Washington so that they had the latest4e information.    And for the -- and then vice-versa verse, right, for them to share what was happening on the consular side.

And only on a handful of occasions, did I need something more than that, and to say, I could write a 10-paragraph, you know, message, about why I'm asking for something that might be exceptional, or I can pick up the phone and call or vice versa. So for the most part, the Washington piece was very separate from what I was doing.

Q    And were there any Washington officials outside of Consular Affairs that you had significant interactions with?

A    No.

BY █████████████ :

Q    Were you -- in your capacity as consular team lead, were you engaging with any foreign officials?

A    Some of our NATO partners I did.    I spoke occasionally because there were conversations about some of our -- our partners, like Germany or United Arab Emirates or -- I'm trying to think -- there were several of -- I talked to Spain one time.    They would come into our liaison office in the JOC and talk about getting some of their travelers, how we could figure out, within our operation, to separate them so that they could board

them for travel to the air platforms.

But I did not interact with anyone outside the NATO and military partners that we had.

Q    Is it fair to characterize those interactions as sort of coordination efforts?

A    Absolutely, they were coordination, yes.

Q    I'm going to name a few key military figures that we believe were significantly involved in the evacuation and ask that you please answer some questions that follow.

I'll begin with General McKenzie.    Can you speak to what General McKenzie's role was in the evacuation?

A    I did not interact directly with General McKenzie.

Q    Okay.    What about General Donahue?

A    Yes.    General Donahue was commander of the 82nd Airborne group that was on the ground, and I interacted with him multiple times a day.

Q    And what was his -- can you speak to his role a bit more?

A    I can tell you what I understood his role to be, although I want to be clear in answering this question that other than operationally, what I needed to understand to get our piece done, I did not ask for, like, what the broader mission is.

My understanding of what General Donahue and the 82nd Airborne were doing is coordinating the overall retrograde of the military mission and providing support to the NEO.

Q    And to what extent did you engage with him, sort of how often, how are you really --

A    I saw General Donahue at least once a day because we had this morning battle rhythm -- we called it the battle rhythm meeting -- and it was early in the morning

every morning where State Department leaders and the military commanders, the planners and the consular officers, we would sit together and talk about what had changed overnight, what our expectations were for the day, any new information, and make a plan to figure out how to operationally iterate in a way that we could, you know, kind of respond to those things and stay ahead of what we anticipated in terms of challenges.

So I saw General Donahue at least once a day, but I interacted with him usually multiple times a day in terms of talking about security situations that were changing, or feedbacks from meetings he may have had with other people in Washington, or with Taliban leaders on the ground.

Q    Was any of that information, to the best of your recollection, relayed back to Washington?

A    It was my impression that it was.    It was not my role.

Q    Okay.    Who were some of the other key officers on the ground that you interacted with on the military side?

A    Military officers?

Q    Uh-huh.

A    General Sullivan, who was the general in charge of the MEU, the marine expeditionary unit.    His office was directly next to mine.    In fact, it was the marine JOC, in which the State Department, we had our liaison office on that side, so definitely General Sullivan.    And then Admiral Vasely.

Q    And how often did you engage with them?

A    They were both also at those meetings, but multiple times a day, because the situation was constantly changing, and so we were, sometimes it felt like every 15 minutes, coming up with a new way to iterate the plan, to respond to what was changing,

and that was always done in a very collaborative, consultative way.

Q    Did you interact with any military officials based outside of Afghanistan, so in D.C.?

A    No.

Q    So if I understand correctly, you were selected for the role as consular team lead by personally volunteering.    Is that correct?

A    Yeah.    I volunteered.

Q    What did you understand the purpose of sending you to Afghanistan to have been?

A    I understood my mission to be to try to evacuate as many U.S. citizens, legal permanent -- lawful permanent residents and their family members; Afghan SIV holders and their family members; other Afghans at risk and our locally engaged staff to safety.

Q    Were you given any direction or guidance before reaching Afghanistan?

A    Before reaching Afghanistan, not very much.    I had one conversation with Washington from Doha, while I was waiting to get on the flight onward from Al Udeid to Kabul, where they gave me kind of the baseline, but most of the briefing happened once I got there.

Q    Who in Washington did you interact with for that briefing?

A    That was Shane Myers.    He was the, at the time, the managing director of the Office of Overseas Citizen Services.

Q    Were you given an opportunity to assemble a team for your mission?

A    No.

Q    How were other consular officers deployed to Afghanistan for the evacuation selected?

A    I couldn't speak to that.

Q    Do you know if any State Department employees who wanted the TDY for HKIA were denied the opportunity?

A    I'm not aware of that.

Q    What were identified to you as the most important priorities for the mission?

A    Priorities for what?

Q    Priorities for the mission, for your role.

A    As I mentioned before, it was to get as many U.S. citizens, lawful permanent residents, SIV holders and persons in the SIV process, our locally engaged staff, and other Afghans who may be at risk of persecution from the Taliban, plus their family members, to get as many of those as we possibly could to safety, of the ones who were seeking repatriation, which there were some that didn't want to leave.

Q    Thank you.

Did you identify any priorities with the Department yourself, or were those all relayed to you from the Department downward?

A    Those were relayed to me.

Q    Did you receive any other kinds of, sort of, briefing or preparation before leaving for Afghanistan?

A    No.    Just my prior experience.

Q    Okay.    Did you receive any materials or documents to review in preparation?

A    I reviewed the Foreign Affairs Manual on noncombatant evacuation operations and the guidance for how we determine potential admissibility to the United States and eligibility for evacuation.

Q    Did you receive any sort of emergency action plans or any sort of plans that

would prepare you for when you were there previously?

A    No.    But I also didn't really -- an emergency action plan, in my experience, would be the document that we would use to decide to do an evacuation but wouldn't necessarily include the guidance on how to do it.   That was when I would refer to the Foreign Affairs Manual.

Q    Okay.    Did you receive sort of any formal documentation as to the guidance on how to conduct the evacuation itself?

A    The Foreign Affairs Manual guidance on how to conduct a NEO, I did review that before I went.

Q    I guess specifically to Afghanistan, was there --

A    No.

Q    -- any sort of plan that you had received?

A    No.    But I was briefed as soon as I got on the ground.    The military planners that were with the marine expeditionary unit were in all of these meetings that I referenced, and so the plan was very -- was evolving kind of.

Q    Did the Department communicate a timeline under which you were going to operate?

A    For my temporary duty assignment?

Q    Uh-huh.

A    No.

Q    How about for sort of the evacuation generally?

A    Before I traveled, no, there was no timeline, right?    I was told, we'll be there as long as we need, or can be.    And then -- and then as the situation unfolded and the determination was made to leave before the 31st, I was told that, maybe 3 or 4 days in, I think that determination was made.   I'm not sure exactly when.    But at least

initially we did not have, like, an end date.

Q    So while you were in-country, was there ever any consideration or discussion of changing that timeline?

A    I was aware that conversations were happening, but they were happening at a higher level than I was present for.

Q    Okay.    Do you know who was having those conversations?

A    When we would have the battle rhythm meeting, it was clear that the generals and both ambassadors, Bass and Wilson, were in consultation with, like, Departments and the Pentagon, and I'm assuming other people in Washington.

So there was feedback about those conversations when we have the operational meetings that I would be present for, but I wasn't privy to exactly who they were interacting with in Washington.

Q    Thank you.

Did you speak with any of the officials on the ground in Kabul prior to your arriving in Afghanistan?

A    No.

Q    We've already touched upon some of the officials you spoke to in D.C. and others who you had not had an opportunity to speak with in preparing for your return.    I have a few follow-up questions --

A    Sure.

Q    -- if you'll indulge me.

Before your departure for Afghanistan, what did Washington communicate to you about the sort of the state of the withdrawal?

A    Before I left from Ankara, almost nothing.    Mainly what I knew about what was happening in Afghanistan was from the media reports, and my own prior experience.

But when I made the decision, and Washington made the decision to send me, it was almost 4 hours before I was actually on a plane flying to Doha.    There wasn't really time.    The focus was on expedience.

So the first time I had a little bit of time was when I got to Doha and was waiting for the flight from Al Udeid, and that was when I got a phone call saying, Okay, let's talk about what you can expect going in and here's the latest information.

Q    And who was that phone call with?

A    Shane Myers, the managing director.

Q    Okay.    And what was your impression of the situation on the ground prior to your deployment?    This is, of course, your own sort of personal impression.

A    My impression was that it looked like there was something where -- a place that I might could contribute.

Q    Did you believe an evacuation -- a full-scale evacuation was likely at that point?

A    At the time I volunteered, a full-scale evacuation was happening.

Q    Okay.    And just to confirm, did you believe it was necessary to shut down Embassy Kabul at that point as well?

A    I don't really have an opinion about that.

BY ███████:

Q    You mentioned your call with Mr. Myers.    What did Mr. Myers communicate to you?

A    He expressed that the scale of the operation was -- was expanding, right, and that -- that the short-term immediate procedures that had, you know, gone into place with the very few number of consular officers who had been at -- who had been present at the embassy and then relocated to the airport -- needed to scale up very

dramatically, and that they were sending in people like me and I could expect significant other numbers of the TDY-ers to arrive, and that they wanted me to look at how to put structure in place now that better resources were arriving in a way that we could dramatically scale up the numbers that we were moving through.

I did spend about 12 hours at Al Udeid in Doha, very specifically observing what the reception was happening like, so that I could use that as a way to try to help better prepare the situation in Kabul, to kind of, to plug into it better.

Q     When you say the "reception," the reception of evacuees?

A     Yes, the reception of evacuees.

Q     And what did you observe there?

A     That obviously similar to what was happening in Kabul, that Al Udeid was dramatically ramping up from what I think the initial expectation was, and trying very quickly to put structure in place to take care of a very large number of people.    Yeah. It was a complex operation.

BY ██████████████ :

Q     So I want to speak a little bit more as to sort of the evacuation itself.    Were there any evacuation plans you were executing, or were you aware of any plans you were executing at --

A     May I ask you to clarify, in what sense, like?

Q     So was there a written plan or document you were working off of in terms --

A     No.    There was no -- I believe written plans existed.    The way planning was happening is because the situation was so fluid, I cannot emphasize enough to you that minute to minute, what was happening was changing what -- how the travelers were accessing the compound was changing, what security event may have happened around was changed, where we could operate.

So the fact that there was a planning team on the ground with the marines was extremely helpful, so.    But the inputs to that planning operation were constant.    So a written product, not that I saw or worked from, but that there was a constant focus on iterating planning itself, was happening on the ground.

████████.    You said that you believed that there was a written plan?

Ms. Howell.    No, I did not say -- I did not intend to say that.    Like, they may have had -- the planning -- there was a planning cell in the JOC that was working.    They may have produced written products based on all of these meetings and consultations, but if they did, it was something that would be changing all the time.

But I was not working from a written product, but I just wanted to be clear that planning was taking place.

████████.    And given the leadership role that you had, did you ever ask to see any sort of written plan?

Ms. Howell.    No.    I didn't feel that I needed one.

BY ████████

Q    Who was part of that leader -- or that planning team in the JOC?

A    There was a unit from the -- from the Army actually.    I believe it was 10th Mountain Division.    I'm not a military expert, but if I remember correctly, they were there, and they were the planners that had arrived with the marine expeditionary unit.

They had been present at the withdrawal from the embassy and the move back over, and they were still with the MEU until the 30th when we left.

Q    Do you recall the names of any of those individuals?

A    The -- the senior officer in that group I do remember, Lieutenant Colonel Hardman -- I don't know if that's still his rank -- he's a very talented officer.    But he was the senior planner, but there was a group of them.

Q    And were there any State Department members of the planning team?

A    Well, we were very much working together, like, their little office was directly above my little office, and we were inside the MEU JOC.    So I mean in some way I kind of was, but, like, we were all very much working together in a collaborative way. That's how I felt.

BY ▓▓▓▓▓▓▓▓▓▓▓:

Q    And to what extent had there been sort of coordination effort with respect to the evacuation with our allies and sort of regional partners?

A    I couldn't speak to that.

Q    So my apologies if we sort of -- this may be a bit redundant, but I'd like to speak more about sort of the timeline of your arrival.

A    Sure.

Q    When did you get to Doha?

A    I got to Doha on the 18th, early, early in the morning of the 18th, and I got to Kabul on the 19th.

Q    Did you travel with anyone?

A    From Anka to Doha I traveled -- I did travel -- I forgot until you just asked that question.    -- there was a TDY-er coming in from London who was on the same flight I was on from Istanbul to Doha, just by luck, so we flew into Doha together.    On then on a MILAIR flight from Al Udeid to Kabul, there were 5 or 6 other TDY-ers.    We went on the same plane.

Q    Upon your arrival what was your impression of the situation in Kabul, more specifically at Hamid Karzai International Airport?

A    I'm sorry.    Could you repeat the question?

Q    Of course.

Upon your arrival, so once you were in-country, what was your impression of the situation on the ground?    What was your immediate sort of reaction?

A    My first impression was that it was extremely kinetic.    Almost immediately coming off of the plane, you could hear machine gun fire, flash bangs.    So it sounded more like grenades, although I'm not an expert in the sounds, and I could hear this roar of people.    I arrived after dark.

And then we were taken over to the JOC, first stop that I went.    And then I had to wait for transport to be able to safely travel over to the KAC, which could only happen every few hours for security reasons.

And so, I went out to -- the first thing I did was walk out to the passenger terminal to observe the consular screening and manifesting operation that was happening there, and it was -- there was a plan.    It was organized.    It was happening.

But the pressure on it, the number of people and the distress of the people in the operation was evident and sad.

Q    Thank you for that.

Can you speak a bit more to the chain of command at HKIA?

A    Could you be more specific?

Q    Of course.    So I guess in terms of, I know there were coordination efforts between State and DOD, so let's focus on State first.    Can you speak as to the chain of command?    So who reported to whom?    Or if there wasn't -- I know we said that there was some separation of authorities, but --

A    Yeah.

Q    -- to the best of your ability, can you sort of speak a bit more --

A    Sure, of course.

Q    -- to that?

A   So of the kind of senior State Department leadership that was based in HKIA, there were just a few people.   There was Ambassador John Bass, Jim DeHart, Mustafa Popal, Tom West, and there was a management officer, was TDY -- right at this second, I can't remember his name -- ███ -- I'm embarrassed, I can't remember, I'll think of it -- and then me.

And so, it was kind of a mini country team in some way, and then Ambassador Bass was, of course, reporting to Ambassador Wilson.   So it kind of functioned like Ambassador Bass was the senior leader at that location.   We all reported to him.

Q   Okay.   And who was officially in charge on the ground during the evacuation?   Was it Ambassador Wilson as sort of the --

A   Yes.   Ambassador Wilson, we were very clear, was the representative of the President, and the rest of us were part of his team.

Q   Did someone decide to delineation of sort of responsibilities between Ambassador Bass and Mr. DeHart and Ambassador Wilson?

A   If they did, I wasn't privy to that.

Q   Was sort of the chain of command and division of responsibilities well understood by the personnel on the ground?

A   I did.   I mean, I had the information I needed and the clear guidance that I needed to do the piece that was mine.   I did not have any confusion.

Q   Did you communicate sort of that delineation, individual responsibilities to your team?

A   As much as they needed it, yes.   I don't remember it being something that people asked or discussed -- asked about or discussed.   I don't remember it as being something that really came up.

Q    Okay.    Ms. Howell, are you aware of what a noncombatant evacuation operation, or acronym NEO, is?

A    Yes.

Q    Okay.    And the August 2021 evacuation was officially a NEO, correct?

A    As far as I understand, yes.

Q    Okay.    I just want to introduce the NEO order as exhibit 1 into the record.

A    Thank you.

Q    Thank you.

[Howell Exhibit No. 1

Was marked for identification.]

BY ███████████████ :

Q    So I'd like to introduce the NEO request by the State Department Exec Secretary to the DOD Secretary into the record.    I'll give you a moment to take a look if you want to just flip through the pages.

To the best of your knowledge, when was the decision to request a NEO made?

A    I do not know.

Q    Do you have any knowledge or insight into the decisionmaking process that led to the declaration of the NEO?

A    No.

Q    So there are two dates in this exhibit, August 17th and August 16th.    Can you explain why there may be two separate dates?

A    At this point, I was still in Turkiye --

Q    Okay.

A    -- and not a part of the Afghanistan evacuation team.    I do not know.

Q    All right.    Thank you.

So I'd like to introduce as exhibit 2, the Joint Publication 3-68.    This is the executive summary.    I have the full document as well in case but didn't want to overload you with 200-plus pages.

[Howell Exhibit No. 2

Was marked for identification.]

███████.    I think I made four, so I may need to grab one of those.

████████.    ████, could you clarify for the record what classification level this document is?

████████.    It's publicly available online off the DOD website.

████████.    Okay.    And I'm not sure if we clarified at the top of the TI, but this is a unclassified transcribed interview.    Is that correct?

████████.    I'm sorry?    Yeah.    It's unclassified, yeah.

███████.    Okay.

████████.    We would definitely not be conducting it here.

██████    I just don't recall having heard it at the beginning.    Thanks.

BY ████████:

Q    So I'd like to represent that the provided version of the Joint Publication was found online off the Department of Defense website.    It was, in effect, at the time of the withdrawal, and a revised draft was submitted by the DOD on May 26, 2022, so after the withdrawal and evacuation?

I'll give you -- I'm happy to give you a couple additional minutes if you'd like to look through it, Ms. Howell, but we'll also have the opportunity to look at the reference with specific pages.

A    Okay.

Q    Have you ever seen this document before?

A    I have seen a version of this document before.    I did a combined NEO training operation with the Marines at Camp Lejeune several years ago, and I reviewed a version of this document that was accurate and up to date at that time, not this specific one.

Q    Thank you.

Ms. Howell, I'll have you turn to romanette i, the Preface.    You'll see that this publication provides a doctrine to plan and conduct joint noncombatant evacuation and repatriation operations, and is prepared under the direction of the chairman of the Joint Chiefs of Staff.

If you could please turn to page romanette ix next.

A    Yeah.    This kind of ix, okay.

Q    Yeah.    They jump around as to where they put the page numbers which is very odd.

So I'd like to point you to the Overview section.    Are you aware that under a NEO, the chief of mission, neither the geographic combatant commander, GCC, nor the subordinate Joint Force commander, JFC, is a senior United States Government authority for the evacuation, and as such, is ultimately responsible for the successful completion of the NEO and the safety of the evacuees?

A    Yes.

Q    As charge, Ambassador Wilson was the chief of mission, correct?

A    That's correct.

Q    According to Joint Publication 3-68, that would make Ambassador Wilson the senior most government authority for the evacuation and ultimately responsible for the successful completion of the NEO, correct?

A    That is my understanding.

Q    In practice, was he the acting assisting U.S. Government authority for the evacuation?

A    In my experience, absolutely, yes.

Q    I'd like to point you back to romanette ix, and do you see that under the Overview of the section, it states the following:    U.S. policies contained in the Memorandum of Agreement between DOD and DOS, titled, Memorandum of Agreement, between the Departments of State and Defense, are the protection and evacuation of U.S. citizens and nationals designated other persons from threatened areas overseas?

A    I'm sorry.    What was the question?

Q    Just that that's on the -- in the record on the page.

A    I see that it's there.

Q    Okay.    Perfect.

I would like to introduce exhibit 3 into the record.    That is the reference Memorandum of Agreement, also found publicly online.

                    [Howell Exhibit No. 3

                    Was marked for identification.]

Ms. Howell.    Thank you.

            BY ▊▊▊▊▊▊▊▊▊ :

Q    So I'll reference the Memorandum of Agreement as the MOA for ease of reference, and just to know, again, this was pulled from the internet off the Department of Defense's website.

Ms. Howell, I'd like to point you to page 1, section A, titled, Policy Objectives, which states the following: In the event of an emergency abroad affecting the safety of U.S. citizens, it is a policy of the United States Government to, protect U.S. citizens and nationals and designated other persons to include, when necessary and feasible, their

evacuation to and welfare in relatively safe areas; reduce to a minimum the number of U.S. citizens and nationals and designated other persons subject to the risk of death and/or seizure as hostages; reduce to a minimum the number of U.S. citizens and nationals and designated other persons in probable or actual combat areas so that combat effectiveness of U.S. and Allied Forces is not impaired.

I want to direct you next to page 2, section c(2)(b), which states the following: The Secretary of State will exercise overall responsibility for obtaining objectives in section A, which I've just read, and except as noted in section c(3)(b), shall prepare plans for the protection and evacuation of all U.S. citizens, nationals, and designated other persons abroad, including the Department of Defense noncombatants.

For just reference, section c(3)(b), which, there was an exception, delegates responsibility of evacuees at the U.S. Naval Base in Guantanamo as the Secretary of Defense.

Ms. Howell, were you aware of any evacuation plans that were prepared by the Secretary of State?

A    Prior to my arrival on August 19th, I was not.

Q    And have you ever read this MOA previously or seen it?

A    I don't recall.

Q    Once you were in country at HKIA, were you aware of any plans prepared by Secretary Blinken?

A    Other than the -- my interjection into the iterating planning process, no.

Q    Were you aware of whether he delegated that responsibility to anyone else at the Department?

A    Which responsibility?

Q    The creation of the plans.

A    I don't -- no, I'm not aware.

Q    And you previously stated that you never physically saw a copy of an evacuation plan or anything at HKIA, correct?

A    No.

Q    Ms. Howell, I'd like to point you next to page 4, section 4, which outlines the responsibilities of chiefs of diplomatic missions and principal officers.

This too is not numbered.    My apologies for that.

A    Okay.

Q    And I'm correct in understanding that Ambassador Wilson as a charge and chief of mission was chief of diplomatic mission and the principal officer, correct?

A    Yes.

Q    You'll see in subsection 4(a), it states that chiefs of diplomatic missions and principal officers shall prepare and maintain the plans described in section c(2)(c) for their areas of responsibility and implement those plans when required.

I appreciate your patience as we flip back and forth.

Let's see, the c(2)(c) found on page 2 discusses the Secretary of State's overall responsibility for coordinating with the Secretary of Defense plans for an evacuation from foreign countries of U.S. citizens and nationals and designated other persons, including, Department of Defense noncombatants can be integrated in Department of State plans.

I'll give you a moment.    Were you able to take a look at that?

A    Yes, I see it.

Q    So based on this MOA it appears that the responsibility to prepare and maintain evacuation plans sat with Ambassador Wilson.    Is that your understanding as well?

███████.    Are you asking her personal knowledge of this document?    I'm

sorry.

BY ▮▮▮▮▮▮▮▮▮▮ :

Q    Is it my correct understanding that based on the MOA, on the terms of the Memorandum of Agreement, it appears that the responsibility to prepare and maintain evacuation plans sat with Ambassador Wilson as the charge and chief of mission?

A    I'm not sure I'm the right person directly to comment on where all of those responsibilities lies.    I mean, I have the information that you've presented in front of me.

Q    Okay.    So let's speak to on the ground sort of practically speaking.

A    Yeah.

Q    To the best of your recollection, did Ambassador Wilson prepare and maintain evacuation plans?

A    I don't have knowledge of that.

Q    Would you know if he coordinated any of those plans with the Department of Defense?

A    I don't have knowledge of that other than, you know, what I observed actually happening on the ground, which was very close coordination.    What happened at the planning phase prior to my arrival, I couldn't speak to.

Q    Okay.    I'd like to point you back to section 4 this time, and to subsection (b), which states, Chiefs of diplomatic missions and principal officers shall provide timely information to the Secretary of State, the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and appropriate commanders of the combatant commands, and the subordinate commanders as necessary regarding the number of potential evacuees, the availability of resources necessary to the evacuation plans, and recommendations as to which parts of the Department of State evacuation plans should be implemented.

To the best of your recollection, did Ambassador Wilson perform these functions?

A     I did not observe that.    That was happening at a level above me.

Q     Do you know who else may have served any of those functions on the ground?

A     I honestly really couldn't comment on that.    That was not what I was doing.

Q     Okay.

          BY ▮▮▮▮▮▮▮▮ :

Q     I want to ask you -- go back to a few things that we discussed earlier.    You mentioned, you were discussing the senior consular officers on the ground.    I believe one of them was Colin Schrader or Schroeder?

A     Conn Schrader.

Q     Oh, Conn Schrader.    How is that spelled?

A     C-o-n-n.

Q     Okay.    And could you explain, you know, who is he and what was his role?

A     Conn is a fairly senior experienced consular officer.    When -- when some of the TDY-ers began to arrive in significant numbers, there were a couple of us who were more senior, and because the operation very much was 24 hours, and we knew that -- actually, we didn't know when it would end at that time, but we knew it was going to be an extended period we needed to maintain the pace.

So we decided that we would have management shifts, and so Conn went to KAC to be the second shift for Greg, and Jean and I stayed at NHKIA to have a 24-hour manager shift.    That way, there was always a senior consular manager available in both locations.    So Conn was the second manager supporting Greg at the KAC.

Q     You also had mentioned that the plan was evolving.    Could you speak more to that and what you meant by that?

A     Sure.    The situation was evolving constantly.    The numbers of people in

certain locations or, you know, a security incident may happen.    The Taliban would change how they would allow people to access different parts of the airport perimeter. The number of people on the compound that we had life support materials for would change.

So it was just kind of constantly -- constantly the reality of the operating environment changed.    And so immediately we would say, okay, how do we shift, how do we make sure that, as much as possible, operations continue, although they might have to shift and change in a different location.

[11:15 a.m.]

BY ▮▮▮▮▮▮▮▮

Q    You mentioned a battle rhythm meeting.    Could you describe that a bit more?

A    Sure.    It was basically a morning senior staff meeting.    The term the military used was battle rhythm meeting.    We adopted their term.    It quite often also happened at the end of the day, but it was -- it never -- we never missed the morning meeting.    And it was a chance for military leadership, State Department leadership to sit down together and make sure that -- that in a formal, structured way we were sharing information that was happening on an ongoing -- informal basis throughout the day.

Q    And who are the participants of that?

A    It was always General Donahue, General Sullivan, some other members of the military leadership, the senior planner I mentioned before.    Lieutenant Colonel Hardman was usually there, I was usually there, Ambassador Bass, and Jim DeHart were almost always there.    Where possible, Ambassador Wilson and the acting deputy chief of mission would attend.    There may be other people based on certain --

Q    Who was the acting deputy chief of mission?

A    Scott Weinhold.    So the -- but because they weren't co-located with the military, they weren't always able to physically be there, but as much as possible they were there.    So it was kind of the senior State Department and military leadership in-person senior staff meeting.

Q    Were there other government agencies or entities represented despite -- you know, aside from the State Department and military/DOD?

A    Sometimes there were other participants, but I think that might be --

██████. Yeah, we don't go into that in this setting.

BY ██████:

Q    Intelligence community.    Okay.    And was there any readout for, you know, notes, SOCs produced of these meetings.

A    If they were produced, I didn't see them and didn't contribute to that.

Q    Okay.

██████. I think we are happy to stop here.

██████. I have some more questions.

BY ██████:

Q    You had mentioned that there were communications challenges at HKIA. What were those?

A    The systems were overloaded.    There were so many people trying to use both like the publicly available cellular networks, that making calls and texting was unbelievably difficult.    But then even with the information infrastructure that had been at place at NHKIA for the military operation there, when it became the hub of military operations for all of us, plus we had, you know, people like me, TDY-ers coming in and plugging into it, it really just kind of overloaded the system.    So it became very difficult for me.

There were -- there were people who really needed the communications stuff that we dedicated the bandwidth to.    The military commanders needed first secured communications.    Ambassador Bass and Dr. Wilson, right, did.    But for the rest of us it was irregular.

Q    And what limitations did that put on you, the communications challenges?

A    Well, then it made it harder for Washington to call me directly, which is why we kept an open line on this Teams chat, which was a much lower data demand signal,

but it worked.    We just had to work in a -- in a less expedient manner on the communications.    We had to find a workaround.

Q    Did it make it harder to communicate with people on the ground, the consular officers that you were working with?

A    Truthfully, I don't think so because of the area.    Like, for me who was -- I was most of the time in the job, although I did, you know, go out to some of the gates every day.    But for the most part, I was in the job trying to participate in these iterating planning sessions.

For the people who are out at the gates, it was so loud, and they were so focused on processing as many people as we possibly could.    I don't think a cell phone was a practical way of communication anyway.    So we relied on the radios and the in-person communication when we could have it.

BY ▮▮▮▮▮▮▮▮:

Q    One clarification with the battle rhythm meetings and the stair (ph) teams and who was represented there, was USAID represented?

A    There was a USAID officer who was at post who was there.    I don't recall them attending.

Q    Do you know who that was?

A    I'm very embarrassed to tell you I do not recall their name, but they were not a particularly senior officer.

▮▮▮▮▮▮▮▮.    This is the end of our first hour.    Would you like to take a brief break?

Ms. Howell.    Yes.

▮▮▮▮▮▮▮▮.    I imagined so.

We are off the record.

[Recess.]

▮▮▮▮▮▮▮.    We'll go ahead and get back on the record.

EXAMINATION

BY ▮▮▮▮▮▮▮ :

Q    My name is ▮▮▮▮    I am ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on the minority side.    So we'd like to start with thanking you so much for your service and for agreeing to appear today voluntarily.

To back it up a little bit, we had a couple of additional questions regarding the evacuation plan.    So if I understood your testimony correctly, you weren't disputing whether there was or was not a plan.    Is that correct?

A    Right, I don't know if there was or wasn't a plan.

Q    So, theoretically, there could have been a plan?

A    Sure.    I don't know.

Q    Okay.    But then you testified, once you arrived in Kabul, there was indeed a plan, perhaps it was communicated verbally.    Is that correct?

A    There was a planning process --

Q    Okay.

A    -- that was iterative, that was constant, that I was very much a participant in and witness to other people participating in.    But I did not observe a document from that.

Q    Right.    And so you had also testified that you took the job on the 17th, within a few hours got on an airplane, arrived in Doha on the 18th.    Is that correct?

A    That is correct, yes.

Q    So would it have been prudent to slow down that expedient process and draft a written plan?

A    For me, no.

Q    Do you feel that you were able to perform your job duties without a written plan?

A    Yes.

Q    Do you think it would have been a good use of your time on the ground to be iterating on a written plan?

A    Prior to my arrival or during the evacuation?

Q    During the evacuation itself.

A    No.    Because the situation changed so frequently and so completely, that by the time we would have produced a document, it would not have been relevant anymore.

Q    And, in fact, would you have been charged with drafting a plan?

A    By who?

Q    By your superiors?    Or were you focused on the operational component of the evacuation?

A    Yes.    There was never a task given to me to produce a document.    Yeah, we were very much focused on the execution of the operation.

Q    And I think you had testified that the situation was complex and evolving minute to minute.    Is that correct?

A    Yes.

Q    Do you feel that the guidance you were giving to your subordinates were changing in real time as a result of the complexity?

A    Yes.    That's why it was so important for us to have the standup meetings, because it was a chance to give them the latest information and explain why things were changing and shifting sometimes even during a shift that they were on.

Q    In your judgment, were the consular officers delivering or executing on those plans?

A    Yes.

Q    What informs that opinion?

A    172,000 people are safely out of Afghanistan.    I -- yes.    I thought that the work of the consular officers was absolutely heroic, and I never witnessed one give one ounce less of what they were humanly capable of doing.

Q    Did any of these consular officers express challenges they were having on the ground?

A    Yes, of course.    And that was my job, to help solve some of those challenges or use some of that feedback to work on developing a more effective process or a more secure process.    So they would provide feedback about what was happening in a certain location, what was working well, what could work better, and that was why it was important to also have the out-brief meeting at the end of every shift to kind of receive that and plug it into the ongoing planning process.

Q    Okay.    And do you feel that your subordinates felt empowered to come to you with these challenges in real time?

A    I hope so very much.    That was my experience.    I did get a lot of feedback in real time.    And it is my hope that they felt empowered too.    I judge that based on the amount of feedback I got, which was significant.

Q    And the feedback in terms of your overall effectiveness or the feedback in terms of what was going on on the ground?

A    I would say the feedback on both, right.    Like, I feel like the consular officers provided feedback about -- usually along the lines of we are so happy we are able to do this; if we did this, we could do even more.

Q    Okay.

BY ▮▮▮▮▮▮▮:

Q    I just had a few quick followups to your earlier testimony.    You testified, I believe, that you volunteered on August 17th for this TDY.    Is that correct?

A    I don't remember if I sent the email on the 16th or the 17th, but I remember, at opening of business in Washington on the 17th, I got an email saying go, and I got a plane ticket and went.

Q    Okay.    And had you received an email previously that was seeking volunteers?

A    There had been a call for volunteers, I believe, the prior week, and I had volunteered.    And I had not received a response to that.    And then they sent a second one, and I volunteered again, and that was when they told me to go.

Q    Do you remember the dates, approximately, of those emails that were calling for volunteers?

A    I know the second one was no earlier than the 16th.    It may have even been on the 17th.    It's in that window.    The one was maybe 2 days prior.    The first one, I can't remember exactly.

Q    Okay.    Have you done other TDYs during your time at the Department?

A    Many.    TDY for evacuations or --

Q    Generally.

A    Just TDYs?    Yes, I have done many TDYs.

Q    Is it usual that you would have -- that you would volunteer for a TDY and depart the next day?

A    No.    That is a very short timeline.    I mean, it depends on the nature of the assignment, like, and what the level of crisis is.    But that was pretty fast.

Q    Is it fair to say that it's suggested that the situation was dynamic?

A    Yes.    I think --

Q    That the TDY proceeded on --

A    Yes.    I felt and it was clear that the bureau leaders also felt that it was -- that every minute counted.

Q    And you testified earlier that your knowledge of what was going on in Kabul in the days prior to your arrival there had been informed by media reports, correct?

A    Yes.

Q    And can you describe what those reports were that you were seeing?

A    Well, I remember seeing the video on TV that so many people saw of the crush of humans fleeing the Taliban toward the airport and the, you know, kind of airport passenger terminal being unable to respond to that, and people coming onto the tarmac. It was heartbreaking.

Q    And those media reports, is it fair to say they also informed your opinion that the situation was dynamic?

A    Yes, that is fair.

Q    And that events were unfolding rapidly?

A    Yes, that is fair.

BY ███████████ :

Q    One more follow-up question.    Why did you decide to volunteer?

A    It's such a hard question to answer.    I felt I was qualified, having had two prior assignments in Afghanistan.    I have supported other NEOs, and so I felt like I had not just regional knowledge, but also substantive knowledge of this kind of function, including a full NEO training operation at Camp Lejeune with the Marines.    So I felt like I had a unique skill set that would allow me to contribute very directly.

But in addition to that, I felt a great deal of personal conviction about the importance of the mission, given my own experience serving twice prior in Afghanistan.

Q    So you had earlier testified you've been in Afghanistan before, in 2004, 2011, and then in 2021 for the evacuation itself.

A    Right.

Q    If you could quantify it a little bit, what percentage of your career has focused on Afghanistan and its people?

A    Well, the two full assignments that I served in Afghanistan are each 1-year assignments, but both came with significant training, including a year of Dari language training.   So 4 years out of 25.

Q    Okay.   And given your language training and your general background, is it fair to say you'd be an expert in Afghanistan policy?

A    I will always balk at referring to myself as an expert on anything, but I would definitely say I have significant experience on consular operations in Afghanistan.

Q    Okay.   And I believe you testified that your experience contributed to the effectiveness and success -- or at least your perceived ability to go into the evacuation in a successful manner?

A    I do believe it contributed to my ability to get up and running quickly and to understand the operating environment and be effective in it.

Q    What experience do you have in the region more broadly?

A    In the region, I've only served twice in the two tours in Afghanistan.   I've also served twice in Turkiye, which is on the margins of the region.   But the Turks were, at the time, in control of NHKIA, and I felt that my knowledge there could also be helpful in working with our partners on the ground.

Q    Right.   And you also testified that you have language skills as well?

A    Yes.

Q    Okay.    And can you describe your experience related to the consular function of State?

A    I have been a consular officer.    This is my 25th year.    And in 25 years of State Department service, I believe I have served three or four outside the Bureau of Consular Affairs.    So 20 years of consular experience.

Q    And so is it true that you would have significant experience working with American citizens, or AMCITS?

A    Yes.

Q    What about with refugees?

A    I have worked less directly with refugees.    So I do not have significant experience managing a refugee program.    That's usually the purview of Bureau of Population, Refugees, and Migration.

Q    Okay.    And what about Afghans in particular?

A    Well, I've done two full assignments in Afghanistan, including serving from 2011 to 2012 as the consular section chief in Kabul.

Q    Okay.    Would you characterize yourself as an expert -- or to have significant experience related to consular affairs?

A    Yes.

Q    Okay.    Have you ever participated in a crisis-related task force at State?

A    Yes.

Q    Could you describe for us what those entailed?

A    The first task force I served on was during the Rambouillet process on Kosovo.    I've served on the task force responding to the triple crisis in Japan following the tsunami.    I have -- gosh, I've done other ones.    Multiple times.    Those are the two

I remember, but I have done at least one or two others.    Unfortunately, periodically, we have enough crises and we all volunteer to go and work on it -- or most of us volunteer to go and work on the task force.

Q    And so in what capacities was your service?    Was it consular related?

A    Yeah, always as a volunteer on the consular task force.    It was not part of my assignment, but it was always a volunteer in addition to my posting.

Q    And have you ever served in a conflict zone?

A    Other than Afghanistan?    No.

BY █████████ :

Q    Have you served at other hardship posts?

A    Yes.

Q    Can you describe some of those postings?

A    I have been posted in -- would it be useful just to list my postings overseas? I've been assigned to -- in addition to two tours in Afghanistan and two tours in Turkiye, I've also served in Tanzania, Zimbabwe, and Ghana, as well as a supervisory regional consular officer where I provided oversight and support to the 89 smallest and most at-risk consular missions in the world and traveled to many of them.

BY █████████ :

Q    And have you ever worked in a complex evacuation situation like this one?

A    Yes.    I was a consular manager during the evacuation of Haiti following the earthquakes there.

Q    In what capacity?

A    I was one of the volunteer TDY-ers who flew in as a manager.    So a team lead.

Q    Okay.    Is it fair to say that you have significant experience related to crises

and evacuations?

A    Yes, I do feel comfortable saying that I have significant experience related to crisis.

Q    Okay.    Are you aware of a Afghanistan task force?

A    I am aware that there was an Afghanistan task force.

Q    Can you describe your understanding of it?

A    To be honest, because our focus was very much on what was happening on the ground and providing feedback to the task force, I could not explain in great detail what was happening.    What I do remember being told in our communications with consular personnel in Washington was that the response on the task force was so large that there were several task force.    Several -- I remember, normally, we have in a crisis, you will have at least two.    You'll have task force 1, which is kind of managing the operations or the policy decisions or kind of overall.    And then a task force 2, which is related very specifically to American citizens who may be impacted by such a crisis.

In my experience with a lot of prior crises, two task force is the number.    When I was on the ground in Kabul, even though I was not focused on that, they kept sending updates to us, and they had gotten up to at least five.    And I believe they had more at one point, because the size of the response on the task force was so large.    So that's why I stopped trying to understand the complexity of that operation and asked for a single point of contact to just provide feedback to one person, and then let them diffuse the information as appropriate.

████.    And that single point of contact was someone on task force 2, the consular --

Ms. Howell.    I believe it was.    I don't want to speak authoritatively, but in my mind, I was talking to task force 2, the consular task force and operations center.    I'm

not sure which number it was.

BY [REDACTED]:

Q   Okay.   I want to touch upon briefly the individuals that reported to you.   I believe you testified there were about 30?

A   Yes.

Q   Okay.   Have you managed a team of 30 before?

A   Yes.

Q   How many times?

A   Several.   My last team, I supervised 72 people.   The job before that was over 30 when I was the consular section chief in Ghana.   My job prior to that, I supervised 130 people.   So I'm comfortable leading large teams.

Q   Okay.   And you had testified that you didn't necessarily select these subordinates.   Is that correct?

A   No.

Q   But given your experience managing large teams, did you feel qualified to work with these individuals?

A   Yes, I felt qualified to lead a consular team.

Q   Great.   And I want to talk a little bit about Ms. Akres, your deputy.   Had you worked together prior?

A   Yes.   Jean and I had worked together in three other assignments.

Q   Could you talk a little bit about her working style?

A   Rock solid.   Jean is extremely organized, extremely efficient, a clear communicator, and a person of great integrity.

Q   Is it fair to say she's an effective leader?

A   One of the best that I've ever worked with.

Q   Skilled?

A   Extremely.

Q   And hardworking?

A   Very.

Q   Okay.   And these individuals who were consular officers on the ground, were all of them consular officers by way of background?

A   They all had consular experience.

Q   Okay.

A   I do not know if they were all, what we say, consular cones.   I do not know if that is their full career path.   But I knew every -- I know everyone had some consular experience.

Q   Okay.   And how did you find the group of 30 to be in terms of character when you arrived?

A   Because every one of them was a volunteer, I found that they were very invested in the success of the mission and reaching out and protecting as many Americans and Afghan partners as possible.   So in my experience of their character, it was just a resolute and absolute commitment to the mission.   I did not have the time to chitchat or get to know them.   Quite frankly, a lot of people.   My only observation of most of them was are they doing the job and how are they doing the job.   And I was extremely impressed.

Q   Okay.   How long were their shifts?

A   Twelve hours.

Q   Okay.   And then after their shift, did they have time to sleep or eat or --

A   Yes.   The consular officers were billeted at the KAC, where we did have some, like, actual bedrooms and showers, and there was still a food facility.   Jean and I

stayed full time at the NHKIA so that we could make sure there was always -- you know, there wasn't ever a gap in oversight between the travel times.    But the rest of them would go back there, be able to sleep at least, usually get a hot meal, hopefully take a shower, and be ready to be fresh for the next day.

Q    Okay.    And I'd like to talk a little bit about your experience and the environment on the ground.    I can either walk you through it or if it is better for you to provide a narrative response in terms of kind of what your main priorities were on the day to day.

A    Okay.

Q    Do you have a preference on which route?

A    Sure.    Questions.

Q    Sure.    Questions.    Okay.    So you reach Kabul, and that was on the 19th.

A    I believe that was right, yes.

Q    What happened when you arrived?

A    One of the consular officers who had gone on an earlier flight met me. They knew we were in the air, and walked us to the JOC --

Q    Okay.

A    -- where I met the consular officers who were on shift.    It was the night I arrived.    I think around 7 p.m. was a night shift.    Was relatively early in the shift. They basically got us to kind of drop what bags we had, got us put into our body armor, did a quick orientation for the other TDY-ers who arrived, and then we immediately deployed out to the sites where we were working and started to kind of pitch in immediately.

For me, because there was an expectation that I would be in a management role, they took me to several of the locations to get kind of the bigger picture.    But I did do a

shift or several hours of a shift working at the passenger terminal.    And then as soon as the sun came up and they did the morning transfer back to KAC, I went with that shift so that I could meet embassy leadership.

Q    Okay.    So you mentioned there was a shift.    Is it correct that the consular team was working 24 hours?

A    Yes.

Q    Okay.

A    The consular team was working 24 hours.

Q    And is that typical?

A    When we're trained for crisis, one of the foundations is that we plan for -- especially if we believe a crisis is going to have some length to it, that we establish shifts so that we can maintain the personnel to be able to be functional for as long as possible.    Usually there are shifts.    It is not always 24 hours.

Q    Okay.

BY ███████ :

Q    So to clarify what you just testified to, when you landed in Kabul, how many minutes or hours lapsed before you were onsite observing consular activities?

A    Very few minutes.    I mean, we walked in, probably had some water, got a very quick briefing on these are the groups of people, this is how we're evaluating, this is where the operations are, and then all of the TDY-ers were immediately sent out with other consular officers who had been on the ground who were kind of training them in real time.    And I went, I don't know, less than an hour before we went out to the first site.

Q    Okay.    And how many hours until you took your first change of shift where you were no longer technically working?

A     Me, personally?    I did not -- I worked three shifts before I took a break. So --

Q     Three 12-hour shifts?

A     Yeah.    So -- because we worked overnight.    Then I worked the day, then I worked the night again.    Then the day again, then that night.    So how many hours is that?

Q     Thirty-six?

A     Is that something -- yeah.    Yeah.

Q     So your testimony is that, in less than an hour after reaching Kabul, you started working, and you worked for the next consecutive 36 hours?

A     Yes.

BY ▮▮▮▮▮▮▮▮▮ :

Q     Do you find that to be understandable given the sudden fall of Kabul?

A     I'm sorry, I don't fully understand the question.    Like --

Q     So you were working 36 hours.    You're immediately pushed into your position.    There were consular officers on the ground working 24 hours.

A     Yeah.

Q     Is that understandable given the urgency and need to start processing folks?

A     I did that -- yes.    Yes, I felt it was useful.    I did that because I felt the urgency, the need, and the need to put structure in place and iterate from the immediate kind of temporary structure and organization that had been put in place when the center of operations had moved from the embassy to the airport.    They were in that crisis and unable to step back.    As a TDY-er coming in fresh, I felt that it was important to invest the time to think about putting structure in place to scale up so that we could ingest more people in a safer and more structured way.

Q    Okay.

A    Did I answer your question?

Q    Kind of.    I think what I'm trying to get at is, you had earlier testified that things were minute to minute.    It was complex, it was fluid --

A    Yes.

Q    -- is my understanding, correct?

A    Yes, that is correct.

Q    So what really underpinned that minute-to-minute fluidity?

A    So that's a different question than how many hours I was working on a shift. But the question of what underpinned the fluidity; primarily, the main constraint, at least, especially in the early days, was how, from a very large crowd of people that were very desperate that we -- that -- and quite frankly, that that perimeter -- the first line of perimeter was provided by the Taliban, who are -- I will not use adjectives to characterize their partnership, but inconsistent partners, let's call them, right.    So how to get people safely, many of whom have a -- are coming to us because they have a fear of the Taliban, how to move them safely through the Taliban, and then to provide a safe and controlled way to identify from that crowd the travelers that we were seeking to assist to access the compound without losing the ability to provide a secure perimeter that would put everyone at imminent risk.

And that is where, together with the military partners, we had to invest so much time constantly trying new ways to do that.    Constantly saying, okay, what if we did this, what if we did that.    Or if something worked or failed, we would, you know, shift or iterate based on the changing conditions.

But the main focus at first was the mad rush of people towards us doesn't seem to be working.    We have to put a new process in place that is controlled.

Does that answer -- is that a better answer?

Q    Kind of.    I still think I'm -- the question I'm trying to ask is, what were the reasons for the sudden surge in crowds?

A    Well, that happened prior to my arrival.    Fear of the Taliban, right, is, you know, the most elemental answer.    And people felt the sense of desperation, that if they weren't on the compound with us, they weren't sure what was going to happen.

Q    And is it your understanding that Kabul fell on August 15th?

A    From media reports, yes.

Q    And you arrived on the 17th?

A    I departed Turkiye on the 17th.    I arrived --

Q    And you arrived on the 19th?

A    -- on the 19th.

Q    All right.    Okay.    What were some of the most significant challenges posed by these large crowds, upon your initial arrival?

A    I mean, the main one was always the stampede; that if there was not appropriate crowd control in place, that people were being crushed or pushed up against the walls.    But then, in addition to the just mechanics of the large number of people and the risk of crushing, there was violence within the crowd.    The Taliban periodically would start, either at the very minimum, beating people with sticks, and in the worst cases, they were using live bullets and shooting at people in the crowd if they felt that the crowd was out of control.    So it could be very violent in the crowd as well.

Q    What were some of the tools that you deployed upon arrival to address that?

A    So I want to be very clear that the U.S. military was in charge of crowd control, not me or the Department of State.    And so what my role was to kind of

understand from them where they saw the risks and see if there were ways that we could mitigate some of those risks by creating different ways and avenues for Americans and our partners to access the compound.    And so we looked at, instead of having just the three or four -- I can't remember the exact number, I'm sorry -- main gates that the evacuation had been using to access the compound initially, kind of public gates, to use the massive perimeter that we had and other access points to the compound to spread some of the populations in the crowd where we could bring them in safely in different ways, and allow us to be more targeted in getting our priority population.

Q    So is it fair to say you were coordinating pretty closely with military on the ground?

A    For me it was absolute lockstep.

Q    Okay.

BY ▇▇▇▇▇▇▇ :

Q    And in terms of your physical proximity to those military members that you were coordinating with, are we correct in understanding, your testimony was that they were responsible for the perimeter at the gates to HKIA --

A    Yes.

Q    -- and physically you and other consular officers were aware?

A    So, initially, there was -- maybe the best way to explain this is kind of a hub and spoke.    So, initially, there were these -- the gates, the ones we kind of remember from TV, the access gates with the crowds.    And the Marines in those gates would have the responsibility for the security of the perimeter.    Actually, the Taliban had the first security perimeter, and then the Marines were guarding like the physical gates.    And sometimes there were other NATO allies who had a role in that.    But, really, the American military was clearly in control of the access to that.

And then we would have the consular officers, when those gates were open, when the military said it was safe to process there, we would have the consular officers just behind that.   And the military was determining, like, how people came on, and it varied even from shift to shift with -- you know, as the conditions were.   And then the consular officers would be there providing kind of subject-matter expertise about potential admissibility to the United States or eligibility for evacuation.

But then, once those groups were kind of vetted at the gates, accessed by the military, and then like triaged by us, then they were brought to the passenger terminal, where the Marines had their manifesting software and terminal kind of set up.   And then we were also, again, providing consular support to that piece, talking again to every person, trying to determine whether or not we thought they were potentially boardable on the flights.   Once they got the final kind of thumbs up or down from us, the Marines would manifest them, hold them in a passenger terminal, and then board them for the next available flight.

So there were consular officers wherever the Marines -- and then later, it became not just those gates, because we started being able to be creative -- creating and using other access points.   We would discuss this in like the standup meeting or the -- what did we call -- battle rhythm meeting -- the battle rhythm meetings or just in our constant conversation throughout the day, we would move them.   But then, even if people came on in some other way or had missed a consular officer at a gate, they were always seen by a consular officer at the passenger terminal.

Q     Okay.   And I think we'd like to get into some of the more creative efforts you described later.   But just to clarify here, generally speaking, consular officers were within a few feet of Marines at the gate --

A     Yes.

Q    -- interacting with them on a regular basis?

A    Yes.

Q    And similarly, because consular officers were otherwise stationed in the passenger terminal --

A    Yes.

Q    -- again, a few feet from Marines?

A    Yes.    Together -- together working.    Yeah, they were very much -- in my experience, a very much integrated team.

███████████.    That was a really helpful narrative in terms of the enmeshment between both parties.

Who was your U.S. military point of contact?

Ms. Howell.    We had a couple, because there were different groups of the U.S. military that were there.    We were co-located with the Marine JOC.    My -- I call it -- an office is a very strong word.    It was like a particle board roofless cubicle was directly adjacent to General Sullivan -- we shared a wall -- and his chief of staff, aide de camp directly outside my door.    So we were --

███████████.    For the record, the witness is making air quotes.

Ms. Howell.    Yes.    But we called it the State Department liaison office.    So we very, very much in constant communication.    And then for the 82nd Airborne, my primary point of contact was General Sullivan and his immediate team.

BY ███████████:

Q    Okay.

A    But like us, they were on shifts.    So there was a group of commanders with both the Marines and the 82nd.    There was also the Air Force command, which was co-located in the JOC.    And so we had -- there were a group of people that rotated.

Q    What percentage of your day did you spend coordinating with the military?

A    Ninety-five.

Q    Okay.    And so is it fair to say you were in communication with them regarding operations outside of the daily standup meetings?

A    What I did was communicate with the military.    We could not act without the military.    In such an environment that the first piece that has to be in place is the security of the operation, because without that, nothing happens, right, then we all have to leave.    So I couldn't make any decision.    Any idea that we had was like vetted and fleshed out and tested together with the military.    But it was not possible for us to do almost anything without the partnership of the military.

Q    Is it fair to characterize your relationship with the military as collaborative?

A    From my perspective, deeply.    Yes.

Q    And did you feel that when you suggested a change of course, the military was responsive to that?

A    Yes.

Q    And vice versa?

A    Yes.    I mean, it was a very stressful environment.    Like, everyone was sleep deprived and food deprived and cranky and scared.    But I did feel very much that if we had an idea and went to them, they would say, okay, fine, we'll try it, or we won't, you know, and this is why, and vice versa.    Some of the best ideas came from a military officer walking into my little cubicle and saying, I have this idea, what do you think?    And it's, oh, okay, here's a way the concert piece of that might work or not work, and we would figure it out together.

Q    Okay.    Is it fair to say that a lot of what you were doing was problem-solving?

A     Yes, we did a lot of problem-solving.

Q     Was it effective?

A     The metric I have for that is the number of people that are safely out of Afghanistan that were seeking to depart.   I believe that -- I'm deeply proud of that number.   I wish it could have been more.

BY [redacted]:

Q     Just to quickly unpack further something you just testified to.   You said that we needed the military, we the State conflict contingent.   Can you explain a little bit more why you needed them in order to do their -- in order to do your consular operations?   What function were they providing that was critical for you that you couldn't have otherwise done for yourself?

A     Thank you.   Sure.   I will try.   Like, there were 34 of us, and there were like tens of thousands of soldiers and Marines around the perimeter, at least at the beginning, and then slowly started retrograding.   Because the primary constraint to access the people that wanted to travel was the perimeter and the security, the Marines or the 82nd, depending on where you were on that perimeter, they were providing the security.   It was foundational to everything.   They were doing the crowd control. They were keeping the Taliban in check.   They were -- and ensuring that people could -- that people that did access the compound were not at risk to the other people already on the compound or to us.

So the -- anything that -- because what we were trying to do is get people on the compound, and they were in control of that.   There was nothing that the small -- the group of 34 consular officers could possibly do that didn't involve having the Marines or the 82nd Airborne assess whether it was safe, assess whether it put the mission at risk, and then whether or not they had the resources available to provide the crowd control

that was absolutely mandatory in everything we did to, like, make it happen.

And the constraint -- the constraint wasn't us.    Like, we couldn't -- it would have made no sense to put consular officers outside, right.    Like, it had to be how to get people on.    And that was the key piece of the entire thing, and that was what the military did.

███████.    And in your prior experience that you testified to, I think at least 20 years of your Department career spent performing consular duties, was this situation where you were working shoulder to shoulder with U.S. military, with tens of thousands of people pressing in a few feet away from you, was that unusual?

Ms. Howell.    It was unprecedented in my career.

BY ███████:

Q     Do you feel that you were getting the support you needed from superiors to execute on the directives?

A     From State Department superiors?

Q     Uh-huh.

A     Yes, I do feel.    Yeah.

Q     And to what extent were you interacting with Afghans on the ground?

A     The only Afghans I interacted with on the ground were either Afghans who were part of our team, you know, Afghan interpreters, or employees of the military or State Department or other government partners on the ground or the travelers themselves.    But I did not interact with anyone from, like, the Taliban government.

Q     Okay.    And before, we were talking a little bit about your day of arrival. After your initial day on the ground, could you tell us what a typical day during the evacuation looked like?

A     A typical day is very difficult to describe.    Every day was very fluid.    But,

okay, so I'll try to answer your question in good faith.

So, like, I was the day shift leader, which was 6 a.m. to 6 p.m.    But I usually was in the office by 4 a.m. to make sure that I could get a readout from the team that had been on overnight, learn any updates in terms of any information that had changed situationally, feedback from the teams about what had happened at the gates, any feedback from Washington that had come in.    And so then we would have the hand-over meetings.    We'd make the assignments for the consular officers for the shift coming in, brief them, get them out to their -- the places that they were assigned for their shift.

Then we would have the battle rhythm meetings where we would sit down and -- actually, I want to be -- I'm not actually sure.    I cannot remember if the battle rhythm meeting was before or after the shift.    It was early.    It was somewhere in the neighborhood of 6:00.    And then we would get the feedback from the military commanders, the other parts of the State Department mission, and we would discuss any coordination that needed to happen.    And then it would go back to the liaison office. And usually there was a line of military or NATO allies outside that had questions or, you know, needed feedback, and we would just kind of triage whatever came in.

And as we got toward the end of the shift, we would again kind of make sure we had the latest; prepare assignments for the incoming staff, do the handover, do the outbrief.    And then my colleague, Ms. Akres, would take over for the night shift.    She would provide the role of staying in the office.    And then I would usually go with whatever group of people, military -- and I haven't mentioned my security colleagues who were with us the entire time, and we would try to evaluate any ideas we had for what we could try next, right.    Because we were always trying to stay ahead of whatever next problem was going to happen.

So quite often we would go out to different parts of the compound and evaluate whether or not we thought we could safely bring in Americans or our partners in a different way, until about midnight or 2:00, and then I would try to take a shower and sleep, and then go back at 4:00.

Q    So I don't want to quiet your earlier testimony, which was that there wasn't, in fact, a typical day.    Is it fair to characterize that there was a typical structure to the day, but the content that underlies that structure changed day to day?

A    That was actually extremely eloquent and much better.    Yes.    So I think that is fair.    Yes.    Yeah.

Q    Okay.    So is it fair to say there was, in effect, a plan, a rhythm that you were following?

A    Yeah.    And that was the goal that we had as the TDY-ers coming in, was to put the structure in place to make sure that the shifts held, that we maintained the efficacy of the consular officers as long as possible, and that together with the military, we put as much process in place as we possibly could to be efficient.    That was our job.

Q    And so it sounds like there was a specified part of each day where you contemplated challenges and thought through solutions to deploy the following day.    Is that correct.

A    Yes, it is.    And, in fact, it was the focus of every day, was, we know this is changing, how do we try to do more than keep up with it, how do we try to stay ahead of it.

Q    Okay.    Which responsibility took the bulk of your time while you were on the ground?

A    Coordinating with the military.    I think I -- that was probably, for me as the team lead on the NHKIA side, that was my main responsibility.    But that was only very

shortly by are we taking care of the people, the consular officers themselves, to make sure that they don't burn out, right, that we can keep them going safely.

Q    Okay.    I think you earlier testified that about 95 percent of your time was spent out coordinating with the military.    Is that correct?

A    It's what I did all day.

Q    Okay.    Would this percentage have been the same for your deputy?

A    Slightly lower.    She definitely did, right, certainly because she was on shift at times when I was not.

Q    Okay.

A    So, you know, there was -- I would say maybe 85 percent of her time was coordinating with the military, because a lot of the biggest decisions I would be a part of. But she was certainly empowered to act if I, for some reason, wasn't reachable.

Q    Okay.    And so you said the second priority or percentage of your time was related to taking care of the consular officers?

A    But I would like to correct my answer on this.

Q    Okay.

A    That is like the how I spent my time.    But all of those functions were unreservedly aimed at how do we safely and securely move more Americans, family members, and people seeking our protection safely out of Afghanistan.    That is why I was doing those things constantly.

Q    When was your official departure from Kabul?

A    I left at about 11 a.m. on the morning of August 30th.

Q    Okay.    And did you continue any of your job duties related to the evacuation post-departure from Kabul?

A    Yeah.    I went back to being the minister counselor for Consular Affairs in

Turkiye.

Q    Okay.    Did you produce any type of final report due to your experiences on the ground?

A    Personally, no.    I did contribute to -- I was interviewed by the AAR team. There was also a consular lessons learned interview, and I participated in both of those. But I didn't personally produce a document.

Q    And what's your impression of how your specific duties were carried out on the ground?

A    Can you be more specific with the question?

Q    If you had to rate yourself on 1 to 10, what was your success level in terms of effectiveness on the ground?

A    I have never done anything that I care more about than the evacuation of Afghanistan.    And I am so proud of all that we accomplished, but I will always wonder if I could have done it better, right.    Like -- because I take it so seriously.    Like, I -- I feel like I'm supposed to say something, but all I can do is be honest with you, which is I am so proud and at the same time I will never think it was good enough.

Q    You certainly don't need to apologize.    And I will just say, from what you've testified here today, it sounds like an incredible job was done.    We're really grateful for your effort then and for all of the folks that were safely evacuated from a really troubling situation.

            BY ██████████

Q    Would you like us to stop the clock?    Do you need a minute?

A    It's okay.

Q    I just have a few more questions, and we'll try to move quickly through them.    I just want to make sure we're clear on things before we end the round.    But,

please, if you do need any time, we're happy to give you that.

So you explained to my colleague what you described as how you spend your time --

A    Right.

Q    -- ninety-five percent communicating with military.    That the second largest portion of your time related to taking care of your team.    But you testified that all of that was serving the mission to move as many people as you could as -- to safety.    Is that correct?

A    Yes.

Q    And who gave you that mission?

A    I mean, fundamentally, what a NEO is, right?    So that was explicit, I think, in the task.    But the specific categories of people that were eligible for this NEO -- thank you -- was briefed to me on arrival by both Greg Floyd in my meeting with him and from Ambassador Bass.

Q    And did you have a sense that they had received that mission from their superiors?

A    Yes, I did.    Yeah, very much so.

Q    And did you attribute that mission or that directive ultimately going all the way up to the President?

A    Yes, I did.    I remember being told that the categories of people included in the NEO had been approved by the President.

Q    So that gave you the sense that the mission was clear --

A    Yes.

Q    -- and was coming directly through the chain of command from the Commander in Chief?

███. I do think we need to be a bit careful here to make sure we're not walking into a territory that may implicate executive branch confidentiality.

Ms. Howell.    Okay.    Thank you, Molly.

BY ███:

Q    I'm happy to keep going.    I think I'll just close with, was the mission clear to you?

A    I felt the mission was clear.

Q    Okay.    I think some of my colleagues may get into this in more detail, but I just want to touch on it here.    Are you aware of criticisms that have been launched about the performance of consular officers during the withdrawal?

A    Can you be more specific?

Q    Specifically, are you aware of any public criticisms from individuals also present for the NEO who claim that consular officers were not performing to the level that they should have been?

A    I am aware that there -- I am aware of some media reports about criticism like this, but I -- yeah, I'm aware.

Q    What's your response to those sorts of criticisms?

A    Well, it's a very vague thing to respond to.

Q    Fair enough.

A    Yeah.    I mean --

BY ███:

Q    If I could just ask, so you had earlier testified that consular officers were in real time sharing with you feedback, challenges, et cetera.    Is that correct?

A    As they were able to, yes.

Q    And did you feel that you responded to those challenges that were raised to

you?

A      Yes.   I think that was the -- that was -- yes.   Yes, I do think that we were responding as quickly as we could to real-time criticisms or opportunities to improve.

Q      Do you feel that that -- do you feel that if there was discontent from the consular officers, that you would have been aware of it?

A      I would say that they -- the Consular Affairs didn't agree with every decision that we made, and they told me that in real time.   So, yes, I would know that.   Yeah.

BY ▇▇▇▇▇▇ :

Q      The last question I had, you're probably going to hate it, but I'm going to ask it anyway just because we forgot to earlier.   When we were establishing some of your experience with respect to Afghanistan, with respect to consular duties, with respect to crisis work, I forgot to ask you, have you received Department awards for your service?

A      I have received Department awards for my service.

Q      Can you describe for us some of those awards?

A      Specific to Afghanistan?

Q      Broadly.

A      I have received I believe it is seven individual superior honor awards, several group superior honor awards.   I'm not sure how many.   I've received the Department's Luther Replogle Award for Management, Innovation, and Excellence.   And I have received Secretary's Award for Heroism.

Q      Thank you.

▇▇▇▇▇▇ .   That concludes our round.   Thank you.

[Recess.]

[1:04 p.m.

████████████. The time is 1:04, and we're back on the record.

EXAMINATION

BY ████████████:

Q    Mr. Howell, you previously testified that when you arrived in Kabul you had an hour-long briefing and then proceeded to get right to work.

Do you recall who that briefing was with?

A    I just want to be -- thank you.

I want to be really clear about that.    I said it was about an hour from when I landed before I went out and started visiting some of the sites where the processing was happening.    It wasn't -- the full time wasn't necessarily just a briefing.

Q    Okay.

A    The consular shift lead on duty was who I checked in with and started the orientation and then took me out on the tour to the locations.    And I'm sorry to tell you that I don't recall his name.

Q    That's okay.

Do you recall sort of the substance of that briefing?    And can you --

A    Yeah.    It started from, you know, these are the categories of travelers that are included in the NEO authorization, and this is how we are assessing that, and then even just the basics of, you know, here's the map of the airport facility, here's where different operations are happening.

And then he walked me over to the passenger terminal.    I remember the first thing I observed was the passenger terminal operations, the manifesting, and then we went out to one of the gates.    I think it was North Gate.    I am not exactly sure, but it

was one of the gates, to see the way the operations were happening at the gates.

And then we came back to the JOC, and he was talking to me about how they were assigning officers and just the management of the operation.

Q    Did they communicate sort of the magnitude of the evacuation at that point in time?

A    In what sense?

Q    In terms of how many people would need to be evacuated in the NEO?

A    Yes, although I think the number of how many people would need to be evacuated would be difficult to define.    But the fact that we were planning for a very large evacuation was evident from the breadth of the categories of people that qualified for the evacuation.

Q    Okay.    Do you recall the approximate number that they provided?

A    I don't believe a number was discussed.

Q    Okay.    Just that it would be a large scale?

A    Yeah.

Q    Okay.    So backtracking a bit further, the call before arriving in Kabul, were you told that the situation was chaotic or a word like chaotic?

A    Yeah.    I don't recall the exact adjectives but, yes, that it was maybe unprecedented in -- at least certainly within this generation, right, that the scale of it was going to be large and something that our government hasn't done in recent memory.

Q    Okay.    Were you given details about the airport being overrun by crowds?

A    I was not.

Q    And you previously stated that you referred to the State Department's FAM, or Foreign Affairs Manual, for guidance.    Did the FAM contemplate evacuation of this magnitude or of any magnitude?

A    Well, I think just kind of the building blocks about how to do a NEO, and then I think the idea is that then you scale to the situation, whether it's a small group or a big group.    But, no, it doesn't explicitly address how to do every scenario.

I think one thing I've learned in a lot of years of consular work is that the specific thing you plan for is never the actual thing that happens.    So most of the guidance focuses on the way things should be done instead of what specifically should be done, if that makes sense.

Q    Uh-huh.

A    Okay.

Q    In your opinion, do you think that the FAM could have properly accounted for, you know, the 120,000-plus people and the airport being surrounded by terrorist groups?

A    I felt that -- for me, the pieces of information I needed to adapt to those kind of unprecedented scenarios that you're describing, I felt like I did have them, right, because the core functions remain the same.    You just do more of them.

Q    And you previously testified that there were discussions about extending the departure date.    And please feel free to correct me if I'm misstating anything.    Who among the leaders of the HKIA wanted to extend that date?

A    I wasn't privy to that level of detail.

Q    Okay.

A    I'm not even sure it was the leadership at HKIA that wanted to extend the date.    I just know there was a discussion about it that was happening between the State Department and military leaders on the ground and leaders in Washington.    But who and who had which position, I was not privy to.

Q    Okay.    And backtracking further to our earlier conversation, you stated that

you had seen a version of the Joint Publication 3-50 at Camp Lejeune.

Do you recall what year that was?

A    I knew you were going to ask me that.    I am going to guesstimate the window because I know what position I was in during that time, so it had to be between 2008 and 2010.

██████.    One other question.

Do you remember the name of the management counselor that you referred to earlier?

Ms. Howell.    The TDY management officer --

██████.    Yes.

Ms. Howell.    -- who came to post?

██████.    Yes.

Ms. Howell.    His first name is ██████    I believe his last name is ██████, but that might be wrong.

BY ██████:

Q    So I know you touched upon this earlier, but how would you distinguish your responsibilities versus Greg Floyd's?

A    Well, I had one task, which was overseeing the specific management of the NEO function that was happening.    Greg continued to be the consular section chief responsible for services to American citizens more broadly, not just this specific evacuation, as well as, you know, the other general scope of consular operations to include support to Ambassador Wilson and providing kind of overall communications back to Washington.

Q    What was the scope of your decision-making authority?    How much latitude did you have in making operational decisions?

A    I had a good deal of latitude in making the operational decisions in terms of where consular officers would be assigned, what information would be given to them to train them, but the decision -- the ultimate decision about their safety and security, certainly the RSO, who there was always an RSO with us, had a big voice in that, and we obviously were very respectful of their role in that.    And then ultimately, Ambassador Bass -- or Ambassador Wilson through Ambassador Bass -- maybe that was the best way to describe it -- had the ultimate responsibility for things like approval of a MASCOT Message, or anything that I would use in a normal embassy that I would send up to the front office to a deputy chief of the mission or an ambassador, that was usually given to me via Ambassador Bass or from Greg from Ambassador Wilson.

Q    Did you have any sort of role or, I guess, authority in sort of the strategic decision-making, the broader strategic decision-making?

A    Can you give me an example?

Q    I guess in terms of sort of, you know, what identification documents would be accepted, you know, which evacuees, which populations would be let in at any given point in time, et cetera.

A    Okay.    So I -- the things you just described, I wouldn't have categorized as strategic decision-making.

Q    Okay.    That's helpful.

A    To me that's very operational.

Q    All right.

A    Yes, I had a lot of authority in responding to those types of questions because one of my roles was making sure that the consular officers who were making decisions about boardability and potential admissibility had the best information and training that we could provide in that environment to make those decisions.

And because many of the evacuees, or potential evacuees were documentless, mainly because they were fearful of showing them to the Taliban that they had to get past to get to us, that we really relied on things like interviewing techniques, right?

And so, I did make a lot of decisions about how to prepare the consular officers to manage that as well as they possibly could, or in a situation where they felt like they needed to elevate to a manager, that would come to me or one of the other consular managers.

Q    That's helpful.    Thank you.

And I guess I should have been clearer.    So it's our understanding that there's sort of guidance coming from Washington, and that guidance was evolving as to, you know, who could come through the gates, who couldn't.    And I know on a person-to-person basis that sort of changes, you know, as they're in real-time.

But I guess in terms of the broader guidance that was being communicated from Washington, did you provide feedback and then they'd come back to you with sort of instructions on how that would play out?

A    Most of that was one-way channel.

Q    All right.

A    But there were only two times -- and I think actually maybe they were at the same time -- that I recall guidance changing on specifically, like, the parameters of who was eligible for the NEO.    And it was kind of a -- there was a brief moment, maybe a day or two, where there seemed to be some discussion about how to shift that.    And those changes were communicated to me, and then my task was to talk to the consular officers about what those changes were, and then to guide them on how to implement that differently.

Q    And did any of the consular priorities change throughout the course of the

evacuation?

A    Consular priorities never changed.

Q    Okay.

A    Consular priorities are pretty static, but the -- at least as I would define a consular priority.    But are you -- can you tell me specifically what you're asking about, like --

Q    No, in terms of sort of -- you know, today we're going to be focusing on ensuring, you know, American citizens are getting out, this is our priority, or ensuring that, you know, we will not be accepting Afghans without documentation because we have to focus on American citizens, et cetera, things of that sort within the wheelhouse of sort of consular functions.

A    Okay.    I hear you.    Thank you for clarifying.

So the core group of American citizens and their immediate family members, lawful permanent residents and their family members never change, ever.    That is, in my experience, the core of what an evacuation is, right?    We're always focused on that. And I never got any direction or saw any direction where that was changing, although sometimes, you know, we have different capacities.    But in this evacuation, capacity was not an issue, right, like, we had planes.

So there was, as I mentioned, a brief window in which we were told to -- for the SIVs -- what initially we had been doing was assessing that if we thought there was a credible reason to believe someone was in the SIV process, and could be approvable that they would be boarded.    And that was the guidance for the majority of the time that I was there.

There was a brief period where the guidance was that -- because that was extremely hard to verify, because it's not the same way as, like, a credibility interview for

someone who claims to be an American citizen or a lawful permanent resident.    That is how we interview people on a day-to-day basis.    We're quite skilled at that.    For someone who might be in the COM process, the chief admission approval process piece of the special immigrant visa process, it's a little bit more vague.

So we got a guidance that we should only board people who had a fully approved special immigrant visa in their passport, and that was -- I don't know.    It couldn't have been more than 36 hours that that was the guidance.    Like, it was a short time, maybe even shorter than that, and then we were given the guidance, no, go ahead and return to the previous criteria of anybody that we think speaks credibly, that they could be in the SIV process.

███████████.    What days were those?

Ms. Howell.    I can't remember.    I will be honest with you, I can't remember.    It was prior -- I know it was prior to the 26th because that is the day that I will always remember what happened before and after, so sometime prior to that.

███████.    Do you remember if it was earlier in the period?

Ms. Howell.    It was earlier.    And then the -- there were -- so I was on the ground right from the -- so 11 days fully on the ground.    The first couple of days it was the same thing.    There was a day or two where we got some guidance to restrict that piece, and also, you know, focus on there was also, like, recognition that it was difficult to determine admissibility for the every other Afghan who might be at risk of persecution.    It is very broad category and difficult to document.    And so it was, like, make sure that we adjudicate that a little bit more narrowly.

That guidance didn't last long, and then it went back to say no, we want to return to the prior guidance.    So of the 11 days, I would say 9 of the days the guidance was the more broad criteria and 1, 1-1/2 days in the middle, sometime between the 19th and the

26th.

BY [REDACTED]:

Q    Do you recall who gave that guidance?

A    It was passed to me by Jim DeHart, and it was portrayed to me as a Washington decision, but I don't know more about who in Washington.

Q    Okay.    Did you ever push back on the guidance on which populations could be sort of -- could gain access?

A    No.    I mean, I -- no, I never pushed back.

Q    So based on what was happening on the ground, there was never -- you never felt a need to sort of push back on the guidance you were receiving?

A    Push back in terms of say I disagreed with it?

Q    Correct.

A    No, I did not say I disagreed with it.

Q    How about on which identification documents would be accepted in a case?

A    It was a constant conversation, but did I push back on how we were doing it, no, because there was a clear recognition that it was very reasonable for exactly the type of people we were trying to evacuate to be undocumented.    There was enormous credible fear that they would be targeted by the Taliban en route to us if they had many of those documents on them.

So I think we understood that we were going to have to do this primarily through interviews.    Some did arrive with documents.    They secreted them on their bodies in some way, and then that was very helpful.    But for many people, it actually made them more credible that they had destroyed any documents that they may have.

Q    You previously testified that when you arrived in Kabul there were about 30 consular officers on the ground, correct?

A     No.   I'm not actually sure how many people were on the ground when I arrived, just to be very specific.    Over the time that I was there, most days between the 19th and the 28th, which was when the majority of the retrograde began, there were about 30, and I think the high at one point was 34.    But I can't be sure exactly how many were on the ground on the 19th.

Q     Okay.   Can you tell us more about the arrivals and departures of consular officers, or how often did they come in?    When did they leave?

A     Yeah.    It is, again, hard to say exactly, but many consular officers around the world answered the same call I did.    I had the luxury of being a 4-hour flight from Ankara to Doha, and could get on a plane that day.    I got there more quickly.

So over a couple of days we had people arrive in tranches, and we would get an email saying so and so is coming in on this flight, and then we would get them.

And then there were a handful of officers who had been there the longest, three or four, that had been there from the embassy, assigned at the embassy, would have been through that evacuation, that were clearly maybe on, like, the 20 -- I'm guesstimating -- 20th to 24th we went ahead and asked them to go ahead and rotate out as the newer officers that were fresh come in.    They were clearly just -- they had just physically hit to where they could not work anymore at that pace.    So there were a handful that we left -- that we let leave.    They needed to rotate out.    But the number really kind of stayed static.    I think the last two TDY-ers arrived on the day of the 26th. I remember I was briefing them, giving them -- because every officer that would come in, I would sit down with them, try to understand about them, their experience, prepare them for the kinds of things they might see, give them the guidance.    And I was briefing the last two TDY-ers the day that we had the bombing.    So the last two TDY-ers arrived on the 26th, so we were receiving them in increments the entire time.

Q    As part of the first group, sort of the ones that were rotated out, did any of those individuals express an interest in staying and weren't permitted to do so?

A    I don't think there were any consular officers that really felt like they wanted to leave before the mission was fully completed.    But the actual interaction with them about the decision for them to rotate out, Greg had that conversation with them, so I don't know exactly what they said at the time.

Q    Do you think there's sort of a loss of institutional knowledge at that point?

A    No, I don't.

Q    Do you believe there were adequate consular officers at HKIA to execute the mission?

A    I mean, yes.    The constraint -- or let me answer that in a different way. The constraint was access to the airport facility through whatever gate.    The bottleneck was never people waiting to talk to a consular officer.    Because we had the hub-and-spoke model, wherever -- in my constant coordination with the military, they told us that we were able to do consular operations, which is the kind of the initial triage vetting to determine potential admissibility to the U.S., or boardability in the evacuation, wherever -- you know, we would have those conversations with the military, and they would say, We're going to do Abbey Gate and the passenger terminal and this other gate today.    We would divide the consular officers, send them to those places, but periodically they would stop.    But we always had somebody at the passenger terminal, right?    So, like, people, if they -- if our military partners or other people who were accessing the compound would bring them into the passenger terminal, they would always see a consular officer.

The constraint that I felt was -- the only real reason that we couldn't have scaled up more was simply the kinetic and unpredictable nature of these huge crowds

surrounding the airport and the importance of the military providing access control there. There was -- and I can't emphasize this enough.    It didn't even start with the military. It was the Taliban.    It was what will the Taliban allow?    What will they let people move through and how will they do it?    Like, there were times that we would have an agreement with the Taliban that we would have a certain population approach maybe, like, the passenger gate is the best example of this, the passenger terminal.    At one point we were able to set that up to use that as an access point, and because it had been a passenger terminal, it had more kind of security, perimeter, and the kind of stuff that we're used to at international airports built in, which is great.    The Taliban agreed -- it was relayed to me.    I did not discuss this with the Taliban.    It was relayed to me that the Taliban had agreed that we would do that.

We went out there.    We had consular officers.    We had the 82nd Airborne, and then the Taliban, because I don't find them to be particularly good faith partners, instead of admitting people in a controlled way, they just opened the boom, and tens of thousands of people rushed, again, back to the passenger terminal, and we lost the ability to use that as a controlled safe environment where -- and if we had not had that perimeter, we would have put both the citizens and the partners that we were trying to help, as well as our own mission, at risk if we lost the ability to secure the perimeter.

So for me as the consular manager I never felt that the constraint to assisting more Americans or partners was the number of consular officers.    I always felt that when the military gave me the requirement or said, Okay, we're able to open up this gate or we're able to do processing at this gate, that I was always able to meet that demand.

The question that you specifically asked is do you think I should have had more consular officers, right?

Q    Uh-huh.

A    Like, maybe.    But I don't believe that having more consular officers would have appreciably changed the number of people we evacuated, because the constraint was never the number of people standing there waiting for a consular officer to chat with them.    The constraint was always will the Taliban let them get to us, and if the Taliban gets to us, is the crowd control and kinetic nature of what was happening outside safe then to admit them.

Q    Do you think the situation would have been different in the evacuation -- or let me rephrase.

Based on your experience and your prior experience in Afghanistan, do you think it would have been more effective if the evacuation was conducted out of Bagram?

A    I mean, for me -- very respectfully, right, because I hadn't been to Bagram in 10 years.    You know, I wasn't involved with this, even though I know a fair amount about Afghanistan, up until I landed, you know, on the 19th.    I'm not sure, right?    You know, like, Bagram is a big base, but HKIA is essentially a big base, too.

███████.    Go ahead.

███████.    So in terms of the number of consular officers, are you saying there was never a moment where a consular officer was needed and they were busy with something else?

Ms. Howell.    I'm saying that -- I mean, that's a very definitive statement.    I'm saying that we didn't -- there was never a moment that we didn't fulfill a demand signal, although it wasn't, like, necessarily instant.    Sometimes it involved repositioning things.    But if in consultation with our military partners, and they told us that we are able to have a gate open here, we sent somebody.    It might not have been -- I might not have had them sitting next to me ready to go.    I would have to pull them from another place, redistribute and divide.

But usually if there wasn't a consular officer at a gate, it was because of a decision that had been made that -- and when I say "had been made," I want to be clear because I'm using a passive voice -- made in consultation between all the military and State Department partners that were looking at the big picture of where operations needed to be, right?    Like if someone would come to me and say -- because Abbey Gate was always the most kinetic gate, right?    It was always the one with the most violence, the most issues with the Taliban, the most issues with crowd control.    And so, I'm using it as an example because that's the one that we stopped and started the most.    But that was not like -- that never started from I don't have consular officers to send there.

It was very common that one of the Marines would come into the liaison office and say somebody just got shot and killed at Abbey Gate, or somebody threw a baby over a wall at Abbey Gate, or something happened.    We're going to hold on Abbey Gate.

The presence of the consular officers there create a pressure on Abbey Gate we can't lose it, right?    And so we would say, Okay, so we would pull a consular officers back from Abbey Gate.    And then we would say, Where else are we processing?    Great, we will send them there.    And then a couple of hours later, or -- I don't know however long it was -- somebody would come back and say, We're ready to start again.    Okay. Now I have got to go get the consular officers, you know, and move them.    But there was never -- I never felt that there was a moment where I wasn't responding to every place that I had been told it was safe to provide those operations.    Although that doesn't mean that it always felt instant, but we were constantly saying, Okay, what is open? Where is it safe to process?    And putting people there.

As it shifted -- sorry.    Now I feel like I'm making a monolog.    Am I saying stuff that's relevant?

███████        Yes.

Ms. Howell.  Okay.  So, like, as the security situation got worse at most of those big public access gates, the one that we all saw on TV right at the beginning -- the last one to close was Abbey Gate -- as it became apparent it was not safe to operate in those places, the military started closing them, because they could not provide crowd control and safe operations.  We were putting people at risk by having them come into these huge massive gates where people were getting trampled, or babies getting separated from parents or violent things were happening.

So they started closing those gates.  And that was part of the period in which we said, How can we use some of the other access points that we can create or flesh out where we have more control?  And by the 26th, when the bombing happened, that's the reason Abbey Gate was the only one open that was still like that, because it was so unsafe to be processing -- and I don't mean unsafe for like my team.  I mean for the people that we were trying to help.  It was just a very kinetic and kind of violent environment.  And so, the whole time we were looking for ways to get people in a more controlled and secure manner.

BY ████████:

Q    Did you have sufficient staffing -- consular staffing to have a consular officer at each of the gates, you know, if each of the gates were open at once on, you know, a continuous basis?

A    So, yeah.  I mean, the short answer is yes, but I feel like I always want to give a long answer because I want to be really clear about this.  Right?

Q    Please give the long answer.

A    Yeah, I want to give you the long answer because I want you to understand what I believe I understand.

So like if -- it was very rare that all the gates were open, not because of us, but

because of the violence.    It was a very violent environment.    And, in particular, the big public gates that had been the first attempt at the NEO, which, honestly, predated me, right?    Like, by the time I got there on the 19th, it was clear that that wasn't a model that was super sustainable.    The operation was having a hard time in these masses of people where people were getting trampled and the Taliban was firing indiscriminately into the crowds, that it was very difficult to identify who is someone qualified for our evacuation.

And so by the time I arrived, there was a recognition by the leadership on the ground that that wasn't going to be the primary way that we accessed and identified our Americans, our LPRs, our SIVs, you know, and our other partners.    We needed to try to find other ways to do that.    And so we were already shifting away from that when I arrived.

But I don't recall ever having somebody, whether it's Marines or 82nd or Air Force -- you know, there were different groups, but whether somebody coming and saying, Hey, like, we're ready to resume operations at this place, that we didn't say, Okay, we're going to start shifting consular resources and spreading them out so we can get people out of there.

I don't recall a time when the constraint -- because we were constantly, like, where's the bottlenecks, where's the constraints, how do we break them, how do we -- you know, that the constraint was the number of consular officers at a place.    That was not my --

Q    You had mentioned kind of transitioning from one model to another. Could you clarify a bit kind of what the first model was and what the model you transitioned to was?

A    Yeah.    So the way it started was, you know, these big gates, like Abbey

Gate, North Gate, the various like -- the big public gates where you see the images of Marines, you know, standing behind the barbed wire and the T-walls, and stuff, and crowds of people approaching it, and they may be waving documents or shouting or saying, you know, I'm an American, I'm an SIV, help me, that type of thing.    But because that was very uncontrolled, then easily if the Marines -- I'm telling you what I have been told because I was not there on those first days, but that I also saw all the way up until the end when we closed Abbey Gate, sometimes if people would create a place for people to come in and some of the people in the crowd could see, Oh, I can -- if I just go over there, I can get in, then, inevitably, the human response, you know, is to rush.    And that was when things would get violent.    Sometimes the Taliban would start firing to try to stop the crowds or people would get separated from small children.

It was just a really uncomfortable, and not particularly efficient way, to use a kind of bureaucratic word about it, to try to find in this huge crowd of people the people that we wanted to assist, right?    Because there were a lot of people there who were desperate Afghans, very understandably, but don't necessarily fall into our criteria for who we were providing assistance to.

So when we realized that we were not able to get as many people as we were trying to get, because the flow of numbers at that point was much lower, we were, like, how do we do this differently.    So we started looking at -- the first thing we looked at was how do we use the passenger terminal?    At that point the passenger terminal was not very -- we just had a baseline security perimeter there, but because that was the scene where when you picture the flood of people that ran onto the tarmac, they came via the passenger terminal.

The Taliban had a perimeter there.    The 82nd Airborne had a perimeter there.    But we weren't using it to bring people in that were our groups.    So we tried to figure

out, Hey, that's an airport that has a structure in place.    How do we use that?

So one of the very first things I did after that first 36 hours was take a team from the 82nd and the Marines and some diplomat security agents, and we went over there, and we sent a message to American citizens to try to go there.

And what I was briefed is that the Taliban had agreed -- and again, I didn't interact with the Taliban, but the military leadership was talking to Taliban leadership and that they had agreed that they would do that, and they would admit Americans in a controlled fashion into that, which is a perfect plan, hooray, because I have an international airport that's set up to process and admit people.    I can put consular officers where the immigration folks used to be, that we have security that can do it.    The Taliban say hooray.    I'm going to bring every American out of Afghanistan right via this passenger terminal.    It was a beautiful, perfect plan.

And then we went out there to do it, and the Taliban were, like, Sure, all we agreed to do was let people in.    And they threw up the arm barrier.    They didn't do anything they had agreed to do, and tens of thousands of people overran the passenger terminal.

Q    And what was the date and timing of that?

A    I don't know.    It was a couple of days after I arrived.

Q    Yeah.

A    And so, we got as many Americans out of that group as we possibly could, processed them.    And then we said, Okay, well, that's not going to work quite like that, so let's go back to the drawing board.

So we ended up still being able to use the passenger terminal, but we ended up shifting to -- and this wasn't really under the consular purview, although I was aware and it was part of our overall planning process.    It ended up being where the military

planners decided would be a good place to use access for groups, because there were a number of groups that were either U.S. citizens, U.S. partners who had been able to get, like, buses.   And so, they decided that they would use that for groups, and they negotiated a different access policy with the Taliban.

So that ended up being a really great access point that we were able to bring a lot of our key partners on, including many American citizens, but it wasn't the original plan, right?   So the passenger terminal we were able to set up and use as a controlled safe access point to bring significant numbers of our travelers on.

And then we had, like, the gate where you had the back entrance from the New Ministry of the Interior -- I'm assuming -- have you been briefed about this?

Q      Why don't you tell us about it.

A      Okay.   So there was a gate on the back side of the airport that through kind of a little bit of a wasteland was adjacent to the back gate of the New Ministry of the Interior.   And the Taliban agreed with, again, not me, but our military partners, that they would -- if we sent American citizens to the Ministry of the Interior, that they would accept, like, as prima facie U.S. travel documents of some kind, specifically a passport, and then everybody was kind of with them, and they would let them pass through the compound of the New Ministry of the Interior, put them out into this -- for lack of a better term -- kind of DMZ between the two and let them walk through and that we would open up our gate and create a hole in our perimeter and let them come in.   And it was also a beautiful plan.   The partner is the Taliban.

And so, we did send messaging out to American citizens to go there.   And as someone who's worked in Afghanistan for 19 years, it's a little bit wild to tell people that you can trust the Taliban, hold up your American passport, but it did kind of work, right?   Like, the Taliban -- they let the Americans through, not maybe in the way that I wanted.

They would kind of keep them for a long time in a room for several hours, and then at 3:00 a.m., after we've been standing there for 8 hours, and they've been saying they're coming, they're coming, all the sudden they would come through the darkness, but they did come, and it worked.

And many nights we were able to go over to this gate and get American citizens who, of course, are the highest priority, right, to grab American citizens and their family members.   And we kept that at a steady flow for -- for up until the 28th, we were still bringing people in through that gate, which was really good.

And so, like, these are the types of things that we were doing where we were able to minimize the pressure on some of those gates where we were having a lot of violence but still to get the people that were our priorities to get to safety.

Q     And you've talked about kind of -- some of the gates in a broad sense. Could you maybe run through them and kind of give us a picture of, you know, the gates overall and kind of the --

A     Honestly -- I mean, I'll be happy to try.   I don't -- I don't talk about this very often.   It may not surprise you, right?   But this is -- and it's been 2 years.

Q     Sure.

A     I'm not really sure I will remember all of the gates and all of the things that were happening.

Q     But the significant ones.

A     Yeah.   For us, the most significant gates were -- there's one I'm forgetting -- Abbey Gate, North Gate, and there's another one that was -- I'm forgetting the name of it, but they were, like, the three big traditional gates that were open and running when I got there and slowly started to close because of military security issues; the passenger terminal, the gate I just described that didn't really have a name, it was the

gate that came in through the back, and then there were other -- from the Ministry of the Interior, and then there were temporary gates that would get opened periodically.   Like sometimes they would take a -- when I say "they," I mean military and other government partners who were present, would decide that they would take, like, a -- I don't know -- large construction piece of equipment that I don't know the name of, and lift up T-walls and create a temporary gate.   And we may admit a special group or if we had identified like a bunch of Americans on one side away from that big crowd, that we might be able to get them in quickly before the crowd would rush to that point and we would lose the ability to bring people in there and kind of we would create temporary gates.

██████████.   How was it communicated to those populations that you were seeking to evacuate?

Ms. Howell.   Usually, for the part that I was involved, in MASCOT Messaging or, if not directly to MASCOT Messaging, emails to people that had registered with us and identified themselves as Americans or lawful permanent residents seeking repatriation.

BY ██████████:

Q   Can you talk a bit about the populations -- you know, we touched on this earlier, but kind of, you know, which populations were, you know, prioritized?   Which populations were eligible?   Which populations were discussed?   Which were ineligible?

A   The populations, as I understand it, were always American citizens and their family members, lawful permanent residents and their family members, our locally engaged staff, Afghan SIVs and their family members -- family members is implicit in all of these groups, right -- Afghan SIVs, and then, you know, other Afghans who may be at significant risk of persecution from the Taliban, which is, obviously, the most broad and important, but I think everybody on the ground was very clear that American citizens are the number one priority and then the rest of them as many as we could possibly help.

Q    Could you talk about that last category, the most broad, Afghans at-risk, and the considerations that went into that?

A    Yeah.    It was obviously the most difficult to define.    There were some groups that feel, you know, kind of they have a prima facie risk, to include most women, and most women who just said, I'm afraid because I am a woman and I will no longer be able to receive medical care, education.    And we would ask a lot more questions, right? Okay.    And we would bring them in.    But then there were other groups who would say, You know, I have been a member of a civil society group that advocated for women's right to education, or I was a member of the Parliament.    We had a couple of people that showed up and said, I was a judge, and I feel, you know, that I may be at risk because of that association.

So it was probably the most difficult and part of the reason that we had multiple lines of vetting, right?    So there was whatever vetting that was able to be done at the perimeter, although quite often the military or other partners would bring people in honestly when the consular officer wasn't even there, which was fine, because everybody went through the hub, right, the passenger terminal where we always had consular officers.    We would interview them again and chat with them and then, of course, the vetting that happened at the lily pads, you know, where people went through them again.

But if there was a reasonable assumption that somebody was expressing a credible fear of the Taliban, we weren't trying to adjudicate asylum out there.    We were saying, Okay.    Come on in.

Q    You referenced there being categories of travelers included in the NEO authorization.    Could you talk a bit more about that, what you meant by that?

A    This exhibit?

Q    Yes.

A     Yeah, these categories, U.S. embassy personnel --

█████████.    You're referring to exhibit 1, I believe.

Ms. Howell.    -- U.S. citizens, lawful permanent residents, third country nationals, and certain Afghans at risk, including SIV applicants.

█████████.    Thank you.

BY █████████:

Q     I want to backtrack back to the consular officers' portion.    You previously testified that there was a brief stand-up meeting at the shift change twice a day.

A     Yes.

Q     Correct?

A     Yes.

Q     Were there any gaps in the shifts for meetings or briefings or who sort of occupied that space in those meetings?

A     No.    So when the shift change was happening, that would be when we did not have consular officers at the vetting points.    So we tried to keep -- that is why we tried to keep them really tight.    And usually it wasn't like both shifts were at the JOC at the same time, but they would be kind of overlapped.    So the diplomatic security would start bringing them back in as the other group was arriving, and they would -- you know, so, inevitably, there were -- I don't know -- probably, on average, half an hour as the shift changed happened when people weren't there.    Some gates were further away and harder to get to.    It might have been longer.    The passenger terminal was an easy 5-minute walk.    It was probably shorter there.

Q     Were any of the Marines or other servicemembers conducting vetting during that period, or are you aware of that?

A     The Marines -- I don't want to speak for what the Marines were doing.    I

mean, we certainly observed what they were doing to a large degree and we were there with them, but I don't know exactly what their orders were, and I don't want to speak for that.    But there certainly were -- the Marines or even members of the 82nd at other locations were bringing people on, right?    Like, I think of it less that they were doing vetting, but they were doing access.

So what I was very comfortable with is some members -- the military -- we were so integrated.    We were one team with different roles, right?    And so they heard every question that a consular officer would ask.    They understood who we were, you know, sending through and who wasn't.    And so quite often, they might see somebody that they thought was an SIV, an LPR, an American citizen, and they would either pull them and they would do the access piece and wait for a consular officer to come back, or quite often, they would bring them to the passenger terminal, and then we would do the vetting piece there.

So I wouldn't characterize what the Marines were doing as vetting, but I do think many Marines did, and with my full support, quite frankly, to think about who should have access to the perimeter where the vetting could be done.

Q    And for that access, were they screening documents?

A    No.    And I don't -- I mean, I don't know.

Q    Okay.

A    Again, I don't want to speak for them.    Please ask them.    But I never interacted with any of the Marines or the other military partners who tried to do the role of the consular officers, but, like, they might see someone holding a U.S. passport and say, Okay, I will bring them in until the consular officers get back, or until I can get a consular officer away from something else they're doing, or I will bring them over if there weren't consular officers for some reason at that time at that gate and bring them to the

passenger terminal.

Q    Was this formally communicated to the Marines, or is this something that happened sort of ad hoc?

A    I think it happened ad hoc.

Q    In terms of sort of the gates, can you please -- so is it a fair characterization to say that if the Marines were at the forefront, they would grant in certain instances access to evacuees, and then the consular officers would be behind the Marines and then be conducting the vetting?

A    In all instances the Marines, or the 82nd, determined who had access to that perimeter.    That was their job.    We would never have inserted ourselves in that.    Like, force protection is not the role of a consular officer.    And who is admitted to a military base, which is what HKIA was, is the role of the U.S. military.

So, like, their question to us was, is this person admissible?    And wherever that we were able to, we would give them that answer.    But who -- even if somebody had been a U.S. citizen but they thought that they were a bomber, they had the right to not admit them, right?    So that's why I think we have to separate the two pieces of this from, like, admissibility versus eligibility to travel to the United States or be evacuated.

Q    Were consular officers then responsible for screening all of the documentation?

A    When there was documentation.

Q    Okay.

A    And quite often, there was not documentation.

Q    Did consular officers provide Marines any training or guidance as to sort of that access process, which sounds like it was typically a consular function, but given the situation?

A    Access is never a consular function.    The potential admissibility to the United States is the consular function, or potential eligibility to be evacuated.    But it very much wasn't like -- I never called the Marines and said, Let me train you on how to do this so that you can do our job for us.    So in that sense, that training piece, no.    And this is why I keep trying to emphasize how integrated it really was.    Like, people were there together.    The Marines and the 82nd Airborne and the consular officers were together in, like, unbelievably trying circumstances with totally the same goal, which is help as many of these people as we possibly can.    And so they heard every question.    They understood what they were.    But it was not, like, a request from me to the Marine Corps to have the Marines go out and bring people in, you know, specifically.    The Marines were there doing their jobs with an unbelievable level of heroism to try to help facilitate the access of many of those people.    And they wanted to, like, naturally, I think, push out some of that questioning, but that was not at our request.

██████████.    So I guess sort of in that sort of holding area, I guess, sort of limbo, for a lack of better term, where the Afghans are past sort of the Marines bringing them in, before they've gotten the consular officers to screen their documents if they had documents, was there ever sort of a time where there was like a ton of backup, or it was backed up to where the Marines weren't able to bring any more Afghans in?

Ms. Howell.    It could have happened.    I don't want to say categorically it did not.    It was -- there was a lot happening is what I hope I'm conveying to you, a lot of different things happening in a lot of different places with a lot of different people who may not always have the same information.

It is possible that there were some Marine groups or 82nd Airborne groups who were holding people to wait for consular officers to come and to do that if it was at a shift change, or if it had been a time that they in their own command had said to me, We're

worried about the pressure on that gate.    We're going to hold for a couple of hours, you know, or something like that.

But also there were times that at the passenger terminal, people would just walk up with a Marine and say, Hey, we have got these 25 people.    They came in this other place.    There wasn't a consular officer there.    And we were, like, Fine, we'll screen them here, right?

So I don't think it would be a correct characterization to think that huge lines of people were just standing inside, like they had been granted access, and they were just waiting necessarily for a consular officer.    There were many ways that people were coming on at different gates for lots of different reasons.

So, yes, there could have been times when there was a backup, but I don't think it was the norm.

▉▉▉▉▉▉.    I believe our minority colleagues touched upon this, but I sort of want to come back to this point.

There has been public reporting, either through sort of reports in the media or, you know, just public testimony, et cetera, about, you know, servicemembers stating that they felt like they had to occupy some of the consular functions and consular roles, that they were vetting, that they couldn't find consular officers when they needed them, and they felt sort of overwhelmed by those functions.

I don't want you to have to speculate, but could you provide some clarity as to those statements?

Ms. Howell.    I mean I really would defer to my military colleagues on what orders they were given.    Any of that that was done by the Marines was not officially like as a request.    Here's what I know.    All of us who were there, to include the Marines and the consular officers and the State Department people, felt an enormous personal

commitment to doing every possible thing we could do to bring as many of these people at risk onto that base and onto planes to safety as quickly as we possibly could.

It is very possible that many of the Marines, if they felt that they could be processing, even if I had been told at a command level, We're holding here for a minute. We're, like, why are we not going?    Why is there not a consular officer?    I'm going to do this, right?    And it would come from the same place that I felt, which was what else can I do, right?    Every possible second that we're not acting, every possible second that someone isn't coming onto the base when we safely could do it, we're missing something.

So, like, I totally can see that that was happening, but it wasn't like because a consular officer wasn't where they were supposed to be.    In terms of the military command coming to me and saying, Jane, we are having -- or to Gene or Greg or Conor, any of us, and saying, We've just reopened Abbey Gate.    We need consular officers.

There was never a moment that that happened where I said, Great, consular officers.    Okay.    Somebody go pull them from this place and send -- you know, like, if there was a place that it was safe to do it, we were doing it.    But just because that was happening in a JOC on a place that had miles of perimeter and different gates that that didn't happen instantly for every Marine that was out there, like, it is very possible that people felt like where are the consular officers in this moment?    But I think that that experience is very true for the person standing there in that moment, but may not be true of what was happening in this massive and complex operation, which was why, quite frankly, I was so happy when if we were at the passenger terminal, a Marine would roll up with a squad of 35 people.    Great, great.    Somebody will see them right here.    It was never a -- the lines in this were not drawn in a way that anybody who was getting into some kind of ego fight over who is supposed to be doing what, it was let's all do everything all the time so that we can do as many people as we possibly can.

Does that answer --

███████████.    It does.

Ms. Howell.    Okay.

███████████.    Thank you.

Ms. Howell.    Yeah.

███████████.    Can you talk more about the debriefings that you had with the consular officers, specifically the problems they were facing, the struggles they were facing?    I'm assuming that they probably had some horror stories to tell as well about some of the things that they were seeing.

Ms. Howell.    Yeah.    I mean, that was a lot of it, right?    Like, communications we touched on, right?    Like, being able to, you know, reach back to us, of course, was a little bit of a problem, but it wasn't one that was -- it was one that just everybody on the ground was facing.    The cell towers weren't working.    It was hard to hear, even if you had a radio, because it was so loud.    The sound of all the people was so loud.    There was so much gunfire.    It was, like, you know, kinetics, like, how do we communicate.

I did have a number of people who really were traumatized by some of the things that they saw.    Seeing people come in, you know, having been shot by the Taliban, it's very hard, right, to see some of the things that people saw, people literally throwing their babies over the wall because they were so fearful and desperate.    There was a lot of trauma.    And we tried to rotate some of those people to different locations and make sure that we were, you know, providing support to them.

One thing that was feedback from the consular officers almost immediately after I arrived was the number of unaccompanied minors.    We didn't have a process in place for them, and there were a significant number.    And, obviously, that wasn't something we had really kind of the ability to try to do family reunification in that environment, but

we recognized the need, and a number of the officers were really upset about it.

So we set up a temporary holding center in the safest place, which was the passenger terminal, because it was in the middle away from the perimeter, and we always had a consular officer there, and we reached out to the Red Cross, Red Crescent, and UNHCR.    And it took them a couple of days, but they were able to come back and provide the support and to work on tracing and reunification to make sure that we had, you know, diapers, formula, things like that that we needed.    That was a big one from the consular officers is what do we do with these kids and babies that are alone.    And so, we came up with a plan.    We worked on that.    We put somebody in charge of that one.    I don't know.

BY ▮▮▮▮▮▮▮▮▮▮▮:

Q     So, I'm curious as to sort of how communications were relayed to the Marines.    You noted that you had, you know, the open lines of communication discussed with sort of the leaders in the military.    On a lower level, how were sort of orders and instructions relayed to the Marines?

A     I can't tell you how their commanders were communicating to them.

Q     Did consular officers or agents, at any point, communicate any instructions they were receiving from you to the Marines or were aware of any formal lines of communication on the ground?

A     I mean, the military does communication and giving orders very well, but I did not insert myself in it at any time.    Like, my role was to communicate with my counterparts, who were the Marine Corps leadership.    I did that.    How they communicated back to the people that reported to them I did not insert myself into.

Q     Did you communicate some of the changes in the acceptable documentation --

A     Yes.

Q     -- and populations, et cetera?

A     Yes.   Anytime we had changes, anytime we were, you know, doing anything differently, it was -- again, we were colocated.   I was as close to you as I am to General Sullivan.   In fact, I was closer because I had a little window between my office and his. So we were in constant communication.

Q     So I want to get to a topic which we briefly touched upon specifically on how evacuees were approved to enter HKIA.

The first question, do you know how many American citizens were left behind when we withdrew?

A     No, I don't know.   And I want to be specific about that question.   There are always two categories of Americans in an evacuation:   the ones that are there and the ones that are seeking repatriation and are there.   And I think it's a very hard distinction to make in a situation like this, right?   I know that there were some Americans that were not able to be repatriated, but some of them were also people not seeking repatriation.

BY █████████ :

Q     Are you able to give estimates on how many Americans who wanted to leave but did not leave were left?

A     I can't give you that number, but I can tell you that that was, like, the constant thing we were starting to try to figure out the whole time, right?   So the only way we can know that in any practicable way, unless we, like, start Airtagging Americans, is they have to reach out to us and say they're seeking repatriation, and then subtract that from the number that we have been able to repatriate.

And so that number was a number that I just, moment to moment, tried to

ascertain.    The problem is that, like, people would -- because it was also not just Americans but also lawful permanent residents.

Q    Sure.

A    So people self-identify, self-report.    They send us, via our STEP system or emails from the State Department, and what you, and they say, I am in this.    And in this case there were an enormous amount of people who used that system that were not American citizens, were not lawful permanent residents, or what we found to be true also -- and this was not the main problem.    It's a minor subset, let me be clear.    But there were a significant number of people who had registered -- like their loved ones in America put their name on the list, but then they, themselves, did not want to depart.

So I had personal interactions with two people, and it kind of blew my mind, but the first night that we did the operation where we brought people from the New Ministry of the Interior in the back gate, I did both of those shifts personally because I wanted to understand -- it was kind of risky, and I wanted to make sure we were doing something that was safe.    And the first night this person came in who was a U.S. citizen, and he had with him a couple of family members, and he walked in, and I was, like, Great, we've got you.    You're safe.    And everybody was crying.    I'm crying.    Everybody is crying. We've got them.

And then he's, like, okay, I'm going back out.    And I was, like, what?    You know, he was, like, I brought -- you know, I brought this person.    You know, I brought -- this is my grandma.    This is my niece.    You know, great, take them to America, but I'm headed back.

And I said, So wait, you're here.    You're on the compound.    We have you. There's, like, a full on war is happening steps away from here.

And he was, like, Well, I don't want to go.    I just want to get these people out,

but my house is here.    You know, I have a life here.

And it was impactful for me, and it helped me put into context some of what I started to see as we got closer and closer to the end.

So I'm not trying to suggest to you, because I think that would be very wrong, that the majority of Americans or lawful permanent residents who are still in Afghanistan were in that situation, but there were some.    And so -- but what it meant is that parsing that number was extremely hard, because it's a self-reported number where it may not even be the person themselves who said, I'm seeking repatriation.    It may be someone who wished that they were seeking repatriation, and had identified them for us.    And some of the people that were reporting to us that they were Americans or lawful permanent residents were not either.    They just wanted out and were hoping by reporting to that that they would be there.

So, at the end of the day, I stopped being obsessed with the number and started focusing on the humans who were there, right, like how do we communicate to the public targeting more specifically Americans, LPRs, and SIVs, but, like, the information about how to access us, and then get as many of the ones that we possibly can, but actually trying to understand what the number was started to feel like a futile exercise and not particularly useful in the planning we were actually doing.

Q    Did you have a confirmed number of Americans, ones that you were able to confirm were Americans or LPRs?

A    That we actually depart -- that actually boarded on planes and left?

Q    That were left behind.

A    No.    And what I'm trying to tell you is I don't think it's possible to know that number.

Q    What was the unconfirmed number?

A      I don't recall.

▮▮▮▮▮.    Is it fair to say then that you can't definitively say that every American that wanted to get out got out of Afghanistan?

Ms. Howell.    No, I don't believe every American who wanted to depart was able to depart.    But how many, I don't know.

▮▮▮▮▮.    And you're not able to estimate that number?

Ms. Howell.    I am not.

▮▮▮▮▮.    Do you know who would be able to estimate that number?

Ms. Howell.    I do not believe that it is estimatable.

▮▮▮▮.    Do you have any sense of -- you know, is this a number in the hundreds, thousands?

Ms. Howell.    It would be just a pure guess.

▮▮▮▮▮.    Who was working on trying to confirm that number?

Ms. Howell.    I am not -- I am not sure.

▮▮▮▮▮.    Do you think that understanding that number was important, especially given the fact that you believe that some Americans who wanted to leave were left behind?

Ms. Howell.    I don't know how it would have changed anything that we did, right, like, because -- and the reason I started this answer by telling you I spent a lot of time trying to figure this number out is because I had started with the assumption that it would be important and it would shift what we were trying to do.

But after a time, I realized the President had made a decision, because of stuff that I don't know how Presidents make decisions, that we were leaving before August 3l. And what I know for sure is that there was not one second between the day that I was told that, a second, not a half a second, not an iota of a second that every single resource

and cell in my body and every person who was there didn't make every heroic effort to get every person.

If someone had told me there's five Americans left or there's 5,000 Americans left, it would not have made a difference in what we did, because there was nothing left on the table, nothing.    There was nothing.

And I'm sorry.    I'm not shouting at you.    I feel like I'm shouting at you.    I am -- I cannot describe to you the level of commitment of the people on the ground from every part of our government.    It was like this clock ticking.    It was like it was over my head. The plane is going to take off, and I want to take everyone who wants to go with me, and every person did that.

And so at some point I started feeling like I don't -- the number doesn't change anything for me.    I have to leave on that day, and there's not one plane that didn't take off, there's not one empty seat, there's not one Marine, member of the Army, State Department employee who didn't throw everything we had at getting every one of those people.

And so, no, I stopped thinking that the number was important because it didn't change anything, and I realized that I just needed to shift my focus to get them all that we can, right?

I'm sorry.    I'm sorry.    I'm not -- I'm just emotional.

And can I please have a minute?

██████████.    Sure.    I was going to suggest a break.

███████.    Do you want to take another 5-, 10-minute break?

Ms. Howell.    Is that okay?

███████.    Yes, 100 percent.

[Recess.]

[2:12 p.m.]

███████. We'll go ahead and get back on the record.

BY ███████:

Q    We'd like to turn to the topic of American citizens.

A    Yeah.

Q    Can you define for the record what an AMCIT is and related to your consular duties?

A    American citizen is someone who has a U.S. citizen, whether by birth or naturalization as determined by the Secretary of State.

Q    Okay. And how is that term related to the classification group eligible for evacuation?

A    Generally, American citizens and their immediate family members are the highest priority in an evacuation. And, you know, we quite often have other categories that are authorized to be in an evacuation, whether a NEO or a -- just regular evacuation, but American citizens are always the highest priority.

Q    Okay. So in terms of the AMCIT and the nuclear family member, for the purpose of the evacuation --

A    Yeah.

Q    -- would the nuclear family member include spouses and children under 18?

A    Yes. Generally, yes.

Q    Okay. What was the messaging that went out to AMCITS in the lead-up to the withdrawal?

A    To be fair, I wasn't a part of that. I started, you know, kind of paying attention to the operation on the -- at that level of detail when I -- when I volunteered

and started to travel on the 17th.   So I'm not really sure what messaging went out to American citizens prior to the 17th.

Q    Okay.   Fair enough.

I'd like to introduce into the record a series of security and travel alerts, the first one dated January 17th, 2021.

[Howell Exhibit No. 4

Was marked for identification.]

BY ███████████ :

Q    And I'll just give you a second to review the document, not in granularity but just at a high level.

A    Yeah.

Yes, I am familiar with these types of documents.

Q    Okay.   Could you explain what these -- general terms, what these documents are?

A    So these are primarily security and health alerts issued by the U.S. mission in Afghanistan in the 6 months prior, seems like most of them, to the withdrawal and the evacuation.   And they are alerts advising U.S. citizens of risks to them and risks of travel to Afghanistan -- while in and travel to Afghanistan.

And most of them also reference the fact that in the Consular Information Program, Afghanistan is what we call a level 4, do-not-travel risk.   So we advise American citizens that due to the conditions on the ground, as well as our limited ability to provide assistance freely within a country, that we advise them not to travel to that country.

Q    Okay.   And where might an American citizen find these security and travel alerts?

A    So they can access them in two ways:    the State Department website, travel.state.gov, which is the repository of our information for U.S. citizens who seek to travel abroad, would have this and -- if you searched Afghanistan.    And then if there were more specific updates, it would be on the home page.

American citizens or other people registered for our Smart Traveler Enrollment -- our Safe Traveler Enrollment Program, STEP -- no -- Safe -- Safe Traveler Enrollment Program, STEP, would also receive updates as they occur in real time, via email or a text, however they choose to self-register for that program.

Q    Okay.    And can you read for me the date on page number 1 of the exhibit?

A    January 17th, 2021.

Q    And so would that have predated the withdrawal from Afghanistan?

A    Yes, it would.

Q    And the evacuation from Afghanistan?

A    Yes.

Q    And if I could call your attention to the last alert, if you turn to the back of the packet -- the exhibit.

A    The health alert?

Q    Yes.    And what is the date on that one?

A    Okay.    Hold on.    The one on the back, I don't -- on the copy I have, it doesn't have a date, does it?    Am I miss --

Q    So if you go -- it's the fourth to last page.

A    Fourth to last -- oh, sorry.    Oh, this one.    Okay.    This one, Suspension of Operations, August 31st, or -- hold on.

Q    So the last two pages, it's dated, Security Alert:    Threats at the Serena Hotel.

A    Oh, yeah.    Sorry.    Sorry.    Thank you.

Q    That's okay.

A    Security Alert:    Threats at the Serena Hotel is dated October 10, 2021.

Q    Okay.    And would that have been after the evacuation?

A    Yes, it would.

Q    Okay.    So to be clear, that exhibit No. 4, the dates range from January 17th, 2021, to October 10th, 2021.    Is that correct?

A    Yes, correct.

Q    And to clarify, these would've been accessible online to folks who wanted to view them?

A    Yes.    And more than just accessible online.    If an American citizen or other person had registered for them via the Safe Traveler Enrollment Program, they would've received them directly via either email or a text.

███████.    And to clarify, with respect to level 4, do not travel, that would constitute an advisory from the Department to not travel to the country and also to consider departing if you are in the country?

Ms. Howell.    Yes.

BY ███████:

Q    And to put a finer point on it, in fact, so if you look at page 1 of the exhibit --

A    Okay.

Q    -- the third sentence says:    The embassy reminds U.S. citizens that the travel advisory for Afghanistan is level 4 do not travel due to crime, terrorism, civil unrest, kidnapping, armed conflict, and COVID-19.    U.S. citizens already in Afghanistan should consider departing.

Do you agree that the document says that?

A    Yes, that is what the document says.

Q    Okay.    I'd also like to introduce into the record exhibit No. 5.

[Howell Exhibit No. 5

Was marked for identification.]

BY ▮▮▮▮▮▮▮▮ :

Q    It is an undated correspondence with text and a map.    The first line reads: U.S. Embassy in Afghanistan.

I'll give you a moment to please read it.

Have you seen this message before?

A    Yes, I have.

Q    Have you seen this exact message before?

A    I have seen this exact message before.

Q    And did you draft it?

A    I was one of the drafters, yes.

Q    You were?    Okay.    Who would have cleared this document?

A    This document would have been cleared certainly with the State Department team at post, to include those of us at NHKIA, including Ambassador Bass, but it would also have been cleared by Greg Floyd and embassy personnel at the KAC, all the way up to Ambassador Wilson.    And then it would have been cleared via the State Department Operations Center --

Q    Okay.

A    -- with other partners in Washington.

Q    And to whom --

A    So I'm sorry, one other.

Q    That's okay.

A    I would've -- I did -- I can tell you I did clear this with the 82nd Airborne and the Marine Expeditionary Unit who were there at post as well.

Q    Okay.    So several -- is it fair to say several individuals either helped draft it and/or cleared this document?

A    Yes.

Q    Okay.    And to whom would this message have been disseminated?

A    This was emailed to -- or actually, I'm not -- I'm not sure if it went email.    I think it went email -- email or texted to American citizens who had informed the State Department via STEP, our Safe Traveler Enrollment Program, or the email that they were in Kabul and seeking to be repatriated.

Q    Okay.    And if you can look at paragraph number 3, please.

A    Yes.

Q    It says:    Please provide photo identification for travelers.    Each family must have one U.S. citizen family member with a U.S. passport in their possession.

Would you agree that this provides guidance on what documentation would be needed to evacuate?

A    Yes, I agree with that.

Q    Okay.    If you look at the next paragraph, it reads:    If you need emergency assistance, please contact the call center at, and then provides a number.    Do you see that?

A    Yes, I see it.

Q    Do you think it's reasonable that if someone in an emergency would be able to call that number -- or would have a point of contact?

A    Yes, I do, because it was happening.    There were many, many Americans calling, or their loved ones.    Like, if there were Americans on the ground in Kabul, their

loved ones in the U.S. were calling on their behalf.

Q    Okay.    And what is -- there's a picture at the bottom of this correspondence.    What is that?

A    So that is a map showing the precise location where American citizens were able to access the Ministry of the Interior compound.    It is the checkpoint that the Taliban had asked us to direct people to.    Because prior to that, prior to when we started this -- this access point, no one had been able to access that ministry.    It was not a place that people were thinking of for an evacuation, so we wanted to make sure we were explicit about that as an entry point.

Q    Okay.    And how many messages of this nature were disseminated during the evacuation?

A    I'm not sure, but we sent several.

Q    Would it have been more than five?

A    I have to be -- I'm really not sure, but we did send it out on several different days.    I'm not sure, because the message itself was sent -- because we had some connectivity issues and, honestly, we didn't want to spend time sending emails.    So we, once this was cleared and approved at post, the Operations Center manually sent it for us.    So how many times it was sent, I'm not sure.

Q    Do you recall how many iterations of documents of this nature you personally reviewed?

A    No.    I don't.    It's probably three or five --

Q    Okay.

A    -- different kind of versions of this, although we did it more times than that. I think the message was static sometimes, but we would revise it as we had lessons learned.

BY ▮▮▮▮▮▮▮ :

Q    And just to be clear, the yellow star in the picture that you were describing on this exhibit, is that the same access point at the Ministry of the Interior compound that you described earlier in your testimony --

A    Yes.

Q    -- as the successful route for bringing American citizens safely onto the compound and evacuating them?

A    Yes.    Because before this, Americans -- because I think, if you can see here -- this is filtered through a lot of stress and trauma, but if I remember what I'm looking at correctly on this, very close to this access point is the access point that was the traditional route to the passenger terminal, where they could not go.    And so we wanted to be really clear with people that we were sending them to a slightly different location that would not put them in harm's way.    That is my recollection about why that star is where it is.

Q    And you testified earlier that American citizens did successfully reach that location?

A    Yes.    They did, yes.

BY ▮▮▮▮▮▮▮ :

Q    Could you talk to us a little bit about the call center that's identified in the exhibit?

A    I believe that refers to the task force at the -- in the Operations Center at the Department of State that was responding to calls for evacuation assistance.

Q    So if folks had communicated with the call center, how did that information get to you on the ground in Kabul?

A    So because our focus was kind of the operation, we were interacting with

very few of the concerned Americans or family members directly.    That was where we were providing the information in real time about operationally where people could go, how we thought we could give them information that would help them be successful, or provide information to them that would help steer them clear of places that could be potentially dangerous for them.    But the -- the actual interaction with the Americans or lawful permanent residents or their family members was done in Washington to ensure that all the resources on the ground were focused on physically bringing as many people in and putting them on planes as possible.

Q    Okay.    So to contrast a little bit, using ballpark numbers, what percentage of the outreach to AMCITS was handled by consular officers at the airport?

A    At the airport?

Q    Uh-huh.

A    Oh, very little.    It was the experience of the consular officers on the ground at the airport that we funneled to Washington to do the interaction with the Americans and their family members.    We were really only interacting with the people in front of us most of the time.    There were, you know, occasionally someone could get to one of us directly, someone might know somebody's phone number or whatever, a phone might ring.    But far and away, the vast majority was via the Operations Center and the task force.

Q    And so on that point, I know we were talking a lot about the messaging that was disseminated to folks who had signed up for the STEP program.    Would it surprise you to know that between March and August 2021, the United States Government sent 19 separate messages to Americans enrolled with the embassy in Kabul, encouraging them to leave the country?

A    That would not surprise -- not surprise me at all.

Q    How does that compare to other communications disseminated in times of crisis, for example, based on your experience in Haiti?

A    No.   I'm not sure how the messaging was going in Haiti.   Similarly, I was outside bringing people in --

Q    Right.

A    -- rather than managing the messaging.   But I can maybe draw on my experience in Afghanistan in 2011 --

Q    Sure.

A    -- when I was the consular section chief.   We also had a level 4 do not travel.   It was a very violent time, and there were a number of attacks, even specifically against the compound.   But I would say the number of messages that we sent out of this nature was significantly less.

Q    Okay.   So is it a fair characterization to say the effort on behalf of the U.S. Government to reach American citizens in Afghanistan was significant?

A    Yes.   I would say that it was extraordinary and perhaps unprecedented.

Q    Okay.   And can you describe a little bit more what the STEP program is?

A    The Safe Traveler Enrollment Program, it's a way -- it's part of our overall Consular Information Program that allows American citizens or other people who are interested in our assessment -- you don't have to be a U.S. citizen to use it, although that's who it is targeted to -- to sign up for real-time messages that allow us to provide information about safety or well-being -- you can see some of these are health alerts -- to alert American citizens to risks when they are traveling abroad.

██████████.   Can I just jump in?

██████████.   Sure.

██████████.   So you just mentioned that the effort to reach Americans was

unprecedented and extraordinary.    You, I mean, have a breadth and depth of knowledge both in the consular world and in Afghanistan.    In your view, what made it extraordinary and unprecedented?

Ms. Howell.    I think the -- for me, the number of people seeking evacuation at a -- in a single moment was maybe generationally singular, like, I wouldn't say ever, but in my experience, in my lifetime, far and away the most -- the biggest number that was seeking it at that time.    But also, the government resources allocated to this evacuation were also extraordinary and made our ability to provide that assistance at that scale possible.    And so we were able to communicate more and evacuate more than we had been in the past, but primarily because we needed to evacuate more than we had in the past.

BY ██████████ :

Q    You had earlier testified that you were interviewed as a part of the afteraction report.    Is that correct?

A    Yes.

Q    Did you ever review a draft of the report?

A    I have not read it.    I have not read the report or seen a draft.

Q    Okay.    I'd like to introduce into the record exhibit No. 6.

[Howell Exhibit No. 6

Was marked for identification.]

BY ██████████ :

Q    The document is for public release, the After Action Review on Afghanistan. It is unclassified.    It is dated January 2020 to August 2021, and the date of the report itself is March 2022.

I'll give you a brief moment to just flip through it since you haven't had a chance --

A    I haven't seen it, yeah.

Q    -- to see it before.

A    Okay.    Is this the -- is -- this is the full report?    Is it?    I don't know, I haven't seen it.

Q    This is the --

A    Or a summary?

Q    -- publicly available --

A    Okay.

Q    -- in part.

A    Okay.

Q    Have you had a chance to briefly look over it?

A    Yeah.    Just I scrolled the consular part.

Q    Fair enough.    I'd like to draw your attention to page 14 of the report.

A    Okay.

Q    Paragraph 21.

A    Yeah.    Yeah.

Q    I'd like to read into the record paragraph 21, which reads:    Nevertheless, in response to this crisis, the Department undertook a massive effort involving tens of thousands of phone calls to contact directly as many private U.S. citizens as possible to determine their whereabouts, whether they wanted to leave Afghanistan, and to provide information on how they could be evacuated.    This was an extraordinary response to a unique situation.

A    Yeah.

Q    Do you agree with this finding?

A    Yeah.    I think it was absolutely extraordinary the number of people -- the number of consular officers and Foreign Service officers and civil service colleagues from around the world who volunteered to take these phone calls and to call them back over and over again.

Quite often, especially at the new Ministry of the Interior gate, when we would connect with an American who had been trying to access the compound for some time and we were able to get them, they would reference the phone calls and say that they had been in touch with people who kept saying -- reassuring them to try.

I think there was a lot of fear among the American community to identify themselves as American to a member of the Taliban who were providing security, and so a lot of these calls were to encourage American citizens that it would be safe to do so. And when they would finally get to us, they would express shock and surprise that the Taliban had actually facilitated their entry, and they would talk about how because of these calls they took the risk to do it.

Q    Thank you.

BY ▮▮▮▮▮▮▮ :

Q    Really quick followup.    In your experience as a consular officer, have you been trained on how to engage American citizens in crisis situations to make them aware of the assistance that's available and to encourage them to pursue such assistance?

A    Yes, that is part of our consular training.

Q    And similarly, you mentioned earlier that because many travelers didn't have documents or had destroyed their documents out of fear of the Taliban, that you relied heavily on the interviews --

A    Yes.

Q    -- to determine who was eligible for evacuation?

A    Yes.

Q    As a consular officer, did you receive training throughout your time at the Department on how to conduct such interviews?

A    Yes.    From the very first assignment, went through -- we go through a training called ConGen, and it is where we learn how to be a consular officer and required in order to have a consular commission.    And from the very beginning, that is the foundational course, basically.

Q    And would you say that consular officers, more so than other employees in the Department or employees at other U.S. Government agencies, have significant experience and specialized skills in these areas?

A    Yes.    I don't know that my colleagues at the Department of Homeland Security would say that we can do it more than they can, and I have a lot of wonderful colleagues and deep respect for CBP and his and CIS, but certainly among those, yes, we are very specialized in understanding who and who is not an adjudicating citizenship.

BY ███████████ :

Q    And one more question.    So you earlier testified that not all of the consular officers on the ground were in the consular cone.    Would those individuals still have had the requisite training --

A    Yes.

Q    -- and knowledge to adjudicate these decisions?

A    Yeah.    That's a good question.    Yeah.    So anyone who has been a consular officer, to include like a civil service colleague who has done an excursion tour or is eligible for a temporary duty assignment, in order to have a consular commission, is required to take ConGen and have consular training.

Q    So in your professional opinion, is it fair to say that the consular officers on

the ground were qualified to adjudicate decisions as related to who could be evacuated?

A    Yes.    I would say the consular officers were the only people on the ground who were in a position to do that.

BY [REDACTED]:

Q    And similarly to interview -- excuse me -- similarly to conduct outreach to and assist American citizens?

A    Yes.    That is our role.

Q    Okay.    We'd like to move to a new topic, specifically SIVs.

A    Okay.

Q    You mentioned that SIVs were one of the categories of eligible evacuees that you were looking for --

A    Yes.

Q    -- and processing on the ground in Kabul.    Could you please talk to us more broadly about your experience related to the SIV program?

A    So as a consular officer, we work with different kinds of special immigrant visas.    The most common one is something called a length-of-service SIV, which I think many of you may be familiar with, people who serve in our embassies or consulates or work for our government overseas for 20 years, or 15 with extraordinary service, are eligible for -- to apply for a special immigrant visa to the United States.    So we've all adjudicated those.

These Afghan special immigrant visas are a different category with different legislative authority that provide for a category of direct-hire employee or contractor or, in some cases, subcontractors and their family members, to emigrate to the United States after a year of service with the American Government, any piece of our American Government.

I was the consular section chief in Afghanistan from 2011 to 2012, which is when we restarted the program in its modern form, and I was the consular section chief at the time that we put in process the -- or in place the foundation for what has become the modern Afghan SIV program.

And so while I had not worked directly on the program for several years, between when I left that posting and came here, it is a -- it is a topic that, even though it is very specialized, I was very familiar with.

Q    And in broad strokes, can you tell us how the program works --

A    Yeah.

Q    -- for Afghan SIVs?

A    Sure.    So there's kind of two phases to it that are similar to the way it works for Afghan -- or for length-of-service SIVs, where first we make a determination that someone is eligible to apply for the visa.    And the way we do that is through something called the chief of mission process, that can sometimes be a chief of mission or a combatant commander delegates the authority to a interagency process to review and determine that the principal applicant has the necessary employment to qualify for the program, that they -- all of the qualifying family members that they're applying for have the qualifying relationship, and that there are no other ineligibilities that exist, that even if they have the employment, there may be some other ineligibility that could preclude their emigration to the United States.

So first they go through this, we call it a COM process, or chief of mission process, to determine if they're eligible to apply for the visa.    Once the eligibility has been determined, then it becomes actually the visa process, and they apply for that, and then we process them as a -- as an immigrant visa.    So there are kind of two phases to it.

Q    And in your experience with the Afghan SIV program dating back to, it

sounds like, its inception, essentially, or its current --

A    Yeah.    In its current form, yes.

Q    -- current form, are you aware of any challenges that have existed in the program with respect to processing and adjudicating?

A    Yeah.    It has -- it was slow to get off the ground, and as I was there, I can talk for some of the reasons why.    And I think some of the reasons that it was slow to ramp up in the numbers that we wanted are still some of the challenges, which is that there had to be a lot of recordkeeping to be able to verify that people are eligible for the employment-based part of this.    And because the legislation includes not just our direct-hire employees but subcontractors, contractors, and sometimes, you know, fairly distant removed employment from directly being a U.S. Government employee, being able to have access to all of those organizations' H.R. records to be able to verify employment, or to be able to access a supervisor to write a letter of recommendation, is a challenge, and has been unevenly administered across the various government agencies who are operating in Afghanistan.

Beyond that, the security vetting, obviously, is very detailed and intense. The -- the -- some of this population is less documented, so doing identity resolution is complicated.

So there are a lot of layers to this population that are different than a typical -- a typical visa.    And I think in the decade-plus that we've been working on these, some of those challenges have been solved and we've been able to move people through quickly, and some of them, I think, are still a little bit of a challenge.

Q    In your professional opinion, what are the causes of some of these challenges?

A    I think I am too far removed from some of the programmatic decisions that

are made on this to really comment effectively on that.

Q    Fair enough.    Are you aware of any steps that the State Department has taken to address these challenges?

A    In my role of -- as I contributed during the evacuation, I was not a participant in any of those, and I feel like from the very limited vantage point I had during the evacuation, it would probably be outdated for me to try to comment on something that I'm aware of from 10 years ago.

Q    Understood.    Do you have -- are you familiar with the term the SIV pipeline?

A    Yes.

Q    Is it fair to also describe the pipeline as a backlog?

A    I guess it's open to interpretation, right.    People waiting to be processed is how I would define the pipeline, the people that are moving through the process.

Q    At some stage of the process --

A    Right.

Q    -- but shy of having received the visa in hand?

A    Right.    But I'm not sure that I would necessarily agree that it always characterizes as a backlog.    Just because there are steps in the process, certainly there may be backlogs at various stages, but I would not agree that the entire pipeline is a backlog.

Q    Fair enough.    I will endeavor to use the term "pipeline" --

A    Okay.

Q    -- unless I'm quoting somewhere else that uses a different terminology.

A    Okay.

Q    But to that point, what was your understanding of the number of

applicants -- SIV applicants -- in the pipeline at the time that you arrived in Kabul?

A    I don't -- I don't think I knew that number.

Q    Okay.    I want to turn your attention back to exhibit 6, the After Action Review, page 13.    And at the top of that page, paragraph 13 says:    At the time the Trump administration signed the agreement with the Taliban in February 2020, there was a significant backlog in the Afghan SIV process.    That administration made no senior-level or interagency effort to address the backlog or consider options for other at-risk Afghans despite its commitment to a military withdrawal.

Does that statement seem credible to you -- that finding seem credible?

A    Again, at the time that they're referring to this, I had no direct involvement with this process, and I would just be sharing an ill-informed opinion to answer that question.

Q    But would it surprise you to hear that there was a significant backlog at any point in the SIV program?

A    There have been significant backlogs in the Afghan SIV process since the day it started.

Q    And can you describe what role you played, if any, from the ground in Kabul to contribute to the processing of SIVs at that time?

A    On the ground in Kabul during the evacuation, we were not trying to process SIVs.    What we were trying to do is make sure that if a person seeking evacuation expressed any credible identification of themselves, that they may possibly be in any step of that process, it was my understanding that those assessments were happening at the lily pads.    And so I wanted to make sure that we were as inclusive as possible, and if someone could speak in any way about the process or tell us about employment that would have made them eligible, we sent them to the lily pads for determination of

whether or not they met SIV criteria.

Q    And you testified earlier -- please tell me if I'm not characterizing this correctly -- that there had been a temporary narrowing for a couple days --

A    Yes.

Q    -- during your time on the ground --

A    Yeah.

Q    -- to a more exclusive definition of SIV --

A    Yeah.

Q    -- who would be eligible for evacuation, but that it ultimately broadened again.

A    Yes.

Q    Is that correct?

A    That is correct.

Q    And that suggests that, to the extent possible on the ground, were you moving as many SIV holders or potential SIV holders through as you could?

A    Yes.    Aside from the few days -- and I'm sorry I can't be more specific about how long it was, but it definitely wasn't more than a 2-day standup cycle, because I can remember two times talking about it.

Yes, other than that time, we were exercising a fairly expansive definition of "in the SIV process" or potentially eligible, because it overlapped not just with, okay, they can articulate something about the SIV process, but there was a distinct overlap to then a group of people who had a credible fear of persecution from the Taliban.

So quite often those two things overlapped, and if there was a possibility one or either were correct, it might be the same thing, so we boarded them.

Q    Okay.    And so regardless of -- you testified earlier you weren't aware of the

number of SIV applications in the pipeline when you landed in Kabul, but regardless of that number --

A    Right.

Q    -- your testimony is that you moved as many SIV holders or potential SIV holders through as possible?

A    Yes.

Q    Thanks.

Let's pivot to another group, locally employed staff.    How were consular officers on the ground in Kabul generally treating the cases of locally employed staff?

A    LE staff were -- locally employed staff were the -- like, right in the -- the core group of people that we were attempting to identify and provide support to.

There was a separate process that was happening.    It was one of the groups that the embassy and the NEO -- the NEO military team were also looking at other ways to identify them, because most of them had, I understand, destroyed their embassy badges at the advice of the embassy early on in the process for fear that it could put them at risk of persecution by the Taliban.

So from a consular perspective, the main way we were engaging with the locally engaged staff was through all of our screening processes as we identified them, they were obviously clearly approvable with their family members, and we were doing the same type of interview.    But that group of people is very easy to determine whether they're credible or not because they can describe an embassy, where they -- who their supervisor was, you know, what it looked like, and so it was very easy for them.

But I know that in parallel to what we were doing, there was also an embassy process to attempt to collate some of them and bring them on to the compound.    But I was only tangentially a part of that process, but the LE staff were considered a priority

group together with the lawful, permanent residents and the SIVs, just behind the Americans in priority.

Q    Okay.   That's helpful.   And what specific efforts did you or your team make on the ground in Kabul to assist locally employed staff who needed it?

A    I think I kind of may have just answered that, but I'll repeat that the -- that they were a priority group.   The consular officers were aware that they were a priority group, and that if someone had a credible -- could credibly identify themselves as a locally engaged staff or their family member, that we would bring them on the compound for other vetting.

Having served in Afghanistan twice, I knew several of them, and I had -- if I may, sorry to just divert for a moment, one of the most special moments of the evacuation for me happened when I went out to the passenger terminal at one point, and a minibus was unloaded.   And a gentleman who was the groundskeeper at the embassy who had been there back to the time that the Taliban were in power before and had been our groundskeeper, who did not speak English and only speaks Dari, got off the bus with his family and recognized me, and came over and greeted me and wanted to introduce me to his wife and daughters, who very proudly told me -- they were in English -- they were so excited to go to America.   Sorry.   Yeah.   So I think we treated them with enormous amount of respect, and they were a high priority for us.

Q    And out of curiosity, you mentioned he got off the minibus.

A    Yeah.

Q    Was there an effort to organize the travel of LES?

A    So because there were all of these -- there were all these gates, people came in different ways and at different distances, there was this parallel effort to bring LE staff -- and, again, I didn't work on this part directly, but of course I was briefed -- I believe

that some of them were brought together in locations and then bussed onto the compound at other locations.

That access point was close to this new Ministry of the Interior gate, which is on the -- like, miles from where the passenger terminal was. And so once they were on the compound, they would be bussed over to the passenger terminal and dropped. But it wasn't just the LE staff that were bussed over.

Q    Okay. Thank you. That's helpful.

Let me move to a different topic. Did you receive requests from other executive branch officials or agencies identifying individuals inside Afghanistan and requesting the consular team on the ground's assistance with getting them out of Kabul?

A    There were such requests. I only received a few personally. I -- I think I mentioned before I had some communication issues, so I was very, very rarely on email but primarily communicating through kind of this Teams chat.

And because of my association with Afghanistan, there are some people who figured out I was there and tried to reach out to me, but it was extremely common for most of us who were on the ground to have requests to identify individual travelers.

Q    And how did you handle such requests?

A    I mean, for me, the way that those requests were handled was to direct them to the information that we were making publicly available, particularly if they were American citizens, right. I didn't have the bandwidth or believe that it was appropriate for me to try to somehow identify individuals when there were so many people that were also in the priority list to come.

But as much -- as much as anything, it was very, very hard to, even when someone would say, there's an LE staff, U.S. citizen with an SIV, right, you know, all of the things, standing at that gate, because of the access control issue, it was almost impossible to do

anything with that data.    So rather than focus on individuals, it made so much more sense to focus on a better process to get as many individuals through.    Although the larger groups, a lot of those, again, were routed into the process where we sent people that may be on buses, or 20 or 40 or a hundred people, to the passenger terminal.    So if anything came in like that, we would direct it to the planning team for the MEU that was handling logistics at that gate.

I think I answered the question.

Q    Yeah.

A    Yeah.

Q    That was helpful.    I should've asked you previously when I asked you if you received requests from other executive branch officials regarding specific Afghans that they wanted your help to get out, did you receive those sorts of requests from Members of Congress or their staff?

A    We received -- and I will speak not just for me personally but for all of the team on the ground.    Those types of requests came from every part of our government.

Q    And did you receive those sorts of requests from non-U.S. Government groups?

A    Yes.

Q    And would you describe the volume of those requests as large?

A    Yes.

Q    And what percentage of your time on the ground in Kabul was spent working on such requests?

A    My time?    Very little.    Because I -- if I had spent my time on that, it would've been a boutique operation that prejudiced the volume of people that we needed to assist.

So as I mentioned, there was a group within the planning team that was working on groups.   And so if there was a group, I would funnel it to them.   But with any individual ones that made it to me, I would direct them to the task force, so I could make sure they were getting the best, up-to-date information that we were giving to all Americans or groups that fell into this category, to try to assist them as much as possible fairly.

Q    Okay.   And were you aware of any situations where any of these individualized or special requests resulted in people being evacuated who would otherwise not have been considered eligible or prioritized for evacuation?

A    I'm sorry, which group specifically?

Q    So the individual requests that were made to you or others on the ground by other U.S. Government, Members of Congress and their staff, or non-U.S. Government groups, to help specific people --

A    Yeah.

Q    -- do you have any reason to believe that any of those individuals were evacuated but would otherwise not have been evacuated or not have been eligible for evacuation?

A    No.   I'm not aware of any examples like that.   The vast majority of these requests were people that would fall into the categories of people that we were seeking to help, at least as far as I understood them.

I really, truly did not spend a lot of time on individual requests --

Q    Okay.

A    -- because it -- I didn't have the bandwidth to do that.

Q    Okay.

A    I focused on funneling them into these appropriate channels.   But I am not

aware of anybody who was evacuated, that we were alerted to, who then subsequently was determined not to be admissible.

Q    And you testified that you didn't have the bandwidth to work on those cases directly.    Did you have knowledge of others on the ground in Kabul who were working on those cases?

A    I do believe there were some people.    There were -- I felt -- I felt a lot of empathy for a lot of my military colleagues, because we've had so many members of our military who had served in Afghanistan who were being reached out to by people that knew they were there, saying, this is my interpreter, this is, you know, my Afghan partner, and I think they felt a very, very strong pressure to try to find those people.

For those of us at State Department, most of those connections were civil society leaders or personal friends, or LE staff who were here, but it was obviously just a lower number given just the volumes of who knew who.    So I do believe there were people that, particularly in the military, who had the access control responsibility at the gate, who did go out into the crowd to try to make connections to people that they had been alerted to.

And some of the -- some of the other special groups that we were alerted to ended up being these large groups that we were able to route to the military to come in via the passenger terminal.

Q    And last -- last question on this.    Given your testimony that you didn't feel you had the bandwidth to necessarily respond to these individual evacuation requests, is it fair to say that your assumption was that these requests were fairly time-intensive or could potentially be time-intensive?

A    Yeah.    Yes.    Yes, that is very fair.    And not just time-intensive, but time-intensive to assist one person that took me away from the ability to assist hundreds

of people if we just focused on having a better process --

Q    Thank you.

A    -- in which hopefully that person would also be able to gain access.

Q    Thank you.    That's helpful.

Okay.    And then I think the last topic I want to shift to, but don't quote me on that, were you aware of any evacuation efforts by private groups that were being organized independently of the State Department?

A    Yes.

Q    When did you become aware of these?

A    Periodically throughout the evacuation, we would be told that there was a private plane that had landed and that they intended to get certain groups, but that really wasn't a consular function, and my military colleagues handled that.

Q    For any of these private evacuation groups -- private groups' evacuation efforts that you became aware of, did you engage or aid them in any way, or you said that was mostly your military colleagues?

A    We did not engage -- the consular team did not engage or aid private evacuation groups in any way.

Q    And why was that?

A    It was not our role.

Q    Did you have concerns about any of these efforts complicating your own efforts to evacuate through a process?

A    I had concerns about where the planes were going and whether or not the passengers on it had been vetted for safe admission to the United States.    Some of my military partners had other concerns about their safety to operate on the tarmac, on the runway, in what was an unbelievably kinetic environment.    But, again, that was

ultimately their responsibility.    They owned the runway.

Q     Okay.    But in your opinion generally, what impact did these parallel but private efforts to evacuate people have on the overall U.S. Government effort that was ongoing to evacuate American citizens out of HKIA?

A     At least as far as I'm aware, it had a negligible impact because there were not significant numbers of them.    Had the number been more significant, it would've been more disruptive, because those planes taking off would have meant our military planes full of evacuees would not be taking off.    But it -- I don't think it had a significant impact on my operation.

Q     Do you think it had a significant impact on your military partners' ability to do --

A     I couldn't -- I would let them comment on that.

Q     Thank you.

█████████.    I had just one more question for you.    It's a really interesting juxtaposition, you've said terms like massive and complex operation, every minute counted, you were working on a 24-hour clock.

And then you've also shared a couple of really interesting narratives about a minibus coming in, or military folks coming with 30 individuals who were ready to be vetted.    And it strikes me as, given the complexity and the confines of the situation, there was a lot of creativity and an entrepreneurial spirit in terms of folks on the ground --

Ms. Howell.    Yeah.

█████████     -- really, really working to do their best.

We've had a number of TIs now and hearings, and that word keeps coming up.    It was really entrepreneurial, particularly given the extraordinary circumstances.

Is there anything you'd like to offer, whether or not you agree with that assessment or have more to add?

Ms. Howell.    I have not used that word, "entrepreneurial," to talk about what happened, but I think it is an extremely accurate description.    Because I think I referenced before too, at least from my perspective, on the operational piece of this, it was deeply collaborative.

There was -- I had no ego about who does what.    It's, how do we use the resources we have to get the mission.    And so sometimes somebody would come in and have a really brilliant idea about something that wasn't even part of their mandate, and the rest of the people in the room would say, yeah, why not, let's try it, right.

It's also why that hub at the passenger terminal was so important because, even though we had the major flow-throughs happening through the big public gates at first, and then we shifted to add in all these other ways, it was the incremental place where if anybody could get one of these people onto the military base safely, then, okay, fine, bring them to the passenger terminal, we will vet them then and there.

And I think in the end, there was no one thing that allowed us to get these huge numbers other than exactly this.    It was 10,000 small incremental acts of entrepreneurship, that totaled 122,000 people.

█████████    Is entrepreneurialism -- or being entrepreneurial an activity that you customarily see in the Department?

Ms. Howell.    Yes.    I'm going to say yes, at least in the Bureau of Consular Affairs. I think we have to because we have very, very large numbers of people that would like to travel to the United States and very large numbers of Americans that go abroad and periodically need assistance, and we have to respond to something that there is almost -- there are very rarely playbooks for, because as I said before, we do a lot of

planning, but we never plan for the exact scenario that happens.    So if we focus on the planning for the building blocks of things that must happen, then it allows us to be prepared to be entrepreneurial and pivot and take care of our people.

▓▓▓▓▓▓    Fair enough.    So customary at least within the Consular Affairs --

Ms. Howell.    Yes.    Well, I won't speak for the rest of us.

▓▓▓▓▓▓.    I have no further questions.

Do you have, ▓▓?

▓▓▓▓▓▓.    Is there anything else we haven't asked you about today that you would like to share with us that you think would be important to our committee's investigation of these events?

Ms. Howell.    No.

▓▓▓▓▓▓.    Thank you very much.

▓▓▓▓▓▓.    Thanks.

▓▓▓▓▓▓.    Would you like -- wow, my voice just cracked.    Would you like another 5-minute break or do you want to continue?

Ms. Howell.    I'm okay.

▓▓▓▓▓▓.    ▓▓, do you think you're going to have a full round, or do you have any estimate?

▓▓▓▓▓▓.    I think we're going to have at least -- we're going to have another hour, I think.    We're going to try to fit it in in that hour, and then I don't know if the minority has -- will probably have follow-up questions to that, but we're going to try to --

▓▓▓▓▓▓.    You're going to try to finish in this round?

▓▓▓▓▓▓.    We're going to try to finish in this round.

▓▓▓▓▓▓.    But I think we'll be -- we'll be able to avail ourselves of an equal time.

Whether we avail ourselves, I will tell you --

▮▮▮▮▮.    Understood.    I just want to make sure you plan ahead.

Are you good with plowing forward?

Ms. Howell.    I'm okay.    Does anybody else need a break?    Do you need a break?

Okay.    Okay.

▮▮▮▮▮▮.    I unfortunately have to step out.

Ms. Howell.    Okay.

▮▮▮▮▮▮.    But thank you very much.

Ms. Howell.    Thank you.    It was nice to meet you.

▮▮▮▮▮.    Let's try to move on.

▮▮▮▮▮▮.    Okay.    Sorry.    I just need 1 minute.

I guess I needed a minute.    Okay.    So we can start the clock, please.

BY ▮▮▮▮▮▮:

Q    So I wanted to introduce another exhibit into the record.    I believe we're at exhibit 7 now.

[Howell Exhibit No. 7

Was marked for identification.]

Ms. Howell.    Thank you.

BY ▮▮▮▮▮▮:

Q    Okay.    So these -- exhibit 7 represents remarks by President Biden on the drawdown of the U.S. Forces in Afghanistan on July 8th.    I'll give you a moment to just take a look, overview.    I'll direct you to the exact portion of the document in just a moment.

A    Okay.

Q     I'd like to draw your attention to page 2, I believe it's the third to last paragraph, which I'll read into the record:    I intend to maintain our diplomatic presence in Afghanistan, and we are coordinating closely with our international partners in order to continue to secure the international airport.

Am I correct in understanding that on July 8th, in a public statement both to the Nation and the world more broadly, the President asserted that the United States would be maintaining its embassy presence in Afghanistan?

A     I mean, that is what the document that you gave me says.

Q     And the NEO, based on, I believe, is exhibit 1, the date on that request was August 16th or the 17th, correct?

A     Yes.

Q     So up until July 8th and perhaps later, the President was communicating about maintaining our presence.    In your professional opinion, do you think this could've contributed to any of the chaos or confusion at the airport?

A     I am not in a position to speculate on that.    I was at that time very focused on our presence in Turkiye and don't have an opinion that's informed enough to share.

Q     Is it fair to say that up until about a month before, the public messaging was that the United States will stay in -- will be in Afghanistan, at least diplomatically?

A     I don't feel comfortable commenting on that.

Q     Okay.    Another follow-up question.    On August 19th, President Biden -- this is not related to the exhibit anymore, but President Biden vowed that if there are American citizens left, we are going to stay until we get them all out. Do you recall this message at any point?

A     When was it?

Q     August 19th, I believe he stated.

A    I honestly was probably in transit somewhere in a military aircraft.    I don't recall the statement.

Q    Okay.    Do you recall, if not the date, that the statement was ever made?

A    I don't recall the statement.

Q    Do you consider this to be a goal set by the President, however, if this were a public statement?

A    I would refer that question to the President.

Q    Okay.

A    It didn't -- it was not given to me as an objective on the ground.

Q    Okay.    So when you're on the ground, that statement was never communicated to you as a priority --

A    To get --

Q    -- or as an objective?

A    That we would not leave until every American --

Q    Correct.

A    No.    I understood the goal was to get every American who wanted to be repatriated if possible, but not that we would not leave until every American who wanted to be evacuated was evacuated.

Q    Okay.    Thank you.    Appreciate that.

So I'm going to backtrack a little bit.    This is going to go back to our earlier points of discussion about the sort of evacuees.

I'm curious, if an evacuee was determined not to be eligible for evacuation but somehow had found their way onto the premises, what would happen to them?

A    Thankfully that was rare.    Far and away the majority of evacuees who made it to the passenger terminal for the final vetting were, I mean, the vast majority, were

determined to be eligible to board the flight.

There were some people who made it there and they were either deemed a security risk or not likely to be admissible to the United States or any of the countries where we had lily pads, and we had coordinated with the military -- with the Marines and the Army -- to come up with a process where those people were pulled aside, they were isolated, they were evaluated as to whether they were a security risk.

And then the military had places, not back at the main big gates where the Taliban were putting a lot of attention, to quietly let them off the compound in a less populated area, hopefully not to create additional security risks for them as being sent off the compound.

Q    So how did the consular teams at lily pads further process Afghan evacuees who were deemed eligible who were sort of let through with no reliable form of ID?

A    I was not present at a lily pad.    I am not sure what the process was.

Q    Okay.    In your opinion, what were the biggest challenges for the State-military coordination or, more specifically, the Consular Affairs-military coordination?

A    On the ground in Kabul?

Q    Uh-huh.

A    Overall, I think it worked well.    I do feel like some of the things that we've talked about today, like different missions and a lack of ability to communicate to -- in great detail -- constantly evolving realities, to people in a very large geographic area who were under fire the entire time, sometimes created misunderstandings.

Like, I think that was probably the biggest challenge, that I may sit next to a marine commander and we have an agreement, but then every single marine and every single consular officer spread in different places may need to understand the same thing

almost immediately.    That didn't always happen.

Q    And I'm going to backtrack further, back to exhibit 1, the NEO request.

There was a specific group of populations that we had previously referenced.    As part of those populations, were you told how many people would need to be evacuated under the NEO?

A    No.

Q    Are you familiar with the gate pass document that was circulated electronically and widely duplicated and copied?

A    Can you be more specific?

[3:14 p.m.]

BY ▮▮▮▮▮▮▮▮▮▮:

Q    Are you familiar with the gate pass document that was circulated electronically and was duplicated and copied?

A    Can you be more specific?

Q    The gate pass, I believe, there was some form of a pass that was circulated, that was provided to sort of eligible populations, and that was then copied and circulated more broadly?

A    I believe you may be referencing a document that the embassy issued just about the time that they evacuated the embassy prior to my arrival.    I heard reference to this document, but by the time I had arrived on the 19th, it was not in use or in circulation, and we did not repeat it.

Q    Okay.    Do you know -- so was the embassy responsible for its creation.    Is that correct?    To the best of your recollection?

A    To the best of my recollection, I have a very vague memory of being briefed on the fact that at the very, very beginning of the transfer to the airport, that they had emailed something that people could print and bring.    I think that may be what you're referring to.    But I have not seen it, don't know the details, and it was not something that was in use after my arrival.

Q    Okay.    Thank you.    Ms. Howell, are you familiar with the Marine Corps' NEO tracking system?

A    Is that the manifesting software that they use?

Q    Correct, with the wristbands and everything else.

A    Yes, yes.

Q    Okay.

A    I have some familiarity, yes.

Q    Can you explain to us, to the best of your recollection or ability, how that tracking system works?

A    I have a very baseline understanding.    But what we saw in practice is that after -- in the passenger terminal, outside, we would do the -- the Marines would do a final security screening.    They had people walk through a metal detectors, they'd pat them down, check their belongings.    The people would discard anything that wasn't like their belongings they would take.    Then a consular officer would do a final kind of review of boardability.    If they wouldn't pass that, they would go upstairs, and the Marines had a room where they had a couple of Marines set up --

████████.    Are we sure that this is a good setting?

Ms. Howell.    I'm sorry?

████████.    Are we sure that this is a good setting?

Ms. Howell.    Yes, I think so.

████████.    I am just reminding.

BY ████████:

A    They had laptops.    And they would manifest based on whatever information or documents that the traveler may have.    And then they would put a wristband on them.    And they would set -- it's very much like an arrival at an airport. They would sit in the terminal by wristbands and then put them on the planes.    That's the only familiarity I have with it.    I did not interact with the software itself.

Q    And what was the primary purpose of that?    Was it to maintain accountability or be able to know who goes where, et cetera?

A    I think it's the same reason airlines wonder who's on the plane, right?    Like

they needed to do tracking, but also like so that we could figure out who went where afterwards.    And if, God forbid, a plane goes down, then who's on the plane?    Yeah.

Q    Do you know what some of the limitations of that `system may be?

A    I really don't know much about the system, other than I know that's what they were using.    You know, the one limitation that seems obvious to me is that it doesn't seem to interface with any of our systems.    It seems like an opportunity.

Q    Do you think that given the fact that some of those individuals did not have identification, would the wristbands -- could it be construed as an individual having been vetted, or would it even mean that someone had been vetted?

A    It was implied that a person had been vetted at that point, because that they were very contained.    At least, if I am remembering the way this process worked correctly, the people who had wristbands and had been manifested by the Marines were about to get on a plane.    So they weren't like back out mixing either with the rest of the population that was on the airport, or certainly outside the gates.    So I think maybe there is a -- there would have been an implication that they had both been fully security screened by the Marines, and that some consular officer somewhere had probably said that they're eligible to board the flight.    There could have been other ways they were using it.    That's the piece of it that had visibility on.

Q    Okay.    And what information did either the consular team or the military confirm before a wristband was given?

A    I honestly am not sure what data fields they were looking for.    I assume it was bio data.    A name, date of birth, something like that.

Q    Okay.    Can you please discuss the circumstances under which numerous passports and American citizens seeking to evacuate were destroyed?    Were you aware of that at all?

A    That certainly didn't happen like during the evac -- like the evacuation from in NHKIA.    I think, are you referring to the passports that were at the embassy when then left?

Q    Correct.

A    Okay.    I don't know much about that because I wasn't there.

BY ███████████

Q    Were there other instances in which, you know, passports were destroyed that you are familiar with?

A    In Afghanistan?

Q    Yes.

A    No.

BY ███████████ :

Q    So I have one follow-up question.    What was the State Department's plan post August 31st to get the Americans, the hundreds of Americans, tens of thousands of Afghan allies left behind?

A    I was not a part of that.

BY ███████████ :

Q    All right.    Moving on --

BY ███████████

Q    Yeah, could you speak about how the State Department tracks the number of American citizens in a foreign country?

A    The American -- I would take -- I don't want to use the word "track." Americans don't like to be tracked.

Q    Maintains records of.

A    So I think what we do is try to be respectful of the privacy of U.S. citizens

while estimating the demand that there may be for us to provide assistance to them. And the way that we do that, generally, is through a process called the F-77 report. I'm sure you're familiar with it. And we take a bunch of data points, and they vary a little bit from country to country, based on what data is available; arrival and departure records that the host country is willing to share that with us; combined with the number of Americans who have voluntarily registered via the Safe Travel Enrollment Program.

These are just examples. There may be other data points, the number of people who have stopped services from us, right, coming through with a passport or filing an immigrant visa petition, things like that. So we take data point as much as we possibly can and use those to estimate how many Americans we think may be in a country. That's an oversimplified version of that. But due to our commitment to the privacy of American citizens, it's hard to say exactly how many Americans may be in a certain country if they choose not to report it.

Q    And what were the estimates of the American citizens in Afghanistan at the time that you were conducting the evacuation?

A    To be honest, I don't recall.

Q    Did you know at the time that you were conducting the evacuation?

A    I do remember having a conversation early in my arrival about the numbers. As I was speaking about earlier, I spent a couple of days focused on the numbers, thinking somehow I would use that number to do things differently. But then at some point, realized that the number wasn't something actually needed to do any of what we were doing. And so I made space for other data in my brain. I do believe I knew at some point, but I don't know now.

BY ███████████:

Q    All right. So you kind of touched on this before, but can you speak to the

security situation at HKIA, or the security situation outside of the airport, and what was the security situation inside of the airport?

A    The security situation from my impression outside of the airport -- I mean, I'll share with you, it was just audibly kinetic, as well as, you know, all the reports from the consular officers and the Marines about the number of people coming in with severe injuries, or if the Taliban chose to fire indiscriminately into the crowd.    It may be other injuries.    Crowd-crush injuries.    Things like that.    Or sometimes Americans would tell me that if they were moving past the Taliban's checkpoint, the Taliban would maybe strike them with sticks, which sounds very consistent with their behavior.

So we were also -- I had been briefed by military partners that there was ISIS risk, and they were worried about that.    So the security situation outside the perimeter was terrible just to use a technical term.    It was just really bad.    Inside the compound, we felt like the perimeter was secure to some degree, but there was always the risk of IDF incoming, or stray bullets coming over the wall, grenades coming over the wall.

And then one of the things that we were very worried about, particularly at the beginning when we were being successful in getting large numbers of evacuees onto a compound, but I'm not really sure why, I don't think I ever got clarity on it, but for a period there was some delays in flights taking off.    So we had very, very large numbers of evacuees on the compound for a period.    It was more like the crowd control, or even have public health issues with this many people without adequate bathrooms or food, things like that.    But generally on the compound, I felt the security situation comparatively was kind of okay.

Q    And so, when you say perimeter, I want to get this clear, perimeter outside the situation, outside the perimeter, you're talking about outside of the U.S. force's perimeter, but sort of inside the Taliban outer perimeter?

A    Yes, yeah.

Q    And so, you briefly testified that you had no interaction with anyone from the Taliban Government.    Did you interact with any of the Taliban sort of foot soldiers that were on there?

A    [Nonverbal response.]

Q    No?    Did anyone on the consular team --

A    Sorry, let me speak out loud.    I was shaking my head no.

Q    Did anyone on the consular team have any contact with them that you know?

A    No, they would not have had any contact with them directly.    And I feel very confident that I would have had that as a report.    There are times when we were at the perimeter that the Taliban were very close, close as I am to you, but they were not -- they were like watch standard-type Taliban, not decisionmaking Taliban.

Q    And --

A    Taliban.

Q    -- and you mentioned some of your observations of the Taliban with beating folks with sticks, firing into the crowd.    Did you observe sort of anything with your own eyes what the Taliban was doing to the people outside of the perimeter?

A    Yeah, I was there the day that we tried to use the passenger terminal for the first time to bring in Americans, and I was outside when they lifted the gate.    It was terrible.    It was chaotic.    It was heartbreaking.

Q    And so that would sort of go into you saying that the Taliban were quote, "inconsistent partners," they sort of helped sometimes, and then not helped other times?

A    Yes, that's correct.

Q    To the best of your knowledge, what were some of the security

understandings with the Taliban?

A    I had very little direct knowledge of that.    What I know about the agreements with the Taliban was briefed to me from the military leadership, but it was usually in the context of understanding when we were going to try something new, like using the passenger terminal or using the new MOI gate, or like the exhibit that we had where we would, you know, told Americans go over there.

Like, for example, that document that we produced, the exhibit -- sorry.    If I could show you, that document was based -- yeah, here we go.    This one.    This exhibit.    That --

████████ .    She is referring to exhibit No. 5.

BY ████████ :

A    We had to -- we had to have a photo identification for the traveler because it was a requirement of the Taliban.    Like, because we were asking them to use their ministry and use this access point, and this is one of the those most entrepreneurial moments where we said, are we going to do this?

But it wasn't about, does anybody want to have an agreement with the Taliban?    It was what saves Americans' lives?    And we thought there was a chance to save American lives.    And so the Taliban said that they would not be comfortable with people -- and this was relayed to me by military command who met with the Taliban on this.

Q    I'm sorry, who were those that were meeting with them?

A    Admiral Vasely and General Donahue.    They relayed to me that the Taliban agreed to this plan, if and only if, Americans could produce a passport.    So we said, okay, that's not going to be all the Americans, but it's some Americans, let's try it.    So that was an agreement with the Taliban that we try it.    And they did it just haphazardly.

Q    Gotcha.    And so in 2011, you were in Kabul for the September 13th, 2011, attack?

A    I was.

Q    Yeah.    Attacked the embassy with RBGs, a small arms fired, I think, 25 Afghans besides the terrorists were killed.    So, you know, you know sort of their brutality firsthand.    Were you concerned at all with the fact that the U.S. was relying on this same Taliban to provide the outer layer of, quote, unquote, security at HKIA during the evacuation?

A    Was I concerned?

Q    Yes.

A    Yes, I was concerned.

Q    How did you feel about relying on the Taliban for that security?

A    Well, I knew that between me and the Taliban was the 82nd Airborne, and I feel really great about the 82nd Airborne.

Q    Gotcha.    Is it your assessment that the biggest challenge with the NEO was the actions of the Taliban and the reliance on the Taliban for that security?

A    I wasn't say it was the biggest, but it was a factor.    You know, like I have to be real of the fact that -- what I would say is the biggest constraint to have gotten more people onto the compound was access control and perimeter control and crowd control, and elements of which was they need to depend on the Taliban.    But even had the Taliban not been the first ring, we still would have had the massive crowds and, you know, and the pressures that would have come from those.    So I think you can only say that in context of the other factors.

BY █████████ :

Q    Would you say that the constraints of the using HKIA as the point of the NEO

were a significant challenge?

A    In what way?

Q    The urban environment, the access issues that you just mentioned, the massive crowds.

A    No, I don't think I would say that.    And I don't know, maybe this is me speaking out of experiences, particularly relevant, but I don't know that I think that there are -- I don't know that it would have significantly changed what happened to be in a different place.    At the end of the day, if we had to be in a place no matter where it was or how big it was, it had a perimeter, and given the number people who were seeking evacuation, being in a more remote location, would likely have only made it more difficult for the people we were trying to evacuate to access this.

BY ███████████ :

Q    Do you know the names of any Taliban officials who were in charge providing security outside the perimeter?

A    No.

Q    No?    Do you know if there were Hakani members of the Taliban providing security outside the airport?

A    No.

Q    Is it your assessment that the same as net prices when you said that U.S. security coordination with the Taliban extended to -- you were asked the question if U.S. security coordination with the Taliban extended to Hakani, and you said, No, it does not, meaning, you know, the Taliban and the KIA network are distinct entities.    Is this your assessment as well?

A    I am not going to make an assessment about the constitution of current Taliban leadership.

Q    All right.

█████████.    Were you aware of an offer made by the Taliban to the U.S. Government to secure Kabul?

Ms. Howell.    No.

█████████.    Okay.

BY █████████:

Q    Are you aware if the Taliban turned away any American passport holders?

A    There are anecdotal reports that the Taliban did turn away some Americans.

Q    And you mentioned the Taliban beating Americans with sticks.    Are you aware of any other violence that the Taliban inflicted on Americans?

A    No, and I was very attentive to those reports, because obviously, I don't believe them to be particularly good faith partners, and I was concerned, right?    I didn't want to be sending people into harm's way.    So that was -- that was something I actively sought information on.    And the worst reports I had were -- and I'm not saying they're not bad -- but this, you know, kind of general harassment with sticks.

Q    Are you aware of claims from U.S. servicemembers on the ground that the Taliban was killing -- were killing Afghans within view of U.S. divisions at HKIA?

A    Yes.

Q    Did you, department officials, or anyone working for the Department ever observe this?

A    I did not.    There are consular officers who reported to me people that they saw people that were shot by the Taliban.

Q    So in your professional opinion, do you believe that the department planned for every contingency?

A    I don't -- well, I wasn't privy to the Department's planning process for this,

right, like in advance of the day that I arrived.

Q    I understand.    So you have always said or you said that you'll always wonder if you could have done a better job when you were there.    Do you believe that you could have done better if you had, you know, more time to plan and train for the -- for what you were going to undertake?

A    Not really, no, I don't, because the thing about that whole period was that minute to minute it changed.    I don't know that it was something -- I could have never envisioned some of the decisions that I had to make or some of the scenarios that occurred.    And so, no.    I have -- I do not think that I had more time to plan for it.    I would have had the creativity necessary to imagine some of the scenarios that occurred.

BY ▇▇▇▇▇▇▇:

Q    What are those, some of those scenarios that you could never have imagined?

A    Asking the Taliban to vet U.S. citizens to access a compound to bring them to me.    I could never have imagined that that would be something that I would be doing, and yet it worked.    It worked.    There are hundreds of Americans who are in the United States safely and their families, because we did that.    But as someone who had served in Afghanistan, multiple times, and has strong feelings about the Taliban, it was wild to me that that was something we were doing.    But I'm really, really proud of the decision that we all made.    And that was not like a single decision, that was a team decision to do that because it saved our lives -- saved many of these people's lives.

▇▇▇▇▇▇▇.    For the record, the witness was referring to exhibit 5 when she was talking.

BY ▇▇▇▇▇▇▇:

Q    You said that that was a decision we all made.    Who was involved in making

that decision?

A    The State Department and military leadership.

Q    But what specific individuals?

A    The people that I described that are normally in the morning battle rhythm meeting.    That was a conversation and decision to try that that we made in that meeting.

Q    And when was that made?

A    I am not sure what day we started doing this, but probably the day prior to the day we sent out the first message, which was I don't know probably around -- I'm guessing, I don't know, probably 22nd or 23rd.    Something like that.

BY ▬▬▬▬▬▬:

Q    I know you came on a timeline thereafter.    So this planning had already happened.    Were you -- in the course of your briefings, were you apprised of any sort of contingency plans that had been in place or the various scenarios that had been contemplated?

A    I think so.    Now, I want to follow up by giving you an example.    Like what -- I don't remember.    But what I -- the reason I say I think I must have been is because perhaps the person I communicated with the most in the military command was the senior planner.    And we spoke many, many times throughout the day.    And he had been part of the new group that went, like, to the embassy and had planned for the evacuation and been there and then was the person leading on the kind of constant revisions and updating as the reality changed.    And I know that we had conversations where he gave me context for, like, how we had gotten to the place where we were, and then we used that as a baseline for going forward.    So I feel like I must have been, but I can't think of a specific example to share with you now.

Q    Did any of those contingency plans, to best of your knowledge, to the best of your recollection contemplate the brutality, the violence, the clinging on planes that you witnessed?

A    I wasn't briefed of anything that referenced that.

Q    This is going to be a more difficult topic, but to the best of your ability, could you please walk us through or talk us through the sequence of events leading up to the terrorist attack at Abbey Gate?

A    Starting when?

Q    I guess starting from -- I know we've gone through when you got there, but sort of walking us through from when you got there to sort of the security concerns, the heightened security concerns, the gates shutting down.    I believe that you said Abbey Gate always the most vulnerable and the most threatened, so.

A    Yeah.    Okay.    So the -- I think as I have previously testified, the situation was very violent.    And I think I should also note that the information I had about the security information was coming from the military, right?    So because we were in -- co-located with them in the Marine JOC, and the 82nd JOC was directly across the street.    So it wasn't in the same building, but it was in that area.

Multiple times throughout the day, the Marines would do like an intelligence briefing and would provide information.    And then if there was something specific, you know, then we would get a specific briefing.    Ambassador Bass, John, I'm sure Ambassador Wilson got them much more frequently that I did.    When I would get them, it was, you know, very specific to a second.

But throughout that time, you know, we were aware that, you know, there was the risk, obviously, of just being there with the Taliban, but then there was an ISIS risk as well.    So I think the story probably for me, for my role in it probably should start in that

morning, the morning of the 26th.    About 4:00 in the morning, I was off-duty.    I was in the little billet that in HKIA, and my phone rang.    My colleague Jean who was on the overnight shift said that military, probably the Marines, I am assuming, because it was their information, and said that that they believed that there was strong information that there was a likely attack.    And based on that information, that she had made a recommendation to embassy leadership, and that includes Ambassador Bass and Ambassador Wilson that it was appropriate to send the MASCOT message out, advising Americans to move away from the Abbey Gate.

And the reason she called to tell me because it had already been approved, and it was in process.    But we were aware at that point, you know, the morning of the 26th, it had been decided for a couple of days that we were -- the American Government was going to leave on August 30th, although, it was not widely, you know, known that we were going to leave before midnight on the 30th.    And so, that was when we had started to fill the clock -- like we cannot waste any minute.    And the military had briefed me, and I cannot remember if it was the morning or the night of the 25th.    But I told the Marines probably at the battle rhythm meeting, but in some meeting at 6 p.m. on the 26th, Abbey Gate would close.    All of the other public gates were already closed. People were only still coming in via these other specialty gates.    So lower volume.    And so, everybody was aware that Abbey Gate was -- it was important to process as many people as we could there for as long as possible.

So, there was an enormous amount of consideration in making the decision to send that MASCOT directing American citizens away from Abbey Gate that morning because we knew it was the last minute, right?    And we were also sending messaging out, telling people, Leave Afghanistan, leave Afghanistan, leave Afghanistan, come to the airport.    And we -- there was a lot of thought about whether or not we were doing the

right thing.    But the information that they had seen from the military about the risk was so significant that they felt that it was important that we send a MASCOT message.    So I said, obviously, I concur with this decision.    We have to do it -- we have to tell people if there's a risk.    No double standard.    You familiar with no double standard.

BY █████████:

Q    Can you give us a very brief --

A    Following the Lockerbie Bombing, there was legislation passed that said that if American -- if the American Government is aware of a generalized risk that's not, like, specific to us, as representatives of the American Government, that we were required to share it with the American public in order to not have a double standard of safety and security information.

So, I guess -- I obviously wasn't in government during the Lockerbie Bombing, despite my silver hair, that we were aware of some risk of a threat to that fight.    And American Government and personnel were told not to fly.    But the general American public was not told, and many Americans died in the bombing.    So as a result of that, Congress passed legislation, which is also taught to all consular officers on day one of learning to be a consular officer that if we are aware of threat information that could save lives, that we would change our behavior based on what we share with the American public.    No double standard.

So we became aware of information.    That was a significant risk.    We are required to share it with the American public.    So we put out the MASCOT message saying there's a risk.    We advise Americans to avoid the area of the airport.    That was about 4:00 in the morning, that we made the decision, and I think it probably went out a few hours later because of the government.    So I went ahead and got up.    I came in. As it was usually, it was kind of my time to come in.    And at 6 o'clock, for the shift

change, we put more than half of the consular officers at Abbey Gate.    So we like really ramped up and said, Okay, we'll put as many people as we possibly can at Abbey Gate and the passenger terminal, I think, maybe there were a couple places that day, to try to get as many people through the gate as we possibly could before the Marines closed it at 6 o'clock.    Which was, again, a decision the Marines had made prior to this threat information.    That was something we were always going to do because the retrograde had really begun, and they didn't feel -- they felt that there was significant risk at that gate.

So throughout the day, in the JOC, they continued their intelligence briefings, you know, their officers to their leadership, and we were always invited to observe.    And at about, I think, guesstimating the time at about 2:30, I remember -- and by the way, I think I referenced it a few times.    There was always a DS agent and a DS analyst that was always with me the whole time.    And they were tracking the movements all of the state perimeters.    And the RSO that was on duty that day and the other DS employee, the title the flow of senior watch officer, I think, the two of them came back, and I had heard the briefing as well because we were all very concerned.    And the tenor of the briefing had changed.    And they said that the attack was imminent.    They believed the attack at Abbey Gate was immediately imminent.    And so the RSO and the watch officer said to me, there's a very strong recommendation that we pull our consular officers back from Abbey Gate at this point.    And I said, Yeah, we have to do it.    Because I have been listening now for close to 12 hours about this risk, and it seemed as we found out to be true.    It seemed like it was very credible.    So Abbey Gate wasn't right by where we were.    The JOC had took a while.    So it was probably an hour, an hour and 15 minutes later.    But the consular officers were actually back.    So now it was probably about 4 o'clock.    Again, I'm guesstimating.    I don't remember exactly, but it was -- it took a

while for them to get out there and come back.    They were frustrated with me.

I should also note that when I made the decision on the recommendation of the diplomatic security agents to pull them back, I had notified the Marines.    I can't remember which commander I told.    I think it might have been the lieutenant colonel who was there, but I told someone, and they said, that makes sense.    We have already got our Conex boxes out there anyway, which is how they were going to, like, close off the gate permanently.    So they had begun the process to close off Abbey Gate.    So the consular officers came back about 4 o'clock.    Something in that vicinity.    I went to a meeting, also in the JOC.    That's just in the office directly above me on actually the LA staff just to get an update on what was happening.    And at about 5:45, I did not hear the blast.    We were in a hardened structure.    The JOC was this thing.    I walked out, and it was so deafening.    The room was silent.    And, normally, there are hundreds of people in this room.    And Jean, my colleague, was standing at the bottom of the stairs, and she said it just went, the bomb went off.    And just -- it was devastating, and it was silent. And the consular officers, many of them were there.    The DS agents were bringing them in.    Basically, the entire operation, not just consulars, but like the operation had stopped while the Marines were providing the triage in the mass casualty event.    And they brought all of the injured and killed to the tarmac at the passenger terminal.    So that they were using where we had been doing the boarding as the mass casualty space.

So they asked us to hold, and we were waiting for news about casualties.    And I very quietly, Jean and I went around and reminded all of the consular officers and the State Department personnel that their parents or loved ones would start seeing this on TV, please text them, and say you're okay.    And we just waited.    And then we got the word -- I think it was about 45 minutes, maybe an hour.    It's hard to know because time kind of stretches out.

And it became clear that the number of casualties was significant, but they still weren't confirming that.    And one of the Marines, not one of the senior commanders, one of the kind of the mid-range Marines came to me and said, we're ready to go.    Like we're still doing the mass casualties, but we need to start processing again.    And so, I said all the consular officers are just looking at me.    And I was like, okay, we're ready to go.    We're going to the passenger terminal.    Who wants to go?

And a hundred percent -- like everybody's hands went up.    But the Marines said they couldn't handle that many, so we kind of just drew a line down the middle, I put on my body armor, and we talked over there, and they were still just behind us, kind of where normally the baggage comes through.    They still had the people being treated, the Afghans, and the soldiers, and the Marines.    And then we started boarding people again.    It really -- I might be 2 hours, it might be 45 minutes.    I don't really know because it was so wildly terrible.

██████████.    Yes.    Thank you very much for that.

And --

██████████.    One question.    Who was the RSO that you mentioned?

Ms. <u>Howell.</u>    There was an RSO on duty.    I believe his name was ██████████.

BY MR. STROTHER:

Q    And were there considerations after the bombing to any NEO right then and there; you said that you went back to work?

A    No.

Q    No?

A    Let me shake my head emphatically no.    I never heard anyone suggest that we should stop NEO, certainly not the Marines.

Q    And were you ever made aware that one of the sniper teams believed they

had made a positive identification of the suspected terrorists?

A    No.

BY ████████████ :

Q    Were you aware of the July 2021 descent count cable in Afghanistan?

A    I had read media reports that there was one, but I don't have any firsthand knowledge of it.

Q    Are you aware of whether the cable influenced department decisionmaking at all?

A    I have no knowledge of that.

████████████ :    Do you have any follow-up or any additional questions?

BY ████████ :

Q    Were you involved in any efforts post departure involving the evacuation and getting out Americans, LPRs, you know, SIBs, and other Afghans?

A    I have not been a part of that directly.

Q    When you say directly, were you part of that indirectly?

A    Well, as a consular coordinator for Turkiye, there have been a handful of Americans or people somehow -- I mean, it's like a handful.    Like three or four that had been able to make their way to Turkiye.    And I have worked with care to assist them. But in terms of, like, policy level, or operational level involvement in that, no, I have not.

Q    Another question.    Was there any effort to, you know, conduct sort of an after-action review or hogwash or lessons learned of either the consular team or the folks who were there on the ground during the evacuation?

A    There was a consular lesson learned process that was in, sometime in the fall of 2021.    I don't remember the exact month, and I was interviewed for that.

Q    Okay.    And what was, I guess, the result of that?

A    If there's a report, I haven't seen it.

Q    Okay.    But that was something specific to Consular Affairs and not, you know, Ambassador Dan Smith's after-action review?

A    Right, I also participated in the after-action review.    I was interviewed for that.    But I was interviewed another time for our consular-specific lessons learned.

Q    Are you aware of any other sort of lessons learned or after-action processes in the departments as in the Consular Affairs and Ambassador Smith?

A    No.

BY ▮▮▮▮▮▮▮▮▮▮▮▮:

Q    I actually had a follow-up question.    Are you aware of any of the sort of, for lack of a better word, deals the U.S. government agreed to with the Taliban related to the evacuation?

A    Other than these very specific ones, you know that I have kind of referenced where they have agreed, you know, Americans can pass this gate or at this time, those are the kinds of things I was briefed on.    Anything higher level than that or broader than that, I was not briefed on.

Q    Do you know who entered into those agreements or arrangements on behalf of the U.S.?

A    The specific ones I referenced, like using the MOI?

Q    Yeah.

A    My understanding was that those agreements were usually made by the military commanders General Donahue and Admiral Vasely in their face-to-face meetings with the Taliban.

Q    Do you know where they got their orders from?

A    I do not.

Q    Okay.    Can you speak to what information the U.S. is providing the Taliban during NEO?

A    No, I mean, the only piece I know about is the stuff that was like, we're going to tell them that we want to use this gate, or we're going to, you know, direct people to, you know, access the perimeter at this location.

Q    And I think I know the answer to this question, but were you made aware of the military rules of engagement in Kabul at all?

A    No.

Q    So I would like to briefly touch on your preparation for this interview.

A    Okay.

Q    How did you first learn of the committee's interest in conducting a transcribed interview?

A    One of my family members saw it on Fox News.

Q    Okay.    Was what was your reaction?

A    I need to check my email.    And then there was an email alerting me from, I think, Legislative Affairs that they had received a request.

Q    And what kind of preparations did you take for this interview?

A    Just discussions with Department counsel.

Q    And what State Department officials were involved in your preparation?

A    Three attorneys from the office of the, I believe, counsel of the legal advisor. And the two colleagues from the Legislative Affairs.

Q    Would you be able to provide us names?

A    Am I going to hurt their feelings if I don't remember all of them?

Q    To the best of your ability.

A    Obviously, these two, Molly and Stacy.    And then Ken Thomas -- Thompson.

Roy, who I don't remember his last name.

████████.    That's okay.

BY ████████████:

A    And a person named Hunter Mims.

Q    Were any officials from outside of the Department involved in your preparation?

A    No.

Q    What were you most proud of about the evacuation, and what were your biggest regrets?

A    Obviously, I'm hugely proud of the number of people who are safely in the United States, that had a legitimate fear, whether they be Americans or Afghans or anything in between from the Taliban.    I am deeply, deeply proud that they are safely in the United States.

Obviously, my regrets is that if there's even one person that feels like they wanted to leave, and we weren't able to provide assistance to them, particularly American citizens, I wish that that was not the case.

Q    Okay.    What do you think should have been done differently in retrospect?

A    I think that is an enormously broad and speculative question that --

Q    I'll narrow it.    If there's one thing you could have changed, whether it be the timing, whether it be -- these are just examples -- you don't have to adhere to these --

A    Yeah, I'll say --

Q    -- what would you have done differently?

A    I am really trying to think of a substantive answer to give you.    I swear, I'm not trying to not answer the question.    It's almost -- I have spent so much time thinking about it.    I'm sorry, I don't think I can answer that question.    I just can't.

Q    Is that because you wouldn't have done anything differently, or because of just sort of the magnitude is too great?

A    Well, I think it's not either.    It's something along the lines of -- as I mentioned before, I will always wonder -- and I've spent an enormous amount of time trying to think about what would have been different.    The situation was so exceptional, and the environment was so complex and kinetic, I think some of the torturing I've done of myself of imagining how it could have been different, I don't ever land on something where I think it would have made it a real impact and change.

If I talk about, like, what I had the ability to influence in the window that I arrived and was there, I don't know that there is one specific thing that I could point out to say, that's the missing link.    And if only we had had that or been able to do that, appreciably, there would have been something really different.    If you accept either the baseline parameters of the question to be, hundreds of thousands of people fleeing for their lives in a circle around a static location, and other people, not just the antagonists that we had that we had been at war with for 20 years, but even a third people of people trying to disrupt it, I just don't know what that missing piece was that would have made a difference.

Q    Okay.    And my apologies.    I believe my colleague has an additional question as a follow-up.

BY ▮▮▮▮▮▮▮

Q    So to sort of backtrack a little, for Americans and Afghans who were trying to be evacuated who were, you know, did not necessarily have a special connection or -- and with the government, how were they able to become evacuated?    How were they able to get through?

A    I am sorry, can you say it again who?    Which group?

Q    For Americans or Afghans who were seeking to be evacuated, who were eligible for evacuation, or having those difficulties, what did the State Department and military do to get them out?

A    Yeah, so there were lots of different ways that that was happening.    And, you know, some of it was just as simple as they had made their way to the front of the line and were able to identify themselves as U.S. citizens or someone, you know, in the list of protected groups that we were looking for, and we were able to kind of identify them in a crowd.

Many of them also received our guidance to go to the new MOI gate, or to travel. Many of them got together in these groups and came in on the buses through the passenger terminal gate, or were there on the day that we tried to do it with the Taliban for the Americans, and they came in that way.    Like, then there were other access points to the compound where other groups came through.    But, like, it was so many answers to that question.    You know, we were directing them to go to the places we thought that we could safely bring them onto the compound and evaluate them and get them onto planes, but it happened in many, many, many different ways.

█████████.    So we greatly appreciate you answering our questions today, making yourself available.    We thank you for your service to the Department and American public.    I want to give my minority colleagues an opportunity to ask questions. But we would like to, obviously, give you an opportunity to provide any closing remarks as well as let them proceed first.    So thank you.

Ms. Howell.    Thank you.

█████████.    Oh, I can say with confidence we're not going to avail ourselves to the full 52 minutes that we're eligible for right now, but could we quickly stop the clock and go off the record for a bathroom break?

[Discussion off the record.]

BY ▮▮▮▮▮▮▮:

Q    Okay.    So we're back on the record.    And as I said before, we will try to move quickly.    We really appreciate the time that you spent with us today.    Just a couple items to follow up on that my colleagues previously asked you about.    The F-77 form that you testified about --

A    Yeah.

Q    -- is it fair to say that the purpose of gathering data and estimating the number of American citizens in country on that form is to inform an evacuation plan that would need to happen from that country?

A    That is correct.    It's one of the primary purposes of the document.

Q    Okay.    I also want to talk about any stoppages in consular processing that happened during your time on the ground at Kabul.    You obviously testified to one discrete window of time after the Abbey Gate bombing where consular processing had to stop.    Thank you for your testimony on that.    That was powerful, and also, thank you for resuming processing so quickly.    But can you describe any other times during your deployment in Kabul where consular processing stopped?

A    Yeah, there were at least two.    One was the following day for the ramp ceremony for the Marines and soldier that was killed.    We all, the whole operation, including the military stopped, and we went to the tarmac to pay respects as the Marines were boarded onto their hero flight to come home.    So the re was a total stoppage even in retrograde at that time.    And then, early in my time in Kabul, again, I don't remember the specific day, but within a couple of days, we had -- I think I referenced earlier briefly there was a -- and I don't know why, buy there was a difficulty with the Air Force of getting enough flights to take off.    And the number of

evacuees on the compound really kind of swelled because the intake numbers were really high, but the planes weren't able to go.    And they were working on it, but there was, like, I don't know a 12- or 24-hour window where they were very concerned about the ability to provide food and water and sanitation to the number of people.    And the Marines, I remember General Sullivan, having this conversation with him, slowed down -- and I don't think if it was a complete stoppage, but we definitely reduced the number of people coming onto the compound because they were very afraid about the conditions on the compound.    And then they had a breakthrough, and we were able to have the planes start taking off.    And very quickly, we got back to a safe number of civilians on the compound that they could take care of safely.    And then we kind of ramped again.    Those are the only two that I'm aware of.

Q    Okay.    And in the first instance, you described the ramp ceremony, I think, we understand, obviously, out of respect for the lives lost.    You know, that would have been the reason for the stoppage of processing at that time.    The second instance that you described that happened earlier, is it fair to say that the consular processing stopped in parallel with the perimeter effectively closing temporarily?

A    Yeah, it was very -- definitely not a consular decision, not a recommendation.    It was an operational and security consideration that was made by the Marines because of, you know, the overall responsibility they had for kind of force protection and security of the evacuees.

Q    And how long did that stoppage last approximately?

A    And I want to be very clear, I am not sure if it was a complete stoppage, or if we just really slowed down while they got that kind of the back-end piece.    But I think it was no more than 24 hours, and it probably was less.

Q    Okay.    And your testimony today was but for those two times that you just

recalled, your understanding is that the consular processing occurred continuously?

A    Yes, up until I left mid-morning on the 30th with the Marines.    And I was at the passenger terminal, and the Marines were still bringing in passengers, and I was out there by myself vetting them until 8:30 or 9:00 that morning.

Q    Okay.    Thank you.

BY ███████████ :

Q    And would you have any reason to question why the military decided to stop processing related to safety?

A    No.    It seemed like an extremely good decision.

Q    And is it fair to say you trusted their judgment?

A    Definitely.

Q    And what informs that opinion?

A    A close observation under extreme circumstances.

Q    Okay.    I also wanted to make sure we have your testimony clear on this one point.    During the last round, you had testified when you landed in Kabul, the situation was chaotic.    Is that correct?

A    Yes.

Q    And to be clear, was the chaos as related to the Taliban and the situation outside of the perimeters?

A    Yes.    The chaotic environment was the -- the chaos was the environment. I don't want to misrepresent what was happening inside the compound.    This was a very large operation, and was very also kind of shaped by what was happening outside. Because what we haven't talked a lot -- in this briefing, there was also an element, especially early on where all the NATO partners who were still there.

So by the end, it was really just America.    But for the majority of this, there were

many nations that were there that had their militaries, that had their citizens, that had their planes, kind of adding to the complexity of what was happening.    So, I don't know that I would characterize inside their perimeter as chaotic, but it was certainly complex, and it was noisy and fluid.    And everything that was happening outside was chaos.

Q    Okay.    So is it fair to say that the State Department's response to the chaos was not chaotic?

A    I did not feel like our response was chaotic, no.

Q    Yeah, and so, we briefly wanted to touch back on exhibit No. 6, the after-action interview.

A    This one?

Q    Correct.    Dated March, 2022.    So, you had previously testified that you were interviewed for the AAR.    Is that correct?

A    Uh-huh.

Q    Are you aware that there were about a 150 individuals who were interviewed for this report?

A    No, I don't know that.

Q    Are you aware of who the drafter of the AAR is?

A    I know that Ambassador Dan Smith was overall responsible for the report, but I am -- I don't know who specifically drafted it.

Q    Have you ever worked with Dan Smith?

A    I have done -- I have done an exercise with Ambassador Smith.

Q    How did you find him to be in terms of his character?

A    He is a man I respect deeply.    He is obviously a man of integrity who cares about the welfare of the people that he works with and for.    And he is deeply intelligent.

Q    How have you seen him act with integrity?

A    The specific situation which I worked with Dan Smith is something that I don't think could be discussed here, so I don't want to go into great detail.    But I saw him have an opportunity to lead in a very difficult environment.    And I thought that the decisions that he made in that environment were clearly made from a place of integrity.

Q    Would you describe his character as trustworthy?

A    That is my impression.

Q    And objective?

A    I only had one discrete scenario in which we worked together.    So I don't want to overstate, you know, my experience working with him, but I found him to be a wonderful leader, a mentor, and manager in that environment.

Q    Understanding that you haven't reviewed the AAR in full, would you have any reason to doubt the credibility of its findings?

A    Oh, I feel like -- I don't feel -- I really haven't read it very much.    I don't want to have an opinion about a document that I haven't studied.

Q    Understandable.    I would like to draw your attention to page No. 6 of the AAR.

A    Yeah.

Q    There's a black box on the right-hand side entitled, Consular Officers at HKIA. Do you see that?

A    Uh-huh, I do.

Q    I know you've testified a lot today about the effectiveness and the general morale and values that were precipitated by consular officers.    So I think in closing we would like to read parts of this section into the record, if that's okay?

A    Sure.

Q    And if you have anything else to add in addition to what I read, please feel

free to do so.    And if not, that's okay as well.    So the section starts:    Consular officers responded heroically to extraordinary challenges while on the ground in HKIA.    Under relentlessly hostile and threatening circumstances, they assisted thousands of panicked U.S. citizens and at-risk Afghans in navigating a path to safety, drawing on their experience and judgment to make often wrenching decisions about whom could enter HKIA and to be evacuated, and whom to turn away.    The AAR team found the accounts of their experiences both uplifting and heartbreaking.    Is there anything you would like to add?

A    I don't think so.    That's not true, let me say something.

Q    Sure, please.

A    But like I said it before, the fact that every consular professional who was there was a volunteer, and unlike me, most of them well-trained consular officers had not served in Afghanistan, had not worked in a war zone prior, just because they believed it was the right thing to do.

The things that we asked of them were some of the most extraordinary and heroic acts of service in the service of our country that I personally have ever seen.    And this is my first time seeing this, but I know what every one of these anecdotes is, and there is so much more to every one of these stories.    And I am deeply, deeply proud to have been there and very, very honored to have been among them.    And I am so proud of them, and it makes me happy to see some of the stories of their heroism and sacrifice captured here.

Q    Thank you so much for your service.    That concludes our questioning. And on behalf of Ranking Member Meeks and the minority staff, we really appreciate your testimony here today.

A    Thank you very much.    Thank you.

▓▓▓▓▓▓▓▓.    We want to give you an opportunity for any closing remarks, if you have any.

Ms. Howell.    Thank you.    I don't think I have anything else that I would say.

▓▓▓▓▓▓▓▓.    Well, thank you, again, on behalf of Chairman McCaul, as well as the majority staff.    I really appreciate your making yourself available and for your testimony today.

Ms. Howell.    Thank you.

▓▓▓▓▓▓▓▓.    And the State Department as well and my minority colleagues.

Ms. Howell.    Thank you.

[Discussion off the record.]

[Whereupon, at 4:15 p.m., the interview was concluded.]

Certificate of Deponent/Interviewee

I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.

Witness Name

03/04/24

Date

**Errata Sheet for the Transcribed Interview of**
**Jayne Howell dated 07/28/2023**
1) majority errata, (2) minority errata, (3) State/agency counsel and witness errata

| Page | Line | Change | Reason |
|---|---|---|---|
| 2 | 12 | Change "SPECIAL" to "PROFESSIONAL" | |
| 5 | 5 | Add "Office of the Legal Adviser" after Department of State | |
| 8 | 18 | Change "Akres" to "Akers" | |
| 16 | 9 | Change "decisionmaking" to "decision-making" | |
| 17 | 10 | Change "he" to "she" | |
| 20 | 8 | Change "latest4e" to "latest" | |
| 20 | 8 | Change "latest4e" to "latest" | |
| 20 | 9 | Change "vice-versa verse" to "vice-versa" | |
| 27 | 2 | Change "four" to six" | |
| 30 | 16 | Change "Anka" to "Ankara" | |
| 30 | 17 | Change "Anka" to "Ankara" | |
| 33 | 16 | Change "decisionmaking" to "decision-making" | |
| 44 | 6 | Change "job" to "JOC" | |
| 44 | 7 | Change "job" to "JOC" | |
| 44 | 14 | Change "stair (ph)" to "staff" | |
| 47 | 2 | Change "172,000" to "122,000" | |
| 48 | 3 | Change "followup" to "follow-up" | |
| 53 | 11 | Change "task force" to "task forces" | |
| 53 | 15 | Change "task force" to "task forces" | |
| 54 | 18 | Change "Akres" to "Akers" | |
| 54 | 18 | Change "Akres" to "Akers" | |
| 55 | 9 | Change "cones" to "coned" | |
| 64 | 21 | Change "concert" to "consular" | |
| 65 | 7 | Change "State conflict contingent" to "state consular contingent" | |
| 67 | 19 | Change "Akres" to "Akers" | |
| 67 | 19 | Change "Akres" to "Akers" | |
| 69 | 24 | Change "Yeah" to "no" | |
| 76 | 24 | Strike "and who" | |
| 91 | 3 | Change "diplomat" to "diplomatic" | |
| 91 | 15 | Change "tens of thousands" to "thousands" | |
| 94 | 24 | Strike "and important" | |
| 98 | 13 | Change "admissible" to "admissible to the United States" | |
| 98 | 13 | Change "wherever" to "whenever" | |
| 98 | 14 | Strike "who" | |
| 101 | 11 | Change "Jane" to "Jayne" | |

| Page | Line | Change | Reason |
|---|---|---|---|
| 101 | 11 | Change "Connor" to "Conn" | |
| 101 | 11 | Change "Gene" to "Jean" | |
| 101 | 13 | Change "where I said, Great, consular officers." To "when I was not able to send consular officers." | |
| 101 | 14 | Change "somebody go" to "somebody would go" | |
| 104 | 4 | Change "I was a close to you as I am to Gen. Sullivan." to "I am as close to you as I was to Gen. Sullivan." | |
| 104 | 13 | Strike "and are there" | |
| 109 | 9 | Change "has a U.S. citizen" to "has U.S. citizenship" | |
| 110 | 18 | Change "travel" to "traveling" | |
| 111 | 5-6 | Change "Smart Traveler Enrollment -- our Safe Traveler Enrollment Program, STEP -- no -- Safe -- Safe Traveler Enrollment Program, STEP," to "Smart Traveler Enrollment Program" | |
| 112 | 12 | Change "Safe" to "Smart" | |
| 114 | 9 | Change "Safe" to "Smart" | |
| 118 | 17 | "Change "Safe" to "Smart" | |
| 121 | 17 | Change "followup" to "follow-up" | |
| 122 | 13 | Change "his" to "ICE" | |
| 122 | 14 | Insert "is or is not a U.S. citizen when adjudicating citizenship" after "specialized in understanding" | |
| 130 | 17 | Change "in English" to "speaking English" | |
| 137 | 8 | Change "to get the mission" to "to get the mission done" | |
| 145 | 10 | Change "if they wouldn't pass that" to "if they passed that" | |
| 145 | 20 | Change "set" to "sit" | |
| 145 | 20 | Change "arrival" to "terminal" | |
| 146 | 18 | Insert "I" between "that" and "had" | |
| 146 | 24 | Change "passports and American citizens" to "passports of American citizens" | |
| 148 | 8 | Change "stopped" to "received" | |
| 150 | 13 | Change "standard" to "stander" | |
| 152 | 4 | Change "RBGs" to "RPGs" | |
| 153 | 10 | Add "like Bagram" after "being in a remote location" | |
| 153 | 16, 21 | Change "Hakani" to "Haqqani" | |
| 153 | 19 | Change "net prices" to "Ned Price's" | |
| 153 | 21 | Change "Hakani" to "Haqqani" | |
| 153 | 22 | Change "KIA" to "Haqqani" | |

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 155 | 9 | Insert "if" after "I do not think that"  Change period to comma after "plan for it" | |
| 156 | 20 | Change "new" to "NEO" | |
| 157 | 22 | Change "Second" to "threat" | |
| 158 | 14 | Change "fill" to "feel" | |
| 158 | 15 | Change "I told the" to "I was told by the" | |
| 158 | 16 | Change "in some meeting at 6 p.m." to "in some meeting, at 6 p.m.," | |
| 159 | 4 | Add "Are" before "You familiar? | |
| 159 | 24 | Change "government" to "government clearance process" | |
| 160 | 14 | Change "perimeter" to "officers" | |
| 160 | 15 | Strike "the flow" | |
| 160 | 23 | Change "the JOC had took a while" to "it took a while to get there from the JOC" | |
| 160 | 24 | Change "later.  But the consular officers" to "later, before the consular officers" | |
| 161 | 9 | Change "LA" to "LE" | |
| 162 | 3 | Change "mid-range" to "mid-ranking" | |
| 162 | 19 | Replace "any" with "end the" | |
| 163 | 4 | Change "descent" with "dissent" | |
| 163 | 7 | Change "decisionmaking" to "decision-making" | |
| 163 | 13 | Change "SIBs" with "SIVs" | |
| 163 | 21 | Change "hogwash" to "hotwash" | |
| 167 | 15 | Change "people of people" to "group of people" | |
| 171 | 4 | Strike "by" | |
| 174 | 12 | Change "well-trained" to "while trained" | |
| 74 | | "Mr." to "Ms." | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |