IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:25-CR-143 |
| | ) | |
| MOHAMMAD SHARIFULLAH, | ) | |
| | ) | |
| Defendant. | ) | |

## MR. SHARIFULLAH'S RESPONSE TO THE GOVERNMENT'S MOTION TO QUASH

The government seeks to quash a trial subpoena for Jayne Howell, Chief of Mission at the U.S. Embassy in Sri Lanka and a direct eyewitness to critical events preceding the Abbey Gate attack on August 26, 2021. Its motion rests on two main arguments: that Ms. Howell's testimony would be cumulative and that the State Department's *Touhy* regulations bar her appearance. The Court should reject these arguments.

### I.   Ms. Howell's Testimony Is Not Cumulative—It Directly Bears On The Independent Intervening Cause Of The Charged Deaths

The government characterizes Ms. Howell's anticipated testimony as merely duplicative of the U.S. Central Command (CENTCOM) report, which it contends already establishes that U.S. government personnel were aware of an imminent attack on Abbey Gate before it occurred. This framing misses the point. The significance of Ms. Howell's testimony is not simply that personnel had advance warning of the threat. It is what decision-makers did with that warning, and whether

the military's failure to act on the same information it shared with Ms. Howell constitutes an independent intervening cause of the soldiers' deaths.

According to Ms. Howell's transcribed testimony before the House Foreign Affairs Committee, when the tenor of the military's threat briefings changed on August 26, 2021, she made an affirmative operational decision: she directed all State Department consular officers to withdraw from Abbey Gate. *See* GX-4 at 160–61. She testified that State Department officers had fully withdrawn from the gate by approximately 4:00 p.m. *Id.* at 161. The attack occurred thereafter at approximately 5:30. The military, which had transmitted the same threat assessment to Ms. Howell and had, in her words, already 'begun the process to close off Abbey Gate,' did not complete that withdrawal before the attack. *Id.*

This distinction is relevant and material to the death-resulting sentencing enhancement. As we have argued, the government must prove that the offense conduct was a proximate cause of the charged deaths. A superseding independent cause—here, a decision by military commanders not to withdraw soldiers in the face of imminent threat reporting that was sufficient, in Ms. Howell's judgment, to require the immediate withdrawal of all civilian personnel—may break the chain of proximate causation. That the CENTCOM report acknowledges awareness of threat reporting does not establish that the military's response to that reporting was reasonable or that its decision-making did not constitute an independent intervening cause.

The government's own framing of the CENTCOM report underscores the gap. The report states that certain personnel were aware of 'increased credible reporting' and that a 'MASCAL event was imminent' as of approximately 1300 on August 26. What the report does not explain—and what Ms. Howell's testimony uniquely addresses—is why, given this common threat assessment, the military chose a different course of action than State Department leadership did. That question, and whether the military's independent decision is a cause of death that breaks the chain of causation from defendant's alleged conduct, cannot be answered by the CENTCOM report alone.

The government's own motion concedes that Ms. Howell's testimony would address 'discussions about what she was told about the security posture in and around Abbey Gate before the attack.' Gov't Mot. at 7. It then argues this would constitute inadmissible hearsay. But Ms. Howell's own decision-making—her independent assessment that an attack was imminent and her resulting operational order to withdraw State Department personnel—is not hearsay. It is her own conduct and judgment, fully admissible as lay testimony. *See* Fed. R. Evid. 602, 701.

## II.   The State Department's Touhy Regulations Do Not Bar Compliance With A Federal Criminal Subpoena Because The Government Has Waived Sovereign Immunity In This Proceeding

The government's reliance on the State Department's *Touhy* regulations also misreads the law as it applies in federal criminal proceedings. As the D.C. Circuit held in *Houston Business Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208 (D.C. Cir. 1996), a federal court litigant may seek production from a

federal agency by means of a federal subpoena precisely because the federal government has waived its sovereign immunity in 5 U.S.C. § 702. *Id.* at 1212 ("[N]either the Federal Housekeeping Statute nor the *Touhy* decision authorizes a federal agency to withhold documents from a federal court."). Unlike a state-court litigant, whose sole remedy is an APA collateral action, a federal litigant may invoke the court's inherent authority to enforce its own subpoenas, subject to review of the agency's refusal under the APA's arbitrary-and-capricious standard.

Indeed, even in the context of a subpoena that did *not* originally arise from a federal case, the Fourth Circuit has held that the Administrative Procedure Act waives the federal government's sovereign immunity and permits a federal court to order a non-party agency to comply with a subpoena if the government has refused production in an arbitrary, capricious, or otherwise unlawful manner. *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 277 (4th Cir. 1999). That case arose from an arbitration proceeding—a far less compelling context than a federal criminal prosecution—and yet the Fourth Circuit recognized APA-based waiver as the proper vehicle for reviewing an agency's *Touhy*-based refusal.

In this case, the State Department cannot refuse to comply with a valid subpoena issued by this Court arising from a federal action. Moreover, even in the context of APA review, the State Department's refusal is both arbitrary and unreasonable. The Department declined to authorize Ms. Howell's testimony primarily on the basis that the defense's original *Touhy* submission was insufficiently specific—then rejected the defense's curative letter without separately analyzing its

4

adequacy. But the curative letter identified with precision the specific testimony sought: Ms. Howell's decision to direct State Department personnel to withdraw from Abbey Gate, and the threat reporting that prompted it. The State Department's categorical refusal to engage with that explanation—without any showing that the requested testimony implicates classified information or would burden national security interests—does not constitute reasoned agency action.

In sum, *Touhy* regulations cannot be read to permit the government to both prosecute a criminal defendant and simultaneously use its agency regulations to deny that defendant evidence material to his defense. *See United States v. Reynolds*, 345 U.S. 1, 12 (1953) ("since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense").

### III.    The Defendant Made A Good-Faith Attempt To Comply With Touhy Regulations, Distinguishing This Case From *Soriano-Jarquin*.

*United States v. Soriano-Jarquin*, 492 F.3d 495 (4th Cir. 2007), cited by the government, is not to the contrary. In that case, and the Fifth and Tenth Circuit decisions it cites, *United States v. Wallace*, 32 F.3d 921 (5th Cir. 1994), and *United States v. Allen*, 554 F.2d 398 (10th Cir. 1977), the defendants made "no attempt whatsoever to comply with" the applicable *Touhy* regulations. *Soriano-Jarquin*, 492 F.3d at 504. The Fourth Circuit's holding was expressly tied to that failure: where a defendant makes no effort to engage the agency process, the court may decline to compel compliance.

Here, the defendant served a *Touhy* request on the State Department on March 27, 2026. When the Department identified deficiencies in the original submission, defense counsel responded the same day with a curative letter the same day providing additional specificity regarding the testimony sought. The government acknowledges both submissions. The distinction from *Soriano-Jarquin* is therefore not technical but fundamental: a defendant who engages the *Touhy* process in good faith and is nevertheless denied authorization stands in an entirely different position from one who ignores it.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion to quash the subpoena. Ms. Howell possesses unique and material testimony that is not cumulative of other available evidence, the State Department's *Touhy*-based refusal is not valid given the government's waiver of sovereign immunity, and the defendant has satisfied his obligation to engage the agency process in good faith.

To the extent that requiring live in-person testimony from Ms. Howell would be too burdensome, the Court should direct to work with the defense to arrive at a mutually acceptable resolution perhaps including testimony by video or by deposition, as Mr. Sharifullah has requested.

 Dated: April 17, 2026.

Respectfully Submitted,

By Counsel,

_____/s/_____
Geremy C. Kamens

6

Va. Bar No. 41596
Federal Public Defender
Lauren E. S. Rosen
VA Bar No: 98540
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800
(703) 600-0880 (fax)
Lauren_Rosen@fd.org
Geremy_Kamens@fd.org

7