IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) ) | Case No. 1:25-cr-00143-AJT-1 |
| MOHAMMAD SHARIFULLAH, | ) ) | |
| *Defendant.* | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

Defendant Mohammad Sharifullah ("Defendant" or "Sharifullah") has been charged with a one-count indictment alleging conspiracy to provide material support to a foreign terrorist organization, the Islamic State of Iraq Khorasan ("ISIS-K").

Defendant has moved to suppress the statements he made to the FBI in five separate interviews in March 2025 and his interview with a journalist in March 2020. [Doc. No. 125] (the "Motion"). The Court held a hearing on the Motion on April 7, 2026, at which the Defendant presented evidence, including testimony by Colonel Steven Kleinman, an expert in human intelligence, strategic interrogation, resistance, and counter terrorism,[1] and the Government presented evidence, including exhibits and testimony by Agnieszka Pikulicka-Wilczewska, the journalist Defendant spoke to in 2020; Kaniskha Bakhshi, a language specialist at the FBI that served as the interpreter for Sharifullah's statements to the FBI that are the subject of this Motion; Wyatt Tackett, the FBI medic that performed Defendant's medical examination; and Austin Price, the FBI agent that Sharifullah made statements to in March 2025.

---

[1] Defendant did not testify at the hearing.

On April 17, 2026, the Court denied the Motion, [Doc. No. 192], and issues this Memorandum Opinion in further support of its ruling.

## I.    THE EVIDENCE

Based on the evidence and information presented in connection with the Motion, the Court makes the following findings:

A.  <u>Sharifullah's background in Afghanistan, detention by the National Directorate of Security, and 2020 interview with journalist.</u>

Sharifullah was born in Kabul, Afghanistan in the late 1990s and as a young adult allegedly participated in ISIS-K activity. [Doc. No. 125] at 2. Between 2019 and August 2021, the National Directorate of Security ("NDS") in Afghanistan detained Sharifullah for his alleged participation in ISIS-K activity, where Sharifullah in his pleadings contends he was "tortured," "shocked by electrical currents, his testicles were twisted, he was deprived of sleep, hung from the ceiling and stretched with a heater placed beneath him, burned with cigarettes, and had plastic bags placed over his head so he could not breathe." *Id.* at 3.

During this period, in 2020, while in NDS custody, Sharifullah gave what he contends was a "required" interview to a Polish journalist, in which he described his recruitment into ISIS-K and, as the journalist testified, appeared "relaxed" and "proud" of his affiliation with ISIS-K. [Doc. No. 194], 04/7/2026 Tr. at 85 (A. Pikulicka-Wilczewska). The journalist testified that, unlike two of the other NDS prisoners she interviewed in that time frame, Sharifullah posed for photos, provided her with his real name, and spoke freely about his involvement with ISIS-K. *Id.* at 82–83. NDS officers escorted Sharifullah to and from the interview with the journalist, and remained in the room for the duration of the interview. *Id.* at 91.

2

B.  <u>Sharifullah's detention by the Pakistani ▆▆▆▆▆▆▆▆▆ and interviews with FBI.</u>

In August 2021, Sharifullah was released from NDS custody in Afghanistan, following which he moved to Pakistan where he lived with his wife and three young children. [Doc. No. 125] at 4. In early 2025, Pakistani ▆▆▆▆▆▆▆▆▆ seized Sharifullah along with his wife who was approximately eight months pregnant, and his three children, all under ten years of age. *Id.*

Following his arrest by Pakistani officials, the FBI was notified by Pakistan that they held Sharifullah,[2] and agents traveled to Pakistan and conducted a series of five interviews with Sharifullah, two on March 2, 2025 (Interviews 1 and 2),[3] two on March 4, 2025 (Interviews 3 and 4), and one on March 5, 2025 (Interview 5). [Doc. No. 141] at 3–4. The first two of the interviews on March 2, 2025 took place in Pakistan while Defendant remained in ▆ custody; the third and fourth interviews took place in flight to the United States in FBI custody; and the last interview took place at the FBI's Washington Field Office, Northern Virginia Resident Agency. *Id.* Present at each interview was an interpreter fluent in Sharifullah's native language Dari. *Id.* Prior to Sharifullah's transfer to American custody, the Defendant was examined for any signs of injury by a medically trained FBI agent, who recorded his findings as to each area of his body, all of which were negative for any injuries or signs of torture or physical abuse.[4] [Doc. No. 141] at 4.

For the first two interviews which occurred while Defendant remained in Pakistani custody, the Defendant was transported to and from the interviews by ▆ agents with a hood over his head.

---

[2] Testimony concerning how the FBI came to learn of Sharifullah's arrest and detention by the Pakistani authorities was presented at the hearing by FBI Special Agent Price, who subsequently interviewed Sharifullah. [Doc. No. 194], 04/7/2026 Tr. at 190–91 (A. Price). Other evidence and information submitted in connection with the suppression motion reflects the involvement of the United States ▆▆▆▆▆▆▆ in efforts to locate and detain Sharifullah, which the Court has also considered. *See* [Doc. Nos. 167, 172, 190].

[3] The first session lasted approximately six hours, while the second session took two hours.

[4] During the hearing, Defendant elicited testimony concerning the ability of trained interrogators to administer types of torture that did not cause visible injury. [Doc. No. 194], 04/7/2026 Tr. at 136 (W. Tackett). The Court has considered that testimony together with all the other evidence concerning defendant's treatment and demeanor.

*Id.* at 17. The ▮▮ agents were not in the room for any of the interviews but Agent Price testified that they sought ▮▮ permission if Defendant wanted to leave the room. [Doc. No. 194], 04/7/2026 Tr. at 194 (A. Price). Defendant remained hand cuffed for the duration of the interviews. [Doc. No. 141] at 22.

Prior to the first two interviews, on March 2, 2025, FBI agents stated, as translated to Sharifullah:

> We understand that you may have previously spoken to someone else. We don't know what they have said you. Or what you have told them. Likewise, we're not interested in, uh, statements that you may have already given to them. We're starting something new from the beginning. Meaning, you do not need to talk to us if you have spoken to others in the past. If, the previous statements you may have, um cannot be, um used against you in the court. And, if you say anything now, can be u.., used against you in the court.

[Doc. No. 141-8], Gov. Ex. 20-2T at 2–3.[5]

The FBI agents then orally administered modified *Miranda* warnings through an interpreter advising the following:

> We're representatives of the United States of America. Even though we're not located in the United States of America[,] United States' laws provide you with specific rights in dealing with us. Before we ask you, a, any question, you have the right to be aware of your rights, Ok? You have the right to decide to remain silent. Even if you have spoken to others, it's not required that you speak to us at present moment. Anything you say, can be used against you in court. You have the right [he says] to have a lawyer with you before you start to have questions and answers with us. You also have the right [he says], to have a lawyer with your during the questions…if you don't have the money, or the financial capability to acquire yourself a lawyer…it's your right that you can have a lawyer provided by us, in um assigned to you. Our ability [he says,] to provide you with a lawyer at this time, um is limited he says, because of um, the local authorities' decisions, that are present here at this time, and also not having access to an attorney who, has studied law in the United States of America. If you decide to answer our questions today, without a lawyer present, you have the right to stop at any time during the answering.

*Id.* at 4–5.[6]

---

[5] There is no dispute that the Government provided this "attenuation warning" prior to the first three interviews. [Doc. No. 141] at 10.

[6] There is no dispute that the Government provided these modified *Miranda* warnings prior to each interview. *Id.*

Agents then instructed Sharifullah to read the warnings in writing on a form titled "Advice of Rights for Suspects in Foreign Custody," which they provided to him in Dari, and which he signed prior to speaking to the FBI agents. [Doc. No. 141-6], Gov. Ex. 20-2A (Advice of Rights in Dari); [Doc. No. 141-7], Gov. Ex. 20-2A-1 (Advice of Rights in English). Before signing the forms, agents asked Sharifullah if he had any questions, to which he responded "[N]o, just one, [] now there is no possibility of a lawyer. You are here, and God willing, I will answer, no problem." Gov. Ex. 20-2T at 6. The agents then proceeded to interrogate Sharifullah.

During the first interrogation, and prior to any *Miranda* warnings, Sharifullah asked in a whisper, "No one can hear our voice, right[?]" [Doc. No. 156-1], Def. Reply Ex. 2 at 2. An agent responded, "We don't know." *Id.* After the FBI officers administered modified *Miranda* warnings, Sharifullah again asked the agents if the session was being recorded. *Id.* at 14. Agents responded that they thought no one was recording the conversations, but were not certain and it was possible that ▮ may find out what he said. *Id.* During the course of the interrogation that followed, Sharifullah wrote two notes in Dari to pass to the FBI agent, reading as follows: "I wrote to you because my voice may [] be recorded. They may punish. My family, my wife is pregnant," [Doc. No. 141-15], Gov. Ex. 20-30B (English Translation), and "These guys made me confess that when I walked out of Pul-i-Charkhi prison I met with Dr. Shahab, Nawab, Fraidoon, and Satar and we designed the attack on the Kabul airport. This is not true. Please help! Don't talk here, my voice may be recorded." [Doc. No. 141-16], Gov. Ex. 20-30C (English Translation). At another point in the interview, Sharifullah said "please don't tell them [the Pakistanis] . . . what we discuss . . . because . . . they will put pressure on me and my wife." Def. Reply Ex. 2 at 20. While in FBI custody in transit to the United States, Sharifullah initiated a third interview. [Doc. No. 141] at 28. FBI Agent Price testified at the hearing that prior to departing Pakistan, Sharifullah asked whether

he was going with the FBI, and when told that he was, Sharifullah replied, "[g]ood. Now I will really talk." [Doc. No. 194], 04/7/2026 Tr. at 177 (A. Price).

Over the course of the five interviews, Defendant admitted to being a long-standing member of ISIS-K and to his involvement in several ISIS-K terrorist attacks, while disavowing his involvement in others. *See, e.g.*, [Doc. No. 141-9], Gov. Ex. 20-23T at 2–3 (admitting that his role in attack on a university was to take ladders for separate ISIS-K co-conspirators to use to scale a wall); [Doc. No. 141-18], Gov. Ex. 20-31T at 5–6 (disclaiming knowledge of attack in Bamiyan region of Afghanistan in May 2024). As to the HKIA attack, Defendant stated that he did not play a prominent role in the planning of the attack because he had just been released from prison, but claimed that he conducted surveillance in support of the attack. *See* [Doc. No. 141-23], Gov. Ex. 20-48T at 1; [Doc. No. 141-24], Gov. Ex. 20-50T at 1. Defendant did not materially change the substance of any of his confessions over the course of his five interviews with the FBI.

At the hearing, FBI Agent Price and the FBI interpreter Bakhshi testified that Sharifullah appeared relaxed and in good spirits, often laughing and joking with them. *See* [Doc. No. 194], 04/7/2026 Tr. at 108–09 (K. Bakhshi). The Government also showed, as exhibits, pictures taken of the rooms in which the interviews in Pakistan took place. [Doc. No. 141] at 22–23.

## II.    LEGAL STANDARD

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir. 2005). The Government bears the burden of proving by a preponderance of the evidence that the statement was voluntary." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (en banc) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

### III.    DISCUSSION

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. Amend. V. To enforce this right, every person subject to custodial interrogation must be advised of the following: (1) the right to remain silent; (2) that any statements may be used against the person; (3) the right to counsel before any questioning begins and during questioning; and (4) the right to appointment of counsel if the person is indigent. *Miranda v. Arizona*, 384 U.S. 436, 468-69 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000). "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under Miranda [] and the defendant knowingly, intelligently, and voluntary waives those rights." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (quoting *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012)). At bottom, the Fifth Amendment requires that a person's statements be "voluntary" to be admissible at trial. *See Braxton*, 112 F.3d at 780.

Voluntariness turns on whether "the defendant's 'will has been overborne and his capacity for self-determination critically impaired,'" or "whether the confession is "the product of an essentially free and unconstrained choice by its maker." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008). Whether a confession is voluntary is determined by examining "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Relevant factors include the age, education, and intelligence of the accused, the length and conditions of detention, and the duration and frequency of questioning. *Id.*

In his Motion to Suppress, Defendant argues that (1) his statements to ISI interrogators were involuntary, and  his statements to the FBI were tainted by his earlier coerced and involuntary

7

statements to ISI interrogators;[7] (2) defective *Miranda* statements mandate suppression of the statements Sharifullah made to the FBI; and (3) the statements Sharifullah made to various media outlets, and any other statements made while in NDS custody, including those to the journalist in 2020, were similarly involuntary and therefore must be suppressed. [Doc. No. 125]. In response, the Government argues that the Defendant's inculpatory statements to the FBI were voluntary because (1) his claims of abuse and threats by Pakistani authorities are unsupported; (2) Sharifullah validly waived his *Miranda* rights after the FBI agents provided proper warnings and attenuation notices; (3) the comfortable environment, Sharifullah's relaxed demeanor, and his behavior during the interviews—including correcting the agents, minimizing his culpability, and proactively initiating the third interview—further support voluntariness; (4) Sharifullah's consistent refusal to make the admission to participating in the planning of the HKIA attack apparently sought by the Pakistanis underscores that they did not overbear his will; and (5) that same reasoning shows that his family's detention did not render his statements involuntary.[8]  The Government further argues that Sharifullah's inculpatory statements to the journalist were voluntary.

---

[7] The record the Court has considered in connection with the suppression motion includes documents and information that Defendant contends reflect the involvement of the United States      in a "joint venture" or "coordinated efforts" with the ▮▮ with respect to the location, detention and interrogation of the Defendant. [Doc. No. 172]. Because the Government is not seeking to introduce statements made to the ▮▮ interrogators, the Court does not address Defendant's arguments to suppress those statements based on that evidence, but has nevertheless considered that information with respect to the FBI's interrogation of the Defendant, which did not involve the active participation of Pakistani authorities. *Cf. United States v. Abu Ali*, 395 F. Supp. 2d 338, 381 (E.D. Va. 2005) (Under the joint venture doctrine, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities" or the foreign agents acted as "agents, or virtual agents, of United States officials.") (internal quotation marks omitted).

[8] In its written opposition to the Motion, the Government also referenced, as evidence reflecting the voluntariness of his statements to the FBI and his lack of fear of U.S. law enforcement, Sharifullah's violent threats against his brother-in-law on a call he knew was being monitored by the FBI while Sharifullah was incarcerated at the Alexandria Detention Center. *See* [Doc. No. 141] at 4 (Sharifullah "repeatedly threatened to behead, break the bones of, shoot, and stab his brother-in-law in retaliation for allegedly battering his sister"). However, there was no mention or evidence presented concerning this statement at the hearing, and the Court does not rely on these statements for the purposes of its ruling on the Motion.

A.  Whether the *Miranda* warnings were defective and mandate suppression of Defendant's statements.

Defendant first argues that the warnings given to Sharifullah failed to comply with the requirements of *Miranda*, and therefore his statements to the FBI should be suppressed. [Doc. No. 125] at 18–19. More specifically, Defendant contends that he was not adequately advised of his right to counsel. In the alternative, Defendant argues that even if his *Miranda* warnings were proper, he did not validly waive his *Miranda* rights and his statements were in any event involuntary.

1.  *Whether Sharifullah was adequately advised of his right to counsel.*

Though no "precise formulation of the warnings" or "talismanic incantation [is] required to satisfy [Miranda's] strictures[,]" *California v. Prysock*, 453 U.S. 355, 359 (1981), the warnings must "reasonably conve[y] to [a suspect] his rights as required by Miranda." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (internal citations and quotations omitted). The Supreme Court has suggested that *Miranda* warnings would not be sufficient "if the reference to the right to appointed counsel was linked [to a] future point in time after the police interrogation," *Prysock*, 453 U.S. at 359; *Duckworth*, 492 U.S. at 203 ("[T]he vice referred to in *Prysock* was that such warnings would not apprise the accused of his right to have an attorney present if he chose to answer questions."). The remedy for failure to provide a proper *Miranda* warning is exclusion of improperly obtained testimony at a criminal trial. *See United States v. Hashime*, 734 F.3d 278, 281 (4th Cir. 2013).

Courts regularly scrutinize how the right to counsel is phrased in *Miranda* warnings, invalidating warnings that are unclear about the right to counsel, or otherwise fail to reasonably convey the government's obligation to provide counsel. *See e.g.*, *United States v. Noti*, 731 F.2d 610, 614-15 (9th Cir. 1984) (holding warnings defective because officers failed to inform defendant he had the right to counsel during questioning as well as before questioning); *United*

9

*States v. Botello-Rosales*, 728 F.3d 865, 867 (9th Cir. 2013) (holding Spanish translation that suggested "that the right to appointed counsel is contingent on the approval of a request or on the lawyer's availability, rather than the government's absolute obligation" was misleading and did not satisfy *Miranda*); *United States v. Perez-Lopez*, 348 F.3d 839, 848 (9th Cir. 2003) (invalidating waiver that as translated required defendant to solicit a lawyer, which "implies the possibility of rejection."); *United States v. Wysinger*, 683 F.3d 784, 803 (7th Cir. 2012) (holding warnings improper where agent stated right to counsel only applied to questioning, suggested the defendant had to choose between representation before questioning or during questioning, and agents confused the defendant "regarding the start of "questioning" and divert him from exercising his rights."); *Lujan v. Garcia*, 734 F.3d 917, 931 (9th Cir. 2013) ("The problem here is that the words used by law enforcement did not reasonably convey to Petitioner that he had the right to speak with an attorney present at all times—before and during his custodial interrogations.").

Here, the Government introduced evidence that both written and oral *Miranda* warnings were given to Sharifullah that stated that he had a right to have a lawyer before he answered questions but that his ability to have a lawyer was limited by "the decisions of the local authorities or the availability of an American-trained attorney." Gov. Ex. 20-2A-1. The Defendant was also specifically told that "if you decide to answer questions now without a lawyer present, you have the right to stop answering at any time," *id*,[9] a right that was repeated to Defendant at several points throughout the interview. *See, e.g.,* [Doc. No. 141-17], Gov. Ex. 20-30T at 2 ("[O]ur conversation today is, you know, your choice, your decision and it's voluntary."); [Doc. No. 141-18], Gov. Ex. 20-31T at 4 ("We told you from the beginning that when you answer our questions, you have the choice, the choice to answer or not to answer.").

---

[9] *See also* Gov. Ex. 20-2A (Advice of Rights in Dari).

In *United States v. Pahlawan*, this Court considered materially identical warnings[10] and rejected the contention "that the FBI agent improperly qualified his right to counsel by informing him that counsel may be limited by 'local authorities' decisions or the unavailability of an American-trained attorney." 2025 WL 1239354, at *50–51 (E.D. Va. Apr. 29, 2025). Here, as in *Pahlawan*, the Defendant "never invoked his right to an attorney." *Id.* at *50-51 (distinguishing *Lujan v. Garcia*, 734 F.3d 917 (9th Cir. 2013), where defendant invoked his right to counsel, at which point the detective informed the defendant that a lawyer would not be available on a Sunday evening); *Perez-Lopez*, 348 F.3d at 848 (invalidating *Miranda* warning where it implied the possibility of rejection of a lawyer, if requested). And following those modified *Miranda* warnings, Defendant asked questions and made statements that indicate he understood his right to counsel and that he could not have access to a lawyer at that time, but could in the future, and was nevertheless willing to speak. Gov. Ex. 20-2T at 6 (Defendant stating ". . . now there is no possibility of a lawyer. You are here and God willing, I will answer, no problem.").

For these reasons, the modified *Miranda* warnings satisfied Defendant's Fifth Amendment privilege against self-incrimination.

### 2. *Whether Sharifullah validly waived his Miranda rights.*

Defendant argues that even if his Miranda warnings were effective, he did not "knowingly and intelligently" waive his privilege against self-incrimination and his right to retained or appointed counsel. [Doc. No. 125] at 24–26. A valid waiver of *Miranda* must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "must have been made with a full awareness of both the nature of the right being

---

[10] The relevant portion of the *Miranda* warnings in *Pahlawan* advised, "[h]owever, our ability to provide you with counsel at this time may be limited by the decisions of the local authorities or the availability of an American-trained attorney," and like those given to Sharifullah, stated that the defendant had the right to stop answering at any time. *United States v. Pahlawan*, 2025 WL 1239354, at *18 (E.D. Va. Apr. 29, 2025).

abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."). To determine if a waiver was knowing and intelligent courts consider "the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of the Miranda warnings." *United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012).

Although Defendant in his briefing points to his limited education in Pakistan and lack of familiarity with the U.S. criminal justice system as indicative that he did not "knowingly and intelligently" waive his right, [Doc. No. 125] at 25, there is no evidence that Sharifullah did not comprehend his rights or failed to understand "the main purpose of *Miranda*," that is "to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Dire*, 680 F.3d at 475 ("[I]t is not necessary that 'a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.'"). And as discussed above, Sharifullah repeatedly verbalized his understanding of his *Miranda* rights. Gov. Ex. 20-2T at 5 (when asked whether he understood his rights following the *Miranda* warning, Defendant responded "Yeah, thank you!"). Based on the totality of the evidence, the Court finds that Defendant validly waived his *Miranda* rights.[11]

B. <u>Whether Sharifullah's statements to the FBI were tainted by coercion and therefore involuntary.</u>

Defendant argues that despite his signed *Miranda* warnings, the "coercive circumstances" of Sharifullah's detention tainted his confessions to the FBI, thereby rendering them involuntary,

---

[11] Defendant also argues that the "coercive circumstances" of Sharifullah's interrogation by the FBI further rendered his *Miranda* waiver invalid. For many of the reasons discussed below, the Court finds the evidence insufficient to establish that any torture inflicted upon Defendant by ▓ agents affected his *Miranda* waiver.

pointing to the first two interrogation sessions occurring while he and his family were still in ISI custody and his being led to the FBI interviews in leg shackles and cuffs, with a hood over his head, [Doc. No. 125] at 26.

"Compliance with *Miranda*'s procedural safeguards is [] necessary but not sufficient." *United States v. Purks*, 139 F.4th 388, 396 (4th Cir. 2025). "Even if the government complied with *Miranda*, a confession is inadmissible unless it was 'voluntarily' given." *Id.* The Government bears the burden of showing that a defendant's statements were voluntary. *Id.* Courts examine the "totality of circumstances to determine whether a confession had been made freely voluntarily, and without compulsion or inducement of any sort." *Id.* at 397. While the most obvious form of coercion is "the use of physical punishment," such as actual violence against the suspect or "the deprivation of food or sleep[,]" *Schneckloth*, 412 U.S. at 226, "coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). Other "forms of coercion, including psychological torture, as well as the conditions of confinement have been considered by courts in their assessment of the voluntariness of the statements." *United States v. Karake*, 443 F. Supp.2d 8, 51–52 (D.D.C. 2006) (collecting cases).

Most recently, the Fourth Circuit in *United States v. Purks* found a Florida state prisoner's statement to Drug Enforcement Administration ("DEA") agents voluntary only two days after he was beaten by prison guards whom the defendant "believed" had been directed to "assault[]" him by the interrogating DEA agents. 139 F.4th at 392-99. In concluding that the interview was "voluntary," the Fourth Circuit relied on (1) the "'couple of days'" between the beating and the interview, (2) the fact that "different agents from different agencies committed the alleged beating and conducted the interview," (3) the agents' provision of Miranda warnings and the "'voluntary,

13

respectful, and at times even friendly'" tone of the "'conversation'" and (4) "most importantly," the fact that "Purks answered some but not all of [the agent's] questions." *Id.* at 398–99.

Here, the totality of the circumstances surrounding Defendant's questioning sufficiently supports a finding that he voluntarily participated in the interviews. Each of the interviews took place in a comfortable setting: a hotel room and a guest house while in Pakistan (Interviews #1–2, [Doc. No. 141] at 22–23, on a private jet while traveling to the United States (Interviews #3–4), and at an FBI field office once in the United States (Interview #5). FBI Agent Price testified that his team was sensitive to Defendant's religious needs, including the fact that the interviews took place during Ramadan when the Defendant was fasting and could only eat after sunset, and needed to stop the interview to pray. [Doc. No. 141-18], Gov. Ex. 20-31T at 2; [Doc. No. 141-20], Gov. Ex. 20-44T at 2. FBI Agent Price testified about Sharifullah's positive and jovial demeanor throughout the questioning and the FBI linguist who served as the interpreter for the interviews testified that Sharifullah joked with him on a few occasions. *See United States v. Abu Ali*, 395 F. Supp. 2d 338, 348 (E.D. Va. 2005) (noting that defendant "appears at times to be relaxed, smiling, and laughing" during interview).

As to the substance of what Defendant told the FBI, he periodically corrected and supplemented information for the agents rather than simply going along with their version of events. *Lyons v. State of Okl.*, 322 U.S. 596, 604–05 (1944) ("[S]tatements correcting and supplementing the questioner's information" support the "voluntar[iness]" of a confession). Sharifullah also proactively initiated the third interview with the FBI agents once he was out of custody, but importantly reaffirmed his prior testimony, continuing to distinguish between false testimony purportedly sought by his Pakistani jailers and what he was telling the agents then. *See, e.g.*, [Doc. No. 141-31], Gov. Ex. 20-64T at 7 ("It is the truth, God willing"). Significantly,

14

Sharifullah repeatedly repudiated across all five interviews his statements to the ▆ that he planned the HKIA attack and coordinated with senior ISIS-K leaders concerning the same attack and was consistent in his statements concerning the extent of his actual involvement across all five interviews, even after being taken out of ▆ custody.

Defendant argues that notwithstanding the above, the coercive effect of the ISI's detention of Sharifullah and his family rendered all of Sharifullah's statements involuntary. The record is unclear concerning exactly when relative to his FBI interviews any coercion or physical abuse took place or the exact nature of that coercion and abuse. Nevertheless, the Court accepts that his family remained in ▆ custody during the FBI interviews, that the Defendant had an understandable concern for their safety and well-being and that the detention of one's family and threats of retaliation against them could, under certain circumstances, affect the voluntariness of an individual's confessions. But the specific facts here do not sufficiently support such a finding with respect to his statements to the FBI. Despite Defendant having claimed to have been under pressure from the ISI to say certain things, including admitting to having played a central role in the HKIA attack, once with FBI agents, Sharifullah repeatedly and consistently made statements to the FBI that were at odds with what the Pakistanis purportedly forced him to say. In doing so, he arguably subjected himself to increased retaliation from the ▆ but that he was willing to do so initially— and reaffirmed the truth of those statements even after he was removed from ▆ custody— undercuts the claim that any coercive hold the Pakistanis exerted over him rendered his statements involuntary. Overall, the statements he made do not appear to have been the result of any of the coercion he claimed caused him to make false confessions to the ▆. Considering the overall circumstances of the confessions, the Court finds that Sharifullah's statements to the FBI were not tainted by any prior or ongoing coercion that rendered them involuntary.

C.  Whether Sharifullah's 2020 statements to the journalist are admissible.

Defendant argues that because "Sharifullah was subjected to various forms of physical torture while in" detention in Afghanistan, his statements in 2020 to a Polish journalist should be suppressed.[12] [Doc. No. 125] at 29.

"When *Miranda* warnings are unnecessary, as in the case of statements made to non-government actors, the Court assesses the voluntariness of a defendant's statements by asking whether they are the product of an essentially free and unconstrained choice by its maker." *United States v. Elsheikh*, 103 F.4th 1006, 1021 (4th Cir. 2024). In *Elsheikh*, the Fourth Circuit, applying a totality of circumstances approach, found that the defendant's statements to media outlets while incarcerated in Syria were voluntary. In affirming the district court's denial of the defendant's motion to suppress statements made to journalists, the Fourth Circuit relied on the fact that numerous witnesses testified credibly that the defendant alone decided to participate in media interviews, decided how or whether to respond to questions posed by the press, and could even terminate an interview mid-course at his discretion. *Id.* at 1021–23. The Fourth Circuit further observed that numerous witnesses testified that they had never seen or received information indicating that the defendant had been mistreated or abused by his captors, and other than his sworn declaration, the defendant did not offer any evidence to counter that factual finding. *Id.*

Here, the facts are somewhat different, but counsel no different result.  Defendant contends that while he was in Afghan custody, he "was burned, shocked, deprived of oxygen and deprived of sleep," and "forced to provide an interview to a Polish journalist." [Doc. No. 125] at 28. Defendant has also filed a declaration in support of his Motion, describing his physical torture on

---

[12] Although Defendant's Motion references the interview with the journalist having taken place in 2019, the Government's opposition to the Motion and the testimony at the hearing made clear that the interview took place in 2020 while Sharifullah was in NDS custody.

16

"multiple occasions," including his hands and feet being tied together, being "hung from the ceiling with a heater beneath me," being "strapped to a metal chair with wet clothes wrapped around" him, waterboarded, and burned with cigarettes. [Doc. No. 156-3].

The journalist who interviewed Defendant testified at the hearing that Sharifullah's demeanor during the interview was confident, relaxed, and proud, and there was no indication he was being coerced to give the interview. And the transcript of that interview supports that characterization. *See generally* [Doc. No. 141-4], Gov. Ex. 11-1T.

Considering the evidence and testimony presented at the hearing, the Court concludes that the Government has carried its burden to establish that Defendant's statements to the journalist were voluntarily given. Although Sharifullah has submitted a sworn declaration alleging various forms of torture while in NDS custody at the time of the interview with the journalist, it remains unclear the extent to which Sharifullah had the ability to refuse to be interviewed or the exact nature of any coercion or torture he experienced.[13] In sum, the Government has established by a preponderance of the evidence that Defendant's statements to the journalist were voluntary; and Defendant has not come forward with sufficient evidence to rebut that showing that his will had "been overborne and his capacity for self-determination critically impaired," *Abu Ali*, 528 F.3d at 232 (citation omitted), when he participated in the media interview with the Polish journalist.

---

[13] Sharifullah was well within his right to decline to testify at the hearing, but having not testified, Defendant's untested recollections of his experiences at NDS, is "less credible than the contrary testimony of [the journalist] who testified at the suppression hearing and did subject [herself] to extensive cross-examination." *See United States v. Elsheikh*, 103 F.4th 1006, 1023 (4th Cir. 2024).

17

## IV.    CONCLUSION

For the above reasons, the Motion is DENIED.


Alexandria, Virginia
April 19, 2026

_____
Anthony J. Trenga
United States District Judge

18