IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

UNITED STATES OF AMERICA,          )
                                   )
            v.                     )
                                   )     Case No. 1:25-cr-143-AJT
MOHAMMAD SHARIFULLAH,              )
                                   )
            Defendant.             )

**RESPONSE IN OPPOSITION TO
DEFENDANT'S MEMORANDUM REGARDING DOUBLE JEOPARDY &
MOTION FOR JUDGMENT OF ACQUITTAL**

The defendant, Mohammad Sharifullah, confessed to participating in the Abbey Gate attack by scouting the route to the airport at the direction of his ISIS-K superiors. He contends that double jeopardy bars immediate retrial of the death-results enhancement and that no reasonable jury could find the charged offense resulted in death or that sufficient evidence corroborated his confession. Each argument fails. First, his double jeopardy claim is both premature—because the government intends to dismiss the death-results allegation without prejudice, rather than retry that element—and meritless. Second, a reasonable jury could find that Sharifullah's scouting specifically, or the conspiracy as a whole, caused death at Abbey Gate. Third, the mere fact that the Abbey Gate attack occurred and caused death suffices to corroborate his confession to the FBI as a matter of law. The trustworthiness of the confession is further bolstered by the fake business card recovered from an ISIS-K safehouse, Sharifullah's presence at Pul-e-Charkhi prison in 2020, the congruity between his statements in the 2020 interview and his confession to the FBI, and the corroboration of numerous details from the confession. The Court should therefore deny the Rule 29 motion and dismiss the death-results allegation without prejudice under Federal Rule of Criminal Procedure 48(a).

1

## LEGAL STANDARD

"[T]he standard of review for a motion for judgment of acquittal following a mistrial is no different than it would be following a jury conviction." *United States v. Jaensch*, 665 F.3d 83, 93 (4th Cir. 2011). Such a motion should be denied if, "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). The evidence need not exclude every reasonable hypothesis of innocence, and circumstantial evidence alone is sufficient to support a guilty verdict. *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008). This Court may "'not reweigh the evidence or the credibility of witnesses, but assume[s] that the jury resolved all contradictions in the testimony in favor of the Government.'" *United States v. Ziegler*, 1 F.4th 219, 232 (4th Cir. 2021). Further, the Court's "focus must remain fixed on the sufficiency of the evidence that *is* in the record rather than on what other evidence there *could be*." *United States v. Seigler*, 990 F.3d 331, 338 (4th Cir. 2021). All considered, a defendant "'faces a heavy burden,'" *United States v. Dennis*, 19 F.4th 656, 665 (4th Cir. 2021), and sufficiency challenges succeed in only "the most egregious cases," *Ziegler*, 1 F.4th at 233.

## ARGUMENT

I.     **Sharifullah's double jeopardy argument is premature and meritless.**

A.     **Absent intent to retry him, Sharifullah's double jeopardy claim is unripe.**

The parties agree on much regarding the jury's split verdict. The parties agree that the jury convicted Sharifullah of conspiracy to provide material support to a foreign terrorist organization. *See* ECF No. 224 at 7-8. The parties agree that conspiracy to provide material support is a lesser-included offense of the enhanced death-results offense. *See id.* at 2-3. The parties agree that the jury did *not* acquit Sharifullah of the enhanced offense. *See id.* at 12. And the parties agree that, should a higher court vacate the conspiracy conviction, double jeopardy would not bar retrial of

2

the full death-results offense. *See id.* at 11-12. The sole disagreement concerns whether the government could immediately retry the death-results element. *See id.* at 12-16.

The government, however, does not presently intend to retry the death-results element, rendering the disagreement a purely theoretical one. Confirming the lack of a live controversy, Sharifullah does not identify the relief he seeks beyond an advisory opinion "conclud[ing] that the Double Jeopardy Clause bars any retrial on the death-resulting element." *See* ECF No. 224 at 16. For instance, he does not purport to seek dismissal of the death-results allegation *with* prejudice because he admits retrial would be permissible upon vacatur of the conspiracy conviction. *See id.* at 11-12. Therefore, rather than address the premature double jeopardy claim, the Court should dismiss the death-results allegation without prejudice—which would not preclude Sharifullah from raising a double jeopardy argument should the government seek to resuscitate the charge. *See, e.g.*, *United States v. Tovar-Rico*, 61 F.3d 1529, 1532 (11th Cir. 1995) ("If the government decides to proceed with another trial of Tovar, she may raise the double jeopardy issue which would then be ripe for decision."); *United States v. Tejada*, 172 F.3d 46, 1999 WL 22731, at *4 n.5 (4th Cir. 1999) (per curiam) ("[A]ny double jeopardy argument is premature inasmuch as the government has not sought to reindict Tejada for the same alleged heroin conspiracy.").

**B.    Double jeopardy does not bar retrial of the death-results element.**

Ripeness aside, Sharifullah's double jeopardy claim fails on the merits. As he acknowledges, the scenario presented by a conviction on a lesser offense and split verdict on a greater offense stands at the intersection of two lines of double jeopardy authority. *See* ECF No. 224 at 12-15. On one hand, "[t]he Government, like the defendant, is entitled to resolution of the case by verdict from the jury." *Richardson v. United States*, 468 U.S. 317, 326 (1984). Hence, "jeopardy does not terminate when the jury is discharged because it is unable to agree." *Id.* And under the continuing jeopardy doctrine, retrial is generally permissible after a "mistrial," *Yeager*

3

*v. United States*, 557 U.S. 110, 118 (2009), or vacatur of a conviction on appeal, *Justices of Bos. Mun. Ct. v. Lydon*, 466 U.S. 294, 308 (1984). On the other hand, "a conviction on a lesser-included offense" generally "bars subsequent trial on the greater offense." *See Illinois v. Vitale*, 447 U.S. 410, 421 (1980); *Brown v. Ohio*, 432 U.S. 161, 169 (1977). Consequently, when the government initially brings a lesser-included charge and secures a conviction, the government may not then turn around and charge the defendant with a greater offense. *See Vitale*, 447 U.S. at 412 (verdict); *Brown*, 432 U.S. at 162 (guilty plea).

When tension arises between the government's entitlement to a jury verdict and the prohibition on retrial for a greater offense after conviction for a lesser offense, the Supreme Court assesses whether the "principles of finality and prevention of prosecutorial overreaching" justifying barring retrial. *See Ohio v. Johnson*, 467 U.S. 493, 501 (1984). Finding "none of the governmental overreaching that double jeopardy is supposed to prevent," the Supreme Court held a defendant's guilty pleas to lesser-included offenses does not bar trial on greater offenses charged in the same indictment. *See id.* at 501-02. Similarly, when a defendant requests separate trials on greater and lesser offenses, conviction or acquittal in the first trial does not bar a second trial. *See Jeffers v. United States*, 432 U.S. 137, 152 (1977); *Currier v. Virginia*, 585 U.S. 493, 501 (2018). In sum, when the government seeks to try greater and lesser offenses together from the beginning, there is no concern with prosecutorial overreach and the bar on trying a greater offense after conviction for a lesser offense does not apply. Consistent with that precedent, every circuit to squarely confront the issue has held that double jeopardy does not bar retrial of a greater offense after a conviction for a lesser offense originally tried with the greater offense.

In *United States v. Jose*, the Ninth Circuit held that final convictions on lesser-included offenses "do not trigger double jeopardy protections against retrial of the greater offense originally

charged under the *same* indictment in the *same* trial." 425 F.3d 1237, 1248 (9th Cir. 2005). There, the court vacated the defendants' convictions for felony murder but affirmed their convictions for lesser-included offenses. *Id.* at 1240. Rejecting the argument that the convictions precluded retrial on the felony murder charge, the Ninth Circuit explained that the line of cases barring retrial "involved successive prosecutions in which jeopardy had terminated after a final judgment on a separately indicted lesser or greater offense." *Id.* at 1242. By contrast, because "both the greater and lesser offenses were initially tried together," "[n]either" the principle of "'finality'" nor preventing "'prosecutorial overreaching'" were "violated in this case." *Id.* at 1242-43. Certainly, the "prosecution did not overreach when it charged and tried the defendants on both felony murder and its lesser included predicates in the same trial." *Id.* at 1243. Jeopardy thus "continued on the greater offense," permitting retrial on the felony murder charge notwithstanding the lesser-included convictions. *See id.* at 1242-48. The Ninth Circuit subsequently made clear the same reasoning permits retrial when a jury convicts on a lesser-included offense and hangs on a greater offense in the same trial. *See United States v. Carothers*, 630 F.3d 959, 963 & n.2 (9th Cir. 2011) (citing *Jose*, 425 F.3d at 1242-43; *United States v. Jefferson*, 566 F.3d 928, 935-36 (9th Cir. 2009)).

The Second Circuit similarly held that, even assuming "narcotics conspiracy" was a lesser-included offense of "murder in the course of the narcotics conspiracy," the district court properly permitted retrial on the murder charge after a jury convicted as to the lesser offense but hung as to the greater. *United States v. Jackson*, 658 F.3d 145, 151-53 (2d Cir. 2011). That was so because "the second and third trials on the murder count are properly seen as continuations of the initial trial, and did not expose Rowe to double jeopardy." *Id.* at 151. In so holding, the court rejected the defendant's reliance on *Yeager v. United States*, 557 U.S. 110 (2009). In *Yeager*, the jury acquitted on some counts and hung on others. *Id.* at 115. Applying principles of issue preclusion,

5

the Supreme Court held that notwithstanding the hung verdict on some counts, the government could not retry any count incompatible with an "issue" "necessarily decided" in the defendant's "favor" by acquitting on other counts. *Id.* at 123. The Second Circuit explained that *Yeager* and issue preclusion did not help the defendant because there was "no logical incompatibility between the earlier conviction on the § 846 count and a conviction on the murder count." *Jackson*, 658 F.3d at 152. Thus, "in this circumstance, where, unlike *Yeager*, the jury in the first trial convicted the defendant on the lesser offense and failed to reach a verdict on the greater offense, the Double Jeopardy Clause does not bar the government from getting 'one complete opportunity' to achieve a conviction on the greater offense, by retrial of that count." *Id.* at 152-53; *see also United States v. Williams*, 449 F.3d 635, 644-46 (5th Cir. 2006) (stating that "conviction on a lesser offense" and "deadlock on . . . injury factors" would "'presents no bar to retrial on the greater offense'").[1]

The Seventh Circuit, to be sure, suggested in dicta that it would be "legally erroneous" to "accept[] a guilty verdict on [a] lesser included offense . . . and allow[] retrial on the greater offense." *United States v. Morgan*, 929 F.3d 411, 423 (7th Cir. 2019). The court, however, recognized the "confusing tension between the rule that states that conviction on a lesser included offense normally precludes a later trial on the greater offense, on the one hand, and the rule that states that double jeopardy does not preclude retrial after a hung jury, on the other." *Id.* "Luckily,"

---

[1] District courts have likewise permitted retrial of a greater offense originally tried with a lesser one. *See, e.g.*, *United States v. Ausby*, 2019 WL 5102820, at *1-4 (D.D.C. Oct. 11, 2019) (lesser-included conviction for "rape" did not bar "retrial on felony murder" count under "'continuing jeopardy' rule"); *Laird v. Wetzel*, 2016 WL 4417258, at *31-33 (E.D. Pa. Aug. 19, 2016) (lesser-included conviction for "third degree murder" did not bar retrial for "first degree murder"). Without deciding the issue on the merits, several circuits have held that state courts did not violate "clearly established" federal law by permitting retrial of a greater offense despite conviction for a lesser one initially tried with the greater offense. *See, e.g.*, *Lambert v. Workman*, 594 F.3d 1260, 1263 (10th Cir. 2010); *Herron v. Straub*, 138 F. App'x 753, 758 (6th Cir. 2005); *Pinero v. Verdini*, 123 F. App'x 410, 410-12 (1st Cir. 2005) (per curiam); *see also Sayed v. Trani*, 2017 WL 698799, at *7 (D. Colo. Feb. 21, 2017).

6

because the defendant "forfeited or waived any" double jeopardy claim, there was no need to "wade into these murky areas of double jeopardy and issue preclusion." *See id.* at 423-27. *Morgan* thus could not have been clearer that its double jeopardy musings were dicta of the most equivocal sort. All told, then, every circuit to reach a holding on the issue has blessed retrial of a greater offense originally tried with a lesser offense.[2]

None of Sharifullah's counterarguments justify departure from that consensus. He first contends "there was no mistrial" as to the enhanced death-results offense. ECF No. 224 at 12-14. Sharifullah, though, does not contest that there was neither an acquittal nor a conviction as to that offense, *see id.* at 11-12, so what else could there be but a mistrial? His own case makes clear that "it would be error to conclude that there was no mistrial simply because the district court failed to use that exact term." *Morgan*, 929 F.3d at 425. Here, the jury could not "agree" on the enhanced death-results offense. *See* Fed. R. Crim. Proc. 31(b)(3). Thus, by discharging the jury after it made clear it was "DEADLOCKED," ECF No. 218 at 1, this Court implicitly declared a mistrial on that enhanced offense. *See, e.g.*, *United States v. Ham*, 58 F.3d 78, 83 (4th Cir. 1995) ("a defendant impliedly consents to a mistrial" by "his failure to object to . . . dismissal of the jury").

Seeking to avoid that conclusion, Sharifullah invokes *Price v. Georgia*, 398 U.S. 323 (1970), and *Green v. United States*, 355 U.S. 184, 187 (1957). ECF No. 224 at 12-13. As he ultimately concedes, however, both cases addressed whether a jury's *silence* as to greater offenses "constituted an 'implied acquittal.'" *Id.* (citing *Price*, 398 U.S. at 329; *Green*, 355 U.S. at 191). Here, "[t]he jury was anything but 'silent.'" *See Jefferson*, 566 F.3d at 935-36 (distinguishing

---

[2] Sharifullah does identify a single unpublished district court order reaching the opposite conclusion. *See United States v. Rivas*, 2006 WL 2471889, at *3-4 (D. Colo. Aug. 23, 2006). The government there apparently failed to put forward any "precedent addressing" the "issue," *see id.* at *3, and in the two decades since, no other court has cited *Rivas*.

*Green* where the jury "wrote that it was 'unable to come to a decision on th[e] verdict'" and "[e]ach juror confirmed the hopeless deadlock when polled by the district court"). Sharifullah's implied acquittal cases thus do nothing to undercut the reality that "when the jury is discharged because it is unable to agree," a mistrial as to the hung charge results. *See, e.g.*, *Richardson*, 468 U.S. at 326.

Shifting gears, Sharifullah contends that *Yeager*, 557 U.S. 110, and *Bravo-Fernandez v. United States*, 580 U.S. 5 (2016), held that "a hung jury as to one offense is irrelevant in determining whether a jury's guilty verdict on another constitutes a double jeopardy bar to retrial." ECF No. 224 at 14-15. Not so. Both decisions addressed issue preclusion based on an *acquittal*, not the double jeopardy bar based on a prior c*onviction*. *Yeager* "h[e]ld" only "that the consideration of hung counts has no place in the issue-preclusion analysis." 557 U.S. at 122. *Bravo-Fernandez*, in turn, "held that issue preclusion does not apply when verdict inconsistency renders unanswerable 'what the jury necessarily decided.'" 580 U.S. at 9. As the Second Circuit explained in rejecting a similar argument, issue preclusion has nothing to say here because there is no "acquittal" to "be logically reconciled with [a] subsequent conviction." *Jackson*, 658 F.3d at 152. Hence, "the Double Jeopardy Clause does not bar the government from getting 'one complete opportunity' to achieve a conviction on the greater offense, by retrial of that count." *Id.* at 153.

## II.    A reasonable jury could find that death resulted from the charged conspiracy.

An enhanced penalty applies when "the death of any person results" from a "conspir[acy]" to "provide[] material support or resources to a foreign terrorist organization." 18 U.S.C. § 2339B(a)(1). A death results if the conspiracy is a "but-for" cause of death. *See Burrage v. United States*, 571 U.S. 204, 218-19 (2014). That standard is satisfied when "the predicate act combines with other factors to produce the result," *id.* at 211, so long as "'death would not have occurred in the absence'" of the charged conspiracy, *see United States v. Robinson*, 55 F.4th 390, 401 (4th Cir. 2022). Here, a jury could reasonably find both that Sharifullah's specific material

support, scouting the route, and the charged conspiracy more broadly caused the deaths of 13 American servicemembers and countless Afghan civilians at Abbey Gate.

### A.    A reasonable jury could find that Sharifullah's scouting caused death.

A reasonable jury could find that death resulted from Sharifullah's scouting of the route to Airport Circle. Specifically, the jury could reasonably find that soon after Sharifullah left Pul-e-Charkhi prison in mid-August 2021, Faridoon's brother Yousef called and gave him money to purchase a smartphone. Ex. 20-26T at 1-2. Yousef then provided a Telegram ID in Faridoon's name, which Sharifullah used to contact Qari Nawab, a member of ISIS-K leadership. *Id.*; Ex. 20-28T at 6. As in other attacks, *see, e.g.*, Ex. 20-23T at 9 (Iraqi Embassy attack), ISIS-K leadership tasked Sharifullah with scouting the route from Sarai Shamali to Airport Circle for checkpoints, *see, e.g.*, 20-26T at 2-3; Ex. 20-27T at 10-11. Yousef provided a motorcycle, Ex. 20-26T at 3, and as Sharifullah scouted the route, Nawab called so "many times" Sharifullah pulled over near Airport Circle to return the calls, Ex. 20-28T at 6, 10-11, 17. At approximately 1:30 or 2:00 in the afternoon, Sharifullah reported the route was clear of checkpoints, leading Nawab to tell him to drive back to the city and return the motorcycle to Yousef. *See, e.g.*, Ex. 20-27T at 15-16; Ex. 20-28T at 1, 4, 6, 10-11, 17. Given Nawab's intense interest in Sharifullah's scouting report, *see, e.g.*, Ex. 20-28T at 10-11, the jury could reasonably infer that Nawab then gave the go-ahead to Logari—who took a few hours to work his way through the crowds nearer Abbey Gate and then blew himself and scores of victims up later that afternoon, *see id.* at 1. Sharifullah's scouting therefore "combine[d] with other factors" to result in death. *Burrage*, 571 U.S. at 211.

Sharifullah asserts that there is no "evidence that [he] was working with anyone who was somehow linked to the people who actually committed the bombing of Abbey Gate." ECF No. 213 at 7. But a jury could reasonably find that Sharifullah acknowledged the attack was planned by the ISIS-K "seniors" (*i.e.*, "leadership"), such as "Nawab," "Shahab," and likely "Faridoon." *See,*

9

*e.g.*, Ex. 20-28T at 14-16; Ex. 20-51T at 1.  ISIS-K claimed responsibility for the attack, *see* Ex. 9-11; Ex. 9-12, just as it had for many of Sharifullah's other attacks, *see, e.g.*, Ex. 9-4 (Nepali attack).  And ISIS-K broadcast a picture of the attacker (Logari) who Sharifullah knew from Pul-e-Charkhi prison.  *See, e.g.*, Ex. 20-32T at 1-2; Ex. 20-32B (picture).  A jury therefore could reasonably conclude that ISIS-K carried out the attack rather than some other entity like the Haqqani Network.

Sharifullah next points to the testimony of Ali Hassani that, in the days leading up to the attack, the Taliban generally controlled South Gate (the main entrance to the airport) and the nearby Airport Circle.  *See* ECF No. 224 at 19-21.  Sharifullah also notes photographs that, according to Hassani, showed Taliban at those locations on an unknown date.  *Id.*; *see* Hassani Tr. at 26 (testifying "I don't know when" photographs were "taken").  The government, however, impeached Hassani's credibility on cross examination:  For instance, Hassani claimed not to remember his contradictory prior statement that he had the Taliban "'in my pocket.'"  Hassani Tr. at 60-64.  Likewise, underscoring his bias, he refused to acknowledge that ISIS-K and the Taliban were enemies despite personally passing the Taliban intelligence to "take care of" "ISIS threats." *Id.* at 53-55, 58-60.  To the extent Hassani's testimony was unfavorable to the government, this Court therefore must assume the jury "disbelieve[d]" it.  *See, e.g.*, *United States v. Maynes*, 880 F.3d 110, 114 (4th Cir. 2018); *Ziegler*, 1 F.4th at 232-34.

More fundamentally, though, the presence of ISIS-K's bitter enemy—the Taliban—near the airport only explains why ISIS-K leadership would task Sharifullah with scouting the route to Airport Circle.  Hassani made clear he did not know whether Taliban were specifically present at Airport Circle around noon on August 26 when Sharifullah scouted the route—much less whether they had set up a checkpoint.  Hassani Tr. at 31.  Hassani, indeed, never set eyes on Airport Circle during the evacuation because that area was outside the U.S. military security perimeter.  *Id.* at 27-

10

28.  Moreover, Hassani acknowledged the scene was "chaotic" and constantly shifting.  *See, e.g., id.* at 15, 65-67.  Drawing all inferences in the government's favor, the jury could reasonably conclude that at the time Sharifullah scouted the route, there was no Taliban checkpoint at Airport Circle.  The Taliban's general presence near South Gate thus only underscores the importance of Sharifullah's surveillance confirming that the path to the airport was clear prior to the attack.

The Taliban's presence outside Abbey Gate is no more availing to Sharifullah.  *See* ECF No. 224 at 21-23.  Sharifullah does not make a specific argument based on the Taliban's presence but appears to suggest that they must have thoroughly searched each of the "'thousands of people at [the] gate.'"  *See id.* at 23.  From that supposition, he seems to infer that Logari could not have been the attacker because the Taliban would have discovered his suicide bomb.  Hassani, to be clear, was not present at Abbey Gate on the day of the attack and never suggested the Taliban searched all Afghans approaching the gate.  *See* Hassani Tr. at 64-66.  Rather, Hassani stated that friendly Afghan forces performed the "initial search" of those entering the airport.  *Id.* at 24-25. The jury therefore was not required to accept Sharifullah's unrealistic assumption that Logari could not have made his way through the "chaotic" crowd outside Abbey Gate without being searched by the Taliban.  *Id.* at 66.  To the contrary, a reasonable jury could find that the need to traverse the crowd explained why Logari did not detonate the bomb until several hours after Sharifullah completed scouting the route.  Moreover, even if a Taliban soldier had discovered Logari's suicide bomb and nevertheless let him through to Abbey Gate due to a hatred of the Americans, that would do nothing to undermine the reality that Sharifullah played a but-for role in causing death.

Relatedly, Sharifullah claims an Afghan special forces commander "could not get close to" Abbey Gate due to the crowds.  ECF No. 224 at 22-23.  In reality, Hassani did not know whether the commander—and his family—failed to navigate the crowd a few days prior to the attack or

11

instead hesitated to approach due to "fear[]" of the Taliban. *See* Hassani Tr. at 47, 66. Either way, Sharifullah makes no explicit argument but seems to suggest the family's difficulty means Logari could not have traversed the crowd. The evidence, though, clearly showed many people succeeded in making it inside Abbey Gate. Kelsee Lainhart, for instance, testified she helped a mother and her children immediately before the explosion. And, as noted, difficulty navigating the crowd perfectly explains why the detonation occurred several hours after Sharifullah's scouting report.

Sharifullah also hypothesizes that Logari might not have "followed the route" he scouted. *See* ECF No. 213 at 7. "'[C]ircumstantial evidence,'" however, suffices to "'support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence.'" *Osborne*, 514 F.3d at 387. The government therefore need not disprove "speculati[ve]" alternative scenarios for the jury to reasonably find that Sharifullah was a "'but for' cause of . . . death." *See, e.g.*, *United States v. Johnson*, 814 F. App'x 526, 532 (11th Cir. 2020) (per curiam). Here, Sharifullah offers no reason to believe ISIS-K departed from its standard practice of sending the bomber along the scouted route. *See, e.g.*, Ex. 20-28T at 2-3. Moreover, even had Logari followed a different route, Sharifullah's scouting would fail the but-for standard only if it was wholly "nonessential" to the success of the attack. *See United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016). Whatever hypotheticals Sharifullah can dream up, a reasonable jury could infer from (1) Nawab's repeated calls to learn the results of Sharifullah's scouting and (2) ISIS-K's practice of assigning each person a specific role and involving as few people as possible in attacks that Sharifullah was not wholly extraneous or unnecessary to the Abbey Gate attack. *See, e.g.*, Ex. 20-27T at 17 (noting each person typical had one job, such as "surveil[ing] the route"); Ex. 20-28T at 6, 10-11, 17 (describing Nawab calling "many times" while on route); Ex. 20-43T at 2 (explaining only those "who are needed" are made "aware of the attack").

Finally, Sharifullah complains about the lack of "witness[es]," "electronic surveillance," or "physical evidence" confirming his role in the attack.  ECF No. 224 at 24.  Yet in reviewing sufficiency, this Court's "focus must remain fixed on the sufficiency of the evidence that *is* in the record rather than on what other evidence there *could be*."  *Seigler*, 990 F.3d at 338.

## B.    The jury could reasonably find that the charged conspiracy caused death.

In addition, a reasonable jury could find that the conspiracy as a whole caused death.  On that front, Sharifullah no longer challenges the sufficiency of the evidence he participated in a single conspiracy to provide material support stretching from 2016 to 2025.  *See* ECF No. 221 at 2.  The jury could reasonably find that Nawab, Shahab, and Faridoon were core figures in that conspiracy along with Sharifullah.  *Compare, e.g.*, Ex. 20-18T at 2-13, Ex. 20-53T at 3-5 (Faridoon, Nawab, and Shahab involved in 2016 Nepali attack), *with, e.g.*, Ex. 20-40T at 16-17, Ex. 20-43T at 2-3, Ex. 20-66T at 1-4 (Faridoon, Nawab, and Shahab still involved in attacks from 2022 through 2024).  The jury could likewise reasonably find that Nawab, Shahab, and Faridoon planned and executed the Abbey Gate attack in the course of the conspiracy.  *See, e.g.*, Ex. 20-27T at 12-15; 20-28T at 15-16; Ex. 20-51T at 1.  Thus, even if Sharifullah's specific contributions to the conspiracy were not a but-for cause of death, the jury could reasonably find that the deaths would not have occurred but for the conspiracy as a whole.

Sharifullah counters that only material support he "knew about" can support the death-results enhancement.  ECF No. 213 at 6.  He errs on the law and the facts.  On the law, while he must have known ISIS-K was a designated foreign terrorist organization or that it engaged in acts of terrorism, and must have knowingly joined the conspiracy, the death-results enhancement "does not contain a separate *mens rea*."  *See, e.g.*, *Alvarado*, 816 F.3d at 250; *United States v. Moya*, 5 F.4th 1168, 1181 (10th Cir. 2021) ("every circuit to consider § 841(b)(1)(C)'s 'death results' element has concluded that it imposes strict liability").  On the facts, while Sharifullah claimed he

did not know what "type of attack," *i.e.*, "suicide or mine," was planned, *see, e.g.*, Ex. 20-48T at 1, the jury could readily infer from his years' worth of prior surveillance of attack routes that he knew he was not scouting a route for a non-lethal purpose, *see, e.g.* Ex. 20-23T at 9.

**III.    The evidence amply corroborates Sharifullah's confession.**

The evidence more than corroborates Sharifullah's confession to the FBI.  For one, when the fact of a crime's commission can be shown without identifying the perpetrator, evidence showing that the crime occurred suffices to corroborate a confession as a matter of law—even absent specific evidence connecting the defendant to the crime.  The undisputed fact that the Abbey Gate attack occurred and resulted in death alone satisfies the corroboration rule.  Even were that not dispositive, it is sufficient if the corroboration supports—not establishes—the essential facts admitted, and corroboration need only tend to establish—not conclusively establish—the trustworthiness of the confession.  Further, the corroboration of any part of a confession corroborates the whole confession.  Drawing all reasonable inferences in favor of the government, ample evidence tends to establish the trustworthiness of Sharifullah's confession:

- A fake business card featuring Sharifullah's name and picture—which was seized in an attack on an ISIS-K safehouse in 2019 and Sharifullah admitted was created for him by ISIS-K—confirms his membership in ISIS-K.

- The significant overlap between the details Sharifullah shared with Ms. Pikulicka-Wilczewska in 2020 and with the FBI in 2025 (for instance, his recruitment by Dr. Naqib, radicalization through videos and concern for the plight of Muslims in Burma, participation in a small terrorist cell based in Kabul, communication primarily through Telegram, and typical role surveilling routes and transporting suicide bombers to attacks) corroborates his confession generally.

- The victims' testimony and ISIS-K's statement of responsibility confirm the Nepali bus attack occurred, damaged person and property, and ISIS-K claimed responsibility. They also corroborate details shared by Sharifullah, such as that the victims were Nepali embassy guards in an unarmored minibus and the bus followed the same route and left at the same time every day.

- Professor Hoffman and Mr. Treml made clear that ISIS-K responsibility claims are quickly taken down, confirming that the details within are not easily accessible.

14

- Sharifullah's presence in Pul-e-Charkhi prison in 2020 corroborates his admission to being caught by Afghan civilians in 2019 while filming an ISIS-K attack.

- The Abbey Gate victims and EOD experts, physical and medical evidence, and ISIS-K's statement of responsibility confirm the attack occurred, caused the death of 13 American servicemembers, and ISIS-K claimed responsibility.  They also corroborate details shared by Sharifullah, such as the attack method (a self-detonated bomb).

- Videos of several of the attacks corroborate details from Sharifullah's confession, such as that the Badakhshan attack was carried out with explosives hidden in a parked "Corolla" and that the Moscow attackers used AK-47 rifles.

- The CART examiner's testimony corroborates Sharifullah's statement he wiped his phone just before the Pakistanis arrested him.

Each corroborated statement, in turn, bolsters the remainder and corroborates the whole of Sharifullah's confession—permitting the government to prove the offense through the confession and the independent evidence.

### A. The undisputed fact the Abbey Gate attack occurred and resulted in death alone suffices to corroborate Sharifullah's confession as a matter of law.

"When an accused confesses to a crime involving 'physical damage to person or property,' the independent corroborating evidence need only show that the crime occurred." *United States v. Brown*, 617 F.3d 857, 862 (6th Cir. 2010) (quoting *Wong Sun v. United States*, 371 U.S. 471, 489 n.15 (1963)).  In such cases, "[t]he prosecution need not show that the independent evidence ties the accused to the crime." *Id.*  Put differently, "in cases involving a tangible corpus delicti where the fact that a crime has been committed can be shown without identifying the perpetrator 'there need . . . be no link, outside the confession, between the injury and the accused who admits having inflicted it.'" *See, e.g.*, *United States v. Johnson*, 589 F.2d 716, 719 (D.C. Cir. 1978); *United States v. Curtis*, 324 F.3d 501, 507 (7th Cir. 2003) ("evidence of the *corpus delicti* is sufficient under *Wong Sun* to corroborate a party confession").

In line with that standard, the Fourth Circuit held that when "undisputed and detailed evidence" established that "a robbery of [a] bank had been committed," the defendant's confession

15

established his guilt despite the lack of any other evidence "to connect him in any way with the crime." *United States v. Hall*, 396 F.2d 841, 844-45 (4th Cir. 1968). Other circuits have come to the same place. *See, e.g.*, *United States v. Daniels*, 528 F.2d 705, 708 (6th Cir. 1976) ("independent evidence that [a] bank robbery took place was sufficient to corroborate" the defendant's confession, despite the lack of any "'link, outside the confession, between the'" defendant and the robbery); *Johnson*, 589 F.2d at 719 (holding that proof of an "armed robbery" obviated need "to assess the substantiality of the Government's independent proof of appellant's participation"); *United States v. Opdahl*, 610 F.2d 490, 494 (8th Cir. 1979) ("An admission by the accused identifying himself as the person involved in the holdup is sufficient to sustain a guilty verdict when the crime itself is shown by independent evidence."); *United States v. Baltrunas*, 957 F.2d 491, 496 (7th Cir. 1992) ("all the 'corroboration' that was needed in this case was evidence that a robbery did indeed occur at the bank on January 9, 1990").

Likewise, evidence a victim "was dead and that his death was caused by a criminal act" renders "unnecessary" any "independent evidence associat[ing] the defendant with the commission of the crime." *See, e.g.*, *United States v. Stabler*, 490 F.2d 345, 350 (8th Cir. 1974); *United States v. Treas-Wilson*, 3 F.3d 1406, 1409 (10th Cir. 1993) ("[T]he dead body and the manner of death support the conclusion that the Kelvin's death was the result of criminal conduct, thereby establishing the requisite trustworthiness of Treas–Wilson's confessions."); *Curtis*, 324 F.3d at 507 ("Rouson's various admissions were corroborated first and foremost by evidence of King's bullet-riddled body."). So, too, in a prosecution for transporting counterfeit money orders in foreign commerce, because "[s]omebody counterfeited" the "money orders . . . and somebody caused them to travel . . . in foreign commerce," no additional "corroboration" of the defendant's confession was needed. *United States v. Braverman*, 376 F.2d 249, 253 (2d Cir. 1967).

16

Here, "undisputed and detailed evidence" demonstrates that the Abbey Gate attack occurred and inflicted physical damage to person or property—specifically, the death of 13 American servicemembers and numerous Afghan civilians. *Hall*, 396 F.2d at 845. Therefore, no additional corroboration of Sharifullah's confession is necessary. *See, e.g.*, *id.* at 844-45.

Sharifullah claims that *United States v. Stephens*, 482 F.3d 669 (4th Cir. 2007), and *United States v. Rodriguez-Soriano*, 931 F.3d 281 (4th Cir. 2019), hold that proof "a crime occurred" does not suffice for corroboration. ECF No. 213 at 12-14. Even had those cases purported to so hold, the Fourth Circuit "follow[s] the bright-line rule that the first-decided case," *i.e.*, *Hall*, "controls." *United States v. Mitchell*, 120 F.4th 1233, 1239 (4th Cir. 2024). More to the point, *Stephens* and *Rodriguez-Soriano* held no such thing. In *Stephens*, the defendant initially confessed to shooting at a drug dealer ("Red") who purportedly wanted the defendant dead for failing to pay a drug debt. 482 F.3d at 671. At trial for cocaine conspiracy and discharging a firearm during a drug trafficking crime, the defendant explained that he lied to police in hopes of leniency and "denied any connection to Red, whose real name he professed not to know, and denied that he was involved in selling drugs, or that he owed anyone money for drugs." *Id.* at 670-71. Finding no proof of "a conspiracy to sell cocaine," *i.e.*, that a crime occurred at all, or evidence to "'fortif[y]' the truth of [the] confession," such as a "connection between Red" and the defendant, the Fourth Circuit held the confession insufficiently corroborated. *Id.* at 673. But it nowhere suggested that proof a tangible crime occurred would not suffice for corroboration. *See id.*

Similarly, in *Rodriguez-Soriano*, while the defendant admitted to straw purchasing firearms in two statements to ATF agents, the government failed to establish "that a crime was committed," *i.e.*, "that the transaction was a straw purchase." 931 F.3d at 288-90. Specifically, the court found that one strand of corroborating evidence (that the defendant no longer possessed

the guns he purchased) "was not offered at trial for the truth of the matter asserted." *Id.* at 290. Likewise, the defendant's lies about purchasing the gun in two separate transactions, contradictory statements, and second confession two weeks later were themselves "uncorroborated" "statements to law enforcement." *Id.* at 289-90. There was thus "no corroboration" that an "offense has been committed in the first instance." *See id.* at 288. Rather than undermining the government's position, *Rodriguez-Soriano* recognized that "'application'" of the "'corroboration rule'" must be carefully "'scrutinized'" because it "'infringe[s] on the province of the primary finder of facts.'" *Id.* And its focus on the absence of proof "a crime was committed"—after which the government may "'prove the offense through the statement of the accused'"—only confirms that proof the Abbey Gate attack occurred and death resulted suffices for corroboration. *See id.* at 288-90.

### B.    Ample additional evidence corroborates Sharifullah's confession.

"[C]ourts require corroboration to prevent confessions to crimes never committed and 'convictions based upon untrue confessions alone.'" *United States v. Abu Ali*, 528 F.3d 210, 234 (4th Cir. 2008). "'[C]orroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that [the] defendant is guilty.'" *Id.* at 235. Nor must "the corroborating evidence . . . establish every element of the offense." *United States v. Waller*, 326 F.2d 314, 315 (4th Cir. 1963). "[O]ne 'mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense through the statements of the accused.'" *Abu Ali*, 528 F.3d at 235. "'[I]t is sufficient if the corroboration *supports*'—not establishes—'the essential facts admitted,' and . . . corroboration need only '*tend to* establish'—not establish—'the trustworthiness' of the confession." *Id.* at 237. Hence, "circumstantial evidence" suffices and "'[e]xtrinsic proof [i]s

sufficient which merely fortifies the truth of the confession[s], without independently establishing the crime charged.'" *Id.* at 236-37.

*United States v. Murillo-Lopez* exemplifies the minimal evidence necessary to corroborate a confession. 151 F.4th 584 (4th Cir. 2025). There, the defendant admitted he "'was illegal'" after officers found a firearm on him. *Id.* at 587-88. On appeal from his conviction for knowingly possessing a firearm while "unlawfully in the United States," 18 U.S.C. § 922(g)(5)(A), the Fourth Circuit held two pieces of evidence sufficed for corroboration: First, the defendant told an "immigration officer" he was born in El Salvador "during a post-arrest interview" and "expressed no confusion" (and claimed no "lawful status") "when told he had been placed in removal proceedings." *Id.* at 588. Second, a search of his "fingerprints in government immigration databases revealed no record that he ever entered the country through a designated port of entry." *Id.* Because that evidence "'tend[ed] to establish the trustworthiness of'" the defendant's "admission," the Fourth Circuit rejected the corroboration challenge. *Id.* at 589.[3]

Beyond the leniency of the standard, courts have also sketched out several subsidiary legal principles regarding corroboration. First, "once the confession is sufficiently corroborated, the confession as a whole is admissible, and some elements of the offense may be proven entirely on the basis of the confession." *See, e.g.*, *Cox*, 218 F. App'x at 258; *United States v. O'Leary*, 957

---

[3] Other Fourth Circuit cases underscore the low bar for corroboration. *See, e.g.*, *United States v. White*, 307 F. App'x 764, 764-65 (4th Cir. 2009) (per curiam) ("prior heroin-related trafficking conviction" corroborated "confession" to possessing with intent to distribute "drugs found in the apartment where he stayed on a regular basis"); *United States v. Cox*, 218 F. App'x 257, 258-59 (4th Cir. 2007) (per curiam) (flight after officer found gun "within arm's reach of where" defendant "had been standing" corroborated confession to pointing firearm at victim); *United States v. Under Seal*, 170 F. App'x 837, 838-39 (4th Cir. 2006) (per curiam) (evidence vehicle tags "were not legitimate" "corroborated" confession defendant "knew the vehicle's registration tags were 'not good'"); *United States v. Byers*, 1991 WL 84052, at *1 (4th Cir. 1991) (per curiam) (evidence defendant "liv[ed] in the bedroom where" gun was found and failure of houses' other occupants to "claim[] ownership" corroborated "confession that the gun belonged to him").

F.3d 731, 733 (7th Cir. 2020) (evidence "supporting key assertions in the confession" suffices to find "the statement as a whole is trustworthy"); *Brown*, 617 F.3d at 863 ("independent corroboration of one part of the statement may corroborate the entire statement"); *United States v. Deville*, 278 F.3d 500, 507 (5th Cir. 2002) ("'If there is extrinsic evidence tending to corroborate the confession, the confession as a whole is admissible'"); *United States v. Wilson*, 436 F.2d 122, 124 (3d Cir. 1971) ("Since two parts of Wilson's admission were corroborated by other evidence, this established the trustworthiness of the entire admission").

*United States v. Sammons* well illustrates the rule.  55 F.4th 1062 (6th Cir. 2022).  There, the defendant admitted, among other things, to sexually abusing his niece and distributing images of the abuse.  *Id.* at 1065.  Because of data-retention limits, investigators recovered only 30 days of his messages, none of which contained images or videos of the abuse.  *Id.*  Even so, the Sixth Circuit upheld his child-exploitation conviction, explaining that corroboration of other parts of the confession (such as evidence he exchanged child pornography and regularly babysat his niece) corroborated "the entire confession"—including his exploitation of his niece.  *Id.* at 1074-75.

Second, when the defendant provides a detailed confession "coincid[ing]" with the "facts" of the crime, "[t]here is a strong inference that the defendant could not have known of such detailed facts but for his participation in the crime."  *United States v. Waller*, 326 F.2d 314, 315 (4th Cir. 1963).  In such circumstances, the corroborated details "tend 'to establish the trustworthiness'" of the confession and, even absent evidence otherwise linking the defendant to the crime, "[m]ore is not required" for "corroboration."  *See id.* at 314-15.

Third, because the corroboration rule exists to check law enforcement "'zeal'" and counterbalance "'the aberration or weakness of the accused under the strain of suspicion,'" *see Abu Ali*, 528 F.3d at 234, it applies only to "post-offense statements made to law enforcement

20

officers," *see, e.g.*, *United States v. Yiheng Zhang*, 2019 WL 2779107, at \*10 (W.D. Va. July 1, 2019) (citing cases); *Warszower v. United States*, 312 U.S. 342, 347 (1941) ("admissions" "made prior to the crime . . . do not need to be corroborated" because "[t]hey contain none of the inherent weaknesses of confessions").  Statements that are not made to "law enforcement officers" or that are made before or during, rather than "after," the offense therefore are not subject to the corroboration requirement.  *See, e.g.*, *United States v. Simmons*, 923 F.2d 934, 954 (2d Cir. 1991) (holding that co-conspirator statements do not require corroboration); *Sammons*, 55 F.4th at 1075 (same for "inculpatory internet posts" "made 'before, or during' a crime").  Additionally, even statements made to law enforcement after the offense can serve as *partial* corroboration.  *See* *Murillo-Lopez*, 151 F.4th at 588-89 (holding that defendant's statements to "immigration officer" "during a post-arrest interview" served as corroboration for confession to police upon arrest).

Gauged against those standards, ample evidence tends to support the "key assertions in" Sharifullah's "confession," corroborating the "whole," *O'Leary*, 957 F.3d at 733, and permitting the government to "'prove the offense through'" the confession, *Abu Ali*, 528 F.3d at 235.

### 1.    The fake business card confirms Sharifullah's membership in ISIS-K.

During Sharifullah's FBI interviews, the agents showed him a fake business card featuring his name, picture, and purported employment as an accountant.  *See* Ex. 20-39T at 1-2; Ex. 3-2 (business card).  Sharifullah not only authenticated the business card but explained that it was created by Dr. Naqib to help Sharifullah conceal from his family both his work for and payments from ISIS-K.  *See* Ex. 20-39T at 1-2.  Adding to the business card's corroborative weight, Sharifullah told Ms. Pikulicka-Wilczewska in 2020 that his parents only learned about his ISIS-K activities after his detention in Pul-e-Charkhi.  *See* Ex. 11-1T at 21-22.  Moreover, in line with Sharifullah's description of ISIS-K's use of safehouses to launch attacks, *see, e.g.*, Ex. 20-18T at

21

9; Ex. 20-28T at 21, parter forces recovered the business card during a military raid on an ISIS-K cell leader's safehouse, *see* Ex. 3-5A.  Given that source, the business card alone corroborates Sharifullah's membership in ISIS-K.  For good reason, then, Sharifullah now concedes that his confession to "involvement in a general conspiracy to provide material support to ISIS-K" was sufficiently "corroborated."  ECF No. 221 at 2.  The corroboration of that fundamental "part of [the] confession," in turn, corroborates "the entire confession."  *See, e.g.*, *Sammons*, 55 F.4th at 1074-74.  The Court therefore could end its corroboration analysis here.

Sharifullah counters that the business card "establishes only his membership in ISIS-K," which (in his view) is not itself "sufficient to support a criminal conviction."  ECF No. 213 at 10-11 & n1.  But even if one could theoretically join ISIS-K without conspiring to provide material support, evidence need not be independently criminal to constitute corroboration.  For instance, in *Abu Ali*, the Fourth Circuit held corroborative the defendant's possession of "literature and address books containing the names and e-mail address of an al-Qaeda leader, a GPS device, a walkie-talkie, a handgun magazine, [and] a cellphone"—even though possessing those items is not itself illegal.  *See, e.g.*, 528 F.3d at 236; *Byers*, 1991 WL 84052, at *1 (evidence defendant "liv[ed] in the bedroom where" a gun was found corroborated "confession that the gun belonged to him").

### 2.    The circumstances and content of the 2020 interview corroborate Sharifullah's confession generally.

Sharifullah's March 2020 interview with Ms. Pikulicka-Wilczewska and the surrounding circumstances corroborate his confession in several ways.  First, Sharifullah's mere presence in Pul-e-Charkhi prison corroborates his admission to being caught by Afghan civilians in 2019 while filming an ISIS-K attack for propaganda and recruiting purpose.  *See* Ex 20-40T at 9-15.  Second, the significant overlap in details between this interview and his confession to the FBI five years later strongly corroborates those statements:

| Defendant's Confession | March 2020 Interview |
|---|---|
| Sharifullah said his brother was in prison for being a member of Hezb-i-Islami and he met Dr. Naqib visiting his brother. *See, e.g.*, Ex. 20-12T at 6-12. | Sharifullah said his brother was in prison for being a member of Hezb-i-Islami and he met Dr. Naqib visiting his brother. *See, e.g.*, Ex. 11-1T at 2-4, 32 |
| Described his recruitment by Dr. Naqib in 2016 and swearing bai'at to ISIS. *See, e.g.*, Ex. 20-6T at 1; Ex. 20-12T at 6-12; Ex. 20-53T at 1-3. Also recognized a picture of Dr. Naqib. *See* Ex. 20-2K. | Described recruitment to ISIS-K in 2016 by Dr. Naqib. *See, e.g.*, Ex. 11-1T at 2-5, 13. |
| Described radicalization and recruitment through ISIS-K videos, mentioned oppression of Muslims in "Burma," Ex. 20-12T at 6-16; Ex. 20-53T at 1-3, and described motive for Nepali attack as victims being "Buddhists," Ex. 20-47T at 3-4. | Described radicalization and recruitment through ISIS videos and expressed concern for abuse of Muslims in "Burma." *See, e.g.*, Ex. 11-1T at 6, 20. |
| Described operating as a member of a cell consisting of approximately 10 members with different roles, such as Dr. Naqib, Faridoon, Zelgai, and Qari Nawab. *See, e.g.*, Exs. 20-7T to 20-16T; Ex. 20-37T at 1; Ex. 20-38T at 1. | Described operating as part of ISIS-K cell in Kabul with approximately "10" members. *See, e.g.*, Ex. 11-1T at 13-16. |
| Described consistent attack roles, including conducting surveillance and transporting the bomber for the Nepali attack, Ex. 20-18T at 3-5, scouting the route for the Abbey Gate attack, Ex. 20-26T at 3, transporting the bomber for the NDS Division 90 attack, Ex. 20-20T at 1-4, scouting the route for the attack on the Iraqi Embassy, Ex. 20-23T at 9, and transporting the bomber to attack the Afghan National TV station, Ex. 20-40T at 1; *see also, e.g.*, Ex. 20-27T at 16-17 (describing attack roles generally). | Described typical duties as surveilling routes, transferring suicide bombers by motorcycle, and transferring weapons. *See, e.g.*, Ex. 11-1T at 14. |
| Explained that ISIS-K made him a fake business card to conceal his membership from his family. Ex. 20-39T at 1-2. | Described his parents' opposition to his involvement with ISIS-K. *See, e.g.*, Ex. 11-1T at 21-22. |
| Described Dr. Naqib's prior leadership of attacks, *see, e.g.*, Ex. 20-47T at 3, and said he was killed while Sharifullah was in prison, Ex. 20-24T at 1-2. | Described Dr. Naqib's leadership, including strapping explosives onto suicide bombers, and death in a drone strike. *See, e.g.*, Ex. 11-1T at 18, 34. |
| Described use of Telegram to communicate about attacks and by ISIS-K to recruit new members. *See, e.g.*, Ex. 20-26T at 1; Ex. 20-27T at 15; Ex. 20-28T at 6; Ex. 20-36T at 4-7; Ex. 20-39T at 3. | Described use of Telegram to communicate with fellow ISIS-K members. Ex. 11-1T at 34. |
| Made numerous statements describing his membership and never disavowed ISIS-K or expressed remorse. *See, e.g.*, 20-5T at 1; 20-80T at 1. Agent Price also testified that Sharifullah appeared to remain "proud" of his membership. | Claimed that he was still a member of ISIS, never disavowed the group, and did not recant his oath of allegiance to ISIS. *See generally* Ex 11-1T. Ms. Pikulicka-Wilczewska also testified |

| | Sharifullah appeared to be "proud" of his membership. |
|---|---|

Sharifullah does not address the interview with Ms. Pikulicka-Wilczewska, apparently believing that his "own words" can never constitute "independent corroboration." *See* ECF No. 213 at 14. The corroboration rule, however, applies only to "post-offense statements made to law enforcement officers." *Yiheng Zhang*, 2019 WL 2779107, at *10. The 2020 interview was neither a "post-offense statement[]" (rather, it was made during the conspiracy) nor was it "made to law enforcement officers" (rather, it was made to a journalist). *See id.* It therefore does not require independent corroboration and may itself corroborate Sharifullah's 2025 confession. In all events, even statements given to law enforcement officers after the offense can serve as *partial* corroboration. *See Murillo-Lopez*, 151 F.4th at 588-89. And, at the least, the other independent evidence (such as the business card) corroborates the 2020 interview as well, thus permitting the interview to bolster the trustworthiness Sharifullah's confession.[4]

### 3. The evidence confirms the Nepali attack occurred and corroborates many details shared by Sharifullah.

Evidence the Nepali attack occurred and caused damage to person and property is, at a minimum, strong corroboration. *See supra* Section III.A. ISIS-K also claimed responsibility for the attack, Ex. 9-4, further corroborating Sharifullah's confession to participating in the attack by scouting the bus route and transporting the suicide attacker on the back of his motorcycle. *See, e.g.*, Ex. 20-18T at 1-13. Additionally, the evidence confirms many details shared by Sharifullah,

---

[4] In *Rodriguez-Soriano*, the Fourth Circuit held that a subsequent "statement[] to law enforcement," close in time ("eighteen days later"), and including the same details, could not serve as *sole* corroboration for an earlier confession. *See* 931 F.3d at 285, 290. The government therefore does not argue that the five FBI interviews corroborate each other.

providing "a strong inference that the defendant could not have known of such detailed facts but for his participation in the crime."  *Waller*, 326 F.2d at 315.

On that score, the testimony of Mr. Treml and Professor Hoffman made clear that, rather than being easily available online, ISIS-K statements of responsibility tend to be quickly taken down by the social media platforms where they are disseminated.  As Mr. Treml put it, while the material might have been technically "public," it was not "easily accessible."  Viewed in the light most favorable to the government, details included in ISIS-K statements of responsibility thus are not so widely disseminated that Sharifullah's knowledge of them would not constitute evidence of his participation in the crimes.  As a result, the jury could reasonably reject the explanation that Sharifullah learned the details from those sources, particularly *nine years* after the attack occurred. The sheer amount of "detailed facts" Sharifullah provided and the internal consistency of the confession therefore corroborate his involvement in the attack.  *See Waller*, 326 F.2d at 315.  And, again, the corroboration of this "part of [the] confession" means "the entire confession may be used to establish the elements of the crime."  *See Sammons*, 55 F.4th at 1074-75.

| Defendant's Confession | Corroborating Evidence |
|---|---|
| Sharifullah said Nepali attack was his first and it occurred in 2016.  *See* Ex. 20-18T at 2-7; Ex. 20-53T at 4-5. | Testimony of the Nepali victims confirm attack occurred in 2016. |
| Said the vehicle was an unarmored minibus, which made it a suitable target.  *See* Ex. 20-18T at 5; Ex. 20-47T at 2. | Testimony of the Nepali victims and the post-attack photographs show that their transport was an unarmored minibus.  *See* Ex. 2-2B. |
| Described learning from scouting that the bus traveled "back and forth" on the same route and missing it the first two times ISIS-K tried to attack.  *See* Ex. 20-47T at 2; Ex. 20-53T at 4-5. | Nepali victims said bus followed the same route and left at the same times. |
| Said motivation for attack was belief guards were "Buddhists" like those oppressing Muslims in "Burma."  Ex. 20-47T at 2. | Sharifullah told Ms. Pikulicka-Wilczewska he joined ISIS-K because of oppression of Muslims in "Burma" by "Buddhis[ts]."  *See* Ex. 11-1T at 6-8, 20. |
| Said victims were Nepali embassy guards.  Ex. 20-18T at 3. | Nepali victim testimony confirms they were guards at Canadian embassy. |

25

| Identified the location of the attack as Bana'ee. *See, e.g.*, Ex. 20-18T at 4; Ex. 20-19T at 1. | The testimony of the FBI translator (based on the photographs of the attack) made clear the attack occurred in Bana'ee district. |
| Identified the suicide attacker as "Irfan," who was "approximately 24, 23 year old."  Ex. 20-18T at 6-7. | ISIS-K's claim of responsibility identified the attacker as "brother Irfanullah Ahmed," Ex 9-4, who appears young, *see* Ex. 9-3. |

### 4. The evidence confirms the Abbey Gate attack occurred and the details cohere with Sharifullah's confession.

Sharifullah does not contest that the Abbey Gate attack occurred and caused the death of 13 American servicemembers and scores of Afghan Civilians.  As addressed above, those undisputed facts alone corroborate the confession as a matter of law.  *See supra* Section III.A. Furthermore, ISIS-K claimed responsibility for the attack and released a photograph of the attacker.  *See, e.g.*, Ex. 9-11; Ex. 9-12.  At the least, then, the (1) attack occurred, (2) resulted in death, and (3) Sharifullah's terrorist group claimed responsibility.  Additional evidence also corroborates several "detail[s]" from Sharifullah's confession, permitting an "inference" he "participat[ed] in the crime."  *See Waller*, 326 F.2d at 315.

| **Defendant's Confession** | **Corroborating Evidence** |
| --- | --- |
| Sharifullah said Abdul Rahman Logari (a fellow Pul-e-Charkhi inmate) carried out the attack, identified several photographs of Logari, and even shared his nickname—"father of noses."  *See, e.g.*, Ex. 20-26T at 4-5; Ex. 20-32T at 1-2; Exs. 20-32A/20-32B. | The circumstances of Ms. Pikulicka's March 2020 interview with Sharifullah confirm he was incarcerated in Pul-e-Charkhi Prison.  *See generally* Ex. 11-1T. |
| Said the attack was a self-detonated suicide bomb.  *See, e.g.*, Ex. 20-29T at 1. | The EOD witnesses (Palmer and Boatwright), Dr. Gordon, and physical evidence make clear that the attack was self-detonated suicide bomb and could not have been remotely activated. |
| Described the typical explosives used by his cell as from mines or rockets, including explosives left over by the Soviets, *i.e.*, military grade.  Ex. 20-28T at 18-19, Ex. 20-51T at 2-4. | Palmer and Boatwright testified that the bomb used 15 to 20 pounds of military- or commercial-grade explosives.  *See, e.g.*, Palmer Tr. at 27. |
| Confessed to surveilling the route to the airport for Abbey Gate attack. *See, e.g.*, Ex. 20-26T at 3. | Sharifullah told Polish journalist his role in attacks frequently included route surveillance.  *See, e.g.*, Ex. 11-1T at 14. |
| Said he was freed from Pul-e-Charkhi and immediately joined Abbey Gate attack.  *See, e.g.*, Ex. 20-26T at 1; 20-52T at 1. | Professor Hoffman testified the Taliban freed prisoners at Pul-e-Chakri when it swept to power in mid-August 2021. |

| | |
|---|---|
| Said he used Telegram to communicate regarding attack and Nawab called multiple times while scouting. *See, e.g.*, Ex. 20-26T at 1; Ex. 20-27T at 15; Ex. 20-28T at 6, 10-11. | Testimony of Professor Hoffman and Mr. Treml, as well Sharifullah's statements to Polish journalist, confirm Telegram was ISIS-K's preferred mode of communication. Ex. 11-1T at 34. |
| ISIS-K leadership directed Sharifullah to scout route and repeatedly called to confirm there were "no Talib." *See, e.g.*, Ex. 20-28T at 6, 10-11, 17. | Hassani testified to Taliban presence near airport. |
| Explained that, unlike a typical attack which occurred soon after scouting, Abbey Gate attack occurred several hours later. *See, e.g.*, Ex. 20-28T at 1-4. | Numerous witnesses testified to the large, chaotic crowds at Abbey Gate. |

### 5.   Independent evidence confirms additional details from Sharifullah's confession, further corroborating it.

In addition to Sharifullah's membership in ISIS-K and participation in the Abbey Gate and Nepali attacks—which suffice to corroborate "the entire confession," *see Sammons*, 55 F.4th at 1074—the evidence corroborates still more aspects of his confession:

| Defendant's Confession | Corroborating Evidence |
|---|---|
| Sharifullah said he erased his (Infinix brand) phone when he heard the Pakistanis and that another of his phones was newly purchased for his wife. *See, e.g.*, Ex. 20-55T at 1-2; Ex. 20-58T at 3-4; Ex. 20-59T at 1-4.  In addressing a different topic, said he was arrested "about 17 days" before, *i.e.*, around February 15, 2025. Ex. 20-64T at 16. | The CART examiner testified that Sharifullah's four phones had minimal data, one had been factory reset in October 2024 and another (an Infinix) had been reset on February 16, 2025. *See also* Ex. 19-3 (Sharifullah's Infinix phone) |
| Recognized an image of Logari and noted it was from Amaq. Ex. 20-32T at 1-2; Ex. 20-32B. | Mr. Treml's testimony and the Amaq videos make clear Amaq is a primary ISIS propaganda source. *See, e.g.*, Ex. 9-21. |

In addition to those corroborated details, Amaq released videos of several other attacks, permitting the jury to reasonably infer the attacks occurred and ISIS-K perpetrated them. The details regarding those attacks also coincide with Sharifullah's confession:

| Defendant's Confession | Corroborating Evidence |
|---|---|
| Sharifullah said the Badakhshan police commander attack occurred in 2022 or 2023, used explosives hidden in a parked "Corolla" rather than a suicide bomber, and killed the target. Ex. 20-40T at 25-34. Also said attack was filmed, but he did not see the video. *Id.* at 33. | December 2022 Badakhshan attack video shows a parked Corolla (confirmed by FBI Forensic Examiner) exploding near a group of several people. Ex. 9-21; *see also* Ex. 9-19, Ex. 9-20 (statements of responsibility). |

| | |
|---|---|
| Admitted to surveilling route for Iraqi Embassy attack while denying responsibility for many others.  Ex. 20-23T at 8-9. | ISIS-K claimed responsibility for attack on Iraqi Embassy.  Ex. 9-5. |
| Said he brought the suicide bomber on his motorcycle to conduct the attack on NDS Department 90.  Ex. 20-20T at 1-4. | ISIS-K claimed responsibility for attack on NDS Department 90.  Ex. 9-7. |
| Described cleaning rockets and performing surveillance for attack with 10 rockets on border area of Uzbekistan in 2022.  Ex. 20-40T at 16-22. | ISIS-K claimed responsibility for April 2022 Uzbekistan rocket attack, Ex. 9-16; video shows rockets launching, Ex. 9-18. |
| Described killing Taliban Badakhshan deputy governor in 2023 and injuring his bodyguards with remotely activated car bomb.  Ex. 20-41T at 1-6. | ISIS-K claimed responsibility for 2023 attack on Taliban deputy governor in Badakhshan.  Ex. 9-22; Ex. 9-23. |
| Confessed to sending AK-47 training video to Moscow attackers and communicating with them using Telegram.  Ex. 20-36T at 1-9; Ex. 20-43T at 1-4; Ex. 20-80T at 3-5; Ex. 20-82T at 1. | ISIS-K claimed responsibility for 2024 Moscow attack, Ex. 9-26; Ex. 9-28, and testimony describing attack video makes clear the attackers used AK-47 rifles. |
| Expressed surprise that ISIS-K had reach to conduct attack in Moscow.  Ex. 20-43T at 1. | Professor Hoffman testified that he wrote an article discussing his surprise at ISIS-K's reach after the Moscow attack. |

### 6.    Sharifullah's remaining arguments miss the mark.

Sharifullah contends that it would "gut the corroboration rule entirely" to find his confession sufficiently corroborated based on (1) the fake business card recovered from an ISIS-K safehouse; (2) his presence in Pul-e-Charkhi prison and disclosure of similar details to a journalist in 2020; (3) undisputed proof the Abbey Gate attack (and other attacks) occurred, resulted in death, and ISIS-K claimed responsibility; and (4) the corroboration of numerous details from his confession.  *See* ECF No. 213 at 12-14.  Rather, it is Sharifullah's approach—requiring that the government prove his involvement in each attack before relying on his confession—that would flout the law of corroboration.  *See id.*  Sharifullah's approach would flout the rule that the evidence need not "connect" the defendant "in any way with the crime" when "undisputed and detailed evidence" shows the crime occurred.  *Hall*, 396 F.2d at 844-45.  It would flout the rule that corroborating "any part of a confession" corroborates "the entire confession."  *Sammons*, 55 F.4th at 1074.  It would flout the rule that a "detailed" confession matching the evidence suffices to link a defendant to the crime—and that corroboration need not "establish every element of the

28

offense." *Waller*, 326 F.2d at 315.  It would flout the rule that independent proof need only "'tend[]

to establish the trustworthiness of'" the confession.  *Murillo-Lopez*, 151 F.4th at 589.  And it would

flout the rule that the corroboration requirement must be carefully "'scrutinized lest the restrictions

it imposes surpass the dangers which gave rise to them.'"  *Abu Ali*, 528 F.3d at 235.

Sharifullah claims his confession is "inconsistent" with Hassani's testimony that "the

Taliban were in control of security outside of the HKIA gates."  ECF No. 224 at 25-28.  As

previously explained, Hassani's testimony is perfectly consistent with Sharifullah's confession.

*See supra* Section II.A.  Indeed, the Taliban's presence near the airport and the large crowds only

bolster the confession by explaining why ISIS-K leadership was so eager for Sharifullah to scout

the route to Airport Circle and why it took so long for Logari to work his way through the crowd.

As a final shot, Sharifullah seeks to ratchet up the corroboration standard by recapitulating

his failed voluntariness arguments.  *See* ECF No. 213 at 14-15.  This Court, however, already

rejected those contentions.  *See* ECF No. 199.  The conviction on the conspiracy to provide

material support charge likewise confirms the jury found Sharifullah's confession "voluntary[y]"

beyond a reasonable doubt.  *See* ECF No. 217-6 at 27.  Sharifullah points to no caselaw permitting

the smuggling of deficient voluntariness arguments into the corroboration analysis.

## CONCLUSION

The Court should deny Sharifullah's motion for judgment of acquittal and dismiss the

death-results allegation without prejudice.


Respectfully submitted,

Todd W. Blanche
Acting Attorney General

29

By:

_____/s/_____

John T. Gibbs
Virginia Bar Number 40380
Avi Panth
Virginia Bar Number 92450
Reed Sawyers
D.C. Bar Number 90018498
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3982
John.Gibbs@usdoj.gov

John A. Eisenberg
Assistant Attorney General for National Security

Ryan D. White
D.C. Bar Number 1655918
Trial Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, D.C. 20530
Phone: (202) 514-0849
Fax: (202) 514-8714
Ryan.White@usdoj.gov