IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MOHAMMAD SHARIFULLAH,<br>also known as "JAFAR,"<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:25-cr-143-AJT |

**UNITED STATES' SENTENCING MEMORANDUM**

From 2016 through 2025, Mohammad Sharifullah participated in at least a dozen Islamic State of Iraq and ash-Sham-Khorasan Province ("ISIS-K") terrorist attacks, leaving death, tragedy, and suffering in his wake. From his teenage years, when he pledged an oath of allegiance to ISIS-K, Sharifullah's carnage was driven by hate. Hate towards Americans. *See, e.g.,* GX-11-1T at 11 (Sharifullah: "The feeling was just to catch the crusaders and kill them all, that's all...These Americans."); *id.* at 28 ("Be strong against the infidels."). Hate towards religions he did not follow. *Id.* at 5-7 (Sharifullah explaining that violence against Buddhists was justified based on mistreatment of Muslims in Buddhist countries). And hate towards ethnic minorities. *Id.* at 26 (describing that "it is permissible to kill [Hazaras] and in Islam, they should be killed").

Sharifullah's violence cost his victims dearly. In his very first attack, Sharifullah drove a suicide bomber to the attack site to kill over a dozen Nepali security guards and injure several more. In another deadly attack that Sharifullah candidly confessed to, he helped kill 13 American servicemembers and approximately 160 Afghan civilians at the Hamid Karzai International Airport's Abbey Gate on August 26, 2021, when the United States and Coalition military forces were conducting evacuation operations from Afghanistan. As reflected in the victim impact statements, the scope of the suffering Sharifullah caused is incalculable.

Given the depravity of Sharifullah's crimes, the tragic consequences suffered by the countless victims of his crimes, and the need to deter anyone who would think of supporting a foreign terrorist organization, a sentence to the statutory maximum penalty of 20 years in prison, followed by a life term of supervised release, is necessary to meet the goals of the sentencing factors.

## I. Standards Governing Sentencing

During sentencing, federal courts must follow a multistep process that analyzes both procedural and substantive concerns. *First*, the Court must correctly calculate the applicable Guidelines range. *See Gall v. United States*, 552 U.S. 38, 49 (2007). *Second*, the Court "must determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011) (internal quotation marks omitted). To the extent the Court deems some deviation from the Guidelines range appropriate, the Court must give serious consideration to the extent of the deviation and must adequately explain it "to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* at 365 (internal quotation marks omitted). In all events, the Court must impose a sentence that takes into consideration the factors listed under 18 U.S.C. § 3553(a). *See id.* at 364.

Additionally, a district court must orally pronounce all discretionary conditions of supervised release, including "standard" conditions. *United States v. Tostado*, 171 F.4th 664, 666 (4th Cir. 2026). When raised by the defendant on appeal, the failure to do so requires vacatur for a full resentencing. *See id.* at 666 & n.1.

## II. Sharifullah's Criminal Conduct

The offense conduct in this case is accurately summarized at Paragraphs 8-55 of the presentence report ("PSR"). The facts contained in the PSR alone, however, understate the ferocity of Sharifullah's conduct.

### A. Evidence at Trial

The evidence at trial established that Sharifullah played a role in dozens of attacks that killed hundreds of people. Generally, Sharifullah described himself as someone who would identify targets, conduct surveillance in advance of attacks, and transport suicide bombers or other explosives to the eventual attack site. And in interviews with both a Polish journalist and the FBI, Sharifullah was utterly matter of fact as he described those attacks. The table set forth below demonstrates how truly chilling his descriptions of his terrorist conduct were for some of the attacks that he participated in:

| Sharifullah's Attacks | Sharifullah's Description of the Impact of the Attacks |
|---|---|
| Attack on Embassy Guards, June 20, 2016<br><br>(Transported the suicide bomber to the attack site) | "10 or 11 people were killed or wounded…Or it was 14 people." GX 20-18T at 6.<br><br>"The suicide attack on the Nepalis' bus or other locations where we witnessed with our own eyes…They just had them on their bodies and that was it." GX 20-51T at 2. |
| Attack on NDS Department 90<br><br>(Transported the suicide bomber to the attack site) | "[Y]ou align yourself here and hit them, the ones who are walking…this is how the job happened." GX 20-20T at 2.<br><br>According to ISIS-K's public claim of responsibility, more than 30 people were killed in this attack. GX 9-7. |
| Attack on Afghan National Radio and TV Employees<br><br>(Transported the suicide bomber to the attack site) | "I believe, uh, 10 people were killed and wounded." GX 20-21T at 2. |

| **Sharifullah's Attacks** | **Sharifullah's Description of the Impact of the Attacks** |
|---|---|
| The Attack on Pul-e-Charkhi Prison Employees<br><br>(Helped to transport a mine encased in cement to the attack site where it was remotely detonated) | "The car came and he blew it up…One person was injured I think." GX 20-40T at 7-8. |
| The Attack on the Iraqi Embassy<br><br>(Conducted reconnaissance to identify any checkpoints) | "Uh, Iraq Embassy, uh, I had the role of, uh, did the, uh, we did the reconnaissance of the route to make sure, uh, there are no checkpoints." GX 20-23T at 5.<br><br>According to ISIS-K's public claim of responsibility 27 people were killed in this attack. GX 9-5. |
| The Russian Road Attack Targeting Afghan Police<br><br>(Attempted to videotape this attack in progress which involved a remotely detonated mine but he was arrested) | "I think seven people were wounded as they arrested me." GX 20-40T at 11. |
| Abbey Gate Attack<br><br>(Conducted reconnaissance to identify any checkpoints close to the airport) | "[F]or example, the suicide bomber is obvious, that he has a vest." GX 20-28T at 17.<br><br>"The material that they purchased most, right? They'd mostly buy rocket materials." GX 20-28T at 19.<br><br>"Leftover from the Russian era, right?...So they mainly used this stuff, the mines' stuff." GX 20-28T at 22.<br><br>"The suicide bomber blows himself up…There's a switch, he pulls it and it explodes." GX 20-29T at 1.<br><br>According to ISIS-K's public claim of responsibility 160 people were killed in this attack, to include 13 Americans. ISIS-K also published an on-line magazine in English with photographs of the 13 American servicemembers who were killed. GX 9-11, 9-12, 9-13 at 20. |

| **Sharifullah's Attacks** | **Sharifullah's Description of the Impact of the Attacks** |
|---|---|
| The Uzbekistan Rocket Attack<br><br>(Cleaned the rockets, surveilled the route and took them to the location where they were launched) | "Faridoon gave me the…ammunitions…I took it to the boys. I cleaned a few of the rounds…BMI round. The one that is shot…When we went there, to that house. We were doing cleaning and such…And the route. Up to that point we surveilled the route as well…They'd gotten a house. We took these near the spot. Then they took these inside the house, placed them and fixated them…Then they'd fired from that house." GX 20-40T at 17, 20-21.<br><br>In a public claim of responsibility for this attack, ISIS-K released a video showing the rockets being launched. GX 9-16, 9-17, 9-18. |
| Attack on a Police Commander in Badakhshan Province<br><br>(Helped to organize this attack including by purchasing a Toyota Corolla in which a remotely-controlled IED was detonated) | "He then told me to speak to him…To tell them, for example, to see the security commander, to surveil him." GX 20-40T at 27.<br><br>"And after that, they said to ask what they need. For example, should we place a mine in the car, or along the way, however it's the easiest…To hit him, yeah." GX 20-40T at 28.<br><br>"We should park the car…And when the person passes by, we blow it up." GX 20-40T at 29.<br><br>"After the explosion happened, they told me [The Police Commander had been killed]. And I reported it to…to Shukrullah." GX 20-40T at 33.<br><br>In a public claim of responsibility for this attack, ISIS-K released a video showing the explosion along with a statement that it had resulted in the death of the Police commander and several of his bodyguards. GX 9-19, 9-20, 9-21. |

| Sharifullah's Attacks | Sharifullah's Description of the Impact of the Attacks |
|---|---|
| Attack on the Deputy Governor of Badakhshan Province<br><br>(Instructed a subordinate to surveil the attack site. Used a remotely detonated IED in this attack) | "That attack was on the Deputy Governor…Then he said that Ahmad have said that the Deputy Governor comes and goes and we can work on him." GX 20-41T at 1.<br><br>"They'd made it themselves and brought the car and parked it on the side of the road…When the Deputy Governor's car was passing through…They exploded him…He was killed." GX 20-41T at 3.<br><br>In a public claim of responsibility for this attack, ISIS-K said that the attack resulted in the death of the Deputy Governor and two of his companions. GX 9-22, 9-23. |
| Attack on the Taliban Ranger<br><br>(Acted as a middleman or liaison between ISIS-K leadership and his subordinates on the ground in Badakhshan. Used a remotely detonated IED on a motorcycle in this attack) | "They'd bought the motorcycle, built the mine, placed it on the motorcycle…That's when they blew them up…In this one I think five people were killed and wounded." GX 20-41T at 7. |
| Attack on Pul-e-Charkhi Prison Employees<br><br>(Coordinated the attack on the prison employees using a cart that was remotely detonated when they were nearby) | "My role, I was guiding them, for example the things that they would say, for example to go today, at what hour do they go and at what hour do they come." GX 20-66T at 1.<br><br>"I believe ten people were killed and injured." GX 20-66T at 3. |
| The Crocus Hall Attack in Moscow<br><br>(Made a video to show the attackers how to use Kalashnikov rifles and communicated with the attackers over Telegram while the attack was in progress) | "Because when the operation took place in Moscow…Qari Nawab…Messaged us, and said that, 'you just make a video, a video, for example, how a Kalashnikov is fired.'" GX 20-36T at 1.<br><br>"When I sent them the video and stuff to Abu Manzir…And after that, he gave me the ID's of one or two of these…He just told me that when they start moving…And come toward the Crocus Hall, you talk to them…Talk to them, for example, where are you, and stuff. On Telegram." GX 20-36T at 4. |

| Sharifullah's Attacks | Sharifullah's Description of the Impact of the Attacks |
|---|---|
| | "Then, I talked to them. They said that they'd arrived. Then, uh, the fight had started." GX 20-36T at 5.<br><br>In a public claim of responsibility for this attack, ISIS-K published a video showing the attack in progress. ISIS-K also claimed that this attack resulted in 500 killed and wounded. GX 9-26, 9-27, 9-28, 9-29. |

### B. Additional Evidence Related to Sharifullah's Criminal Conduct

#### 1. Sharifullah's DNA on Unexploded Improvised Explosive Device

While Sharifullah's self-described role in ISIS-K was of an individual who facilitated attacks through surveillance and transportation, additional evidence suggests he played an even greater role. In August 2019, around the same time as Sharifullah's arrest, Afghan forces recovered an unexploded mine in Kabul, Afghanistan. *See, e.g.,* GX 7-2B (Photo 1 of Wire Twists encased in tape) and GX 7-2C (Photo 2 of Wire Twists) at Attachment A and B. Subsequent testing showed that wire twists from *within* the mine contained Sharifullah's DNA. In fact, a forensic biologist employed by the U.S. Army Criminal Investigative Laboratory conducted a manual comparison of the DNA obtained from the wire twists to a buccal swab taken from Sharifullah in 2025 and concluded that the partial DNA profile developed from the wire twists was consistent with Sharifullah's DNA and 750 trillion times more likely to have originated from the defendant than from an unknown individual.

Thus, one can infer that Sharifullah was not "merely" identifying targets, conducting surveillance, and transporting suicide bombers but rather was involved in the construction of explosive devices used in those attacks. At a minimum, Sharifullah was involved in handling components that ultimately were used to build explosive devices, but more likely, Sharifullah

himself was actually building those devices. At trial, the government was prepared to present expert testimony from an EOD technician regarding how the twisting of two wires together is essential to the construction of an improvised explosive device—and the presence of DNA on those wires is "'not innocuous' and could only be 'nefarious.'" *See* Attachment C. Moreover, the notion of Sharifullah as a bombmaker is consistent with his admissions to FBI that he was an experienced blacksmith which would give him at least the rudimentary skills to be able to execute such a task. *See* GX 20-12T at 8 (Sharifullah describing his recruitment by Dr. Naqibullah where he told the FBI, "I'd said that I work at a blacksmith shop. And, once, uh, he took me to his house. His real house…There I did their metal works. I made fences and stuff for them"). It is also consistent with his statements to the FBI regarding the types of explosives ISIS-K used in suicide vests and how those vests were constructed. And having served in ISIS-K for nearly ten years during which he steadily moved up in the ranks, it is not at all implausible that he would acquire the skills necessary to construct IED's.

2. <u>Mohammad Adil</u>

In June 2025, the FBI conducted interviews of Mohammad Adil, another ISIS-K operative who was likewise in Pakistani custody. Adil explained that the particular ISIS-K cell in which he worked with Sharifullah was formed after the Abbey Gate attack and that Sharifullah was a leader or "Amir" of ISIS-K in charge of military personnel and suicide attacks. In that capacity, Sharifullah ordered attacks, selected targets, and approved Adil's attack plans. Adil also stated that Sharifullah was a first-class bombmaker and that Adil used Sharifullah's techniques in preparing his own bombs.

During the interviews, Adil described numerous attacks he carried out at Sharifullah's direction, including the 2022 attack on the Taliban Police Chief in Badakhshan using an explosive

placed in a purchased "Corolla" and the rocket attack on Uzbekistan. He also noted that one of Sharifullah's most successful attacks was on a bus carrying Filipino workers in Kabul, although Adil did not know who they were because the attack predated his membership in ISIS-K. Adil also said Sharifullah was responsible for overseeing the January 3, 2024, bombings in Kerman, Iran during the ceremony commemorating former IRGC leader Qasem Soleimani, which killed more than 80 people and injured several hundred more. While Sharifullah made no mention of his involvement in that attack to the FBI, Adil said that Sharifullah coordinated pre-attack surveillance, gave the suicide bombers the order for the attack, and ultimately adjusted the attack sites at the last minute to target more civilians.

Beyond the specifics, Adil described Sharifullah as a "lion" and said it would be very difficult to fill his shoes because he is a very special person responsible for numerous complex suicide operations. Adil told the FBI that Sharifullah was responsible for dozens of operations that resulted in the murder and wounding of more than 5,000 people. While Sharifullah lacks formal education and is physically weak, Adil emphasized that he is very smart and sharp.

For his part, Sharifullah freely admitted to knowing Adil, and he described Adil's role within ISIS-K. For example, in the Uzbekistan rocket attack, Sharifullah told the FBI that Adil was the one who transported the rockets and Sharifullah was the one assigned to clean them. GX 20-40T at 17. Later, after conducting surveillance of the route to the house where the rockets would be fired, Sharifullah said that Adil was the person he contacted to report that the route was clear. *Id.* at 19. Sharifullah also described a second rocket attack into Uzbekistan where Adil fired a rocket from a car. According to Sharifullah, he and another ISIS-K member named Assad were present when this attack took place. *Id.* at 22-24.

Sharifullah said that Adil was also heavily involved in the IED attack against the police commander in Badakhshan Province where a bomb was placed inside a Toyota Corolla and in another attack in Badakhshan on a Taliban Deputy Governor. *See* GX20-40T at 32 ("MS: And then after that Adel had gone and fixed the car for them. KB: Had placed the mine? MS: Yes, yeah….KB: Who was inside the Toyota Corolla? MS: There wasn't anyone. They'd placed a remote-controlled mine."); GX20-41T at 3 ("MS: They bought a Passow car. And after that, Ahmad himself had made it this time…, KB: The mine? MS: Yeah. He'd learned, right? Adil had taught them.").

### C. Sharifullah's Victims

There are hundreds of victims, both living and dead, from the ISIS-K attacks in which Sharifullah participated. The victims who survived the attacks in which Sharifullah participated also suffered grievously.

*Nepali attack.* In addition to the more than 10 embassy guards killed in the attack, the two survivors of the Nepali attack who testified at trial also submitted victim impact statements. According to Prem Chhetri, he suffered serious bodily injuries when the IED which Sharifullah drove to the attack scene detonated. He was knocked unconscious and he later found both his ear drums were damaged and he had partial hearing loss, in addition to experiencing memory loss and repeated trauma even ten years later.

Tragically, he was also unable to piece his life back together. He could not get another job as a security guard due to his diminished hearing and physical condition. As a result of being unable to provide for his family, both his daughter and his son had to discontinue their studies. His daughter was forced to marry at a young age, and his son had to leave school to start working to provide for their family.

Krishna Deuja also suffered grievous injuries from the blast and came away with metal fragments permanently lodged in his head. At trial, he noted that the blood streaming down the rear of the bus, where he was then sitting, was his blood.



*Government's Trial Exhibit 2-2B*

Krishna Deuja also suffered great financial hardship as a result of the attack. He could not get another job due to this attack, and he is suffering from high blood pressure. His wife divorced him after 22 years of marriage, and he is now estranged from his children. Since his wife got their house in the divorce, he is now homeless.

*Abbey Gate Attack.* Sharifullah's scouting of the route to Hamid Karzai International Airport resulted in the death of more than one hundred Afghan civilians, as well as 13 United States servicemembers at Abbey Gate:

Army Staff Sergeant Ryan C. Knauss

Navy Petty Officer Third Class Maxton W. Soviak

Marine Corps Lance Corporal Dylan R. Merola

Marine Corps Lance Corporal Kareem M. Nikoui

Marine Corps Lance Corporal Jared M. Schmitz

Marine Corps Corporal Humberto A. Sanchez

Marine Corps Lance Corporal David L. Espinoza

Marine Corps Corporal Hunter Lopez

Marine Corps Corporal Daegan W. Page

Marine Corps Lance Corporal Rylee J. McCollum

Marine Corps Sergeant Nicole L. Gee

Marine Corps Staff Sergeant Darin T. Hoover

Marine Corps Sergeant Johanny Rosario Pichardo

Each of those thirteen servicemembers volunteered to serve the United States. They gave their lives conducting a *non-combat* evacuation operation, helping Afghanis they had never met, including women and children, who supported the United States during the war evacuate to the freedom they had earned. And because of the depraved conduct of Sharifullah and his ISIS-K coconspirators, those servicemembers' lives were cut short, and they never made it home to their families.

Dozens of servicemembers were wounded in the Abbey Gate attack and suffered grievously. Two of those surviving victims, Kelsee Lainhart and Michael Gretzon, testified at trial. On the day of the attack, Kelsee Lainhart volunteered to go to Abbey Gate, because her friend, Nicole Gee, was going there, and Lainhart did not want Gee to be alone. Both Lainhart and Gee were blown through the air when the IED exploded, and Lainhart described a feeling of floating. She also saw Gee lying nearby with her eyes closed and recalled thinking that Gee looked peaceful. Lainhart would only later learn that Gee had been killed in this attack.

As a result of this terrorist attack, Lainhart is permanently paralyzed from the waist down. She took a voluntary separation from the Marine Corps as a result of her injuries. Following the

attack, she made two on-line posts describing what happened on August 26, 2021. *See* Attachments D and E.

As for Michael Gretzon, he too suffered debilitating and lasting physical injuries from the blast and its associated shrapnel, some of which is still lodged in his body. He suffered a traumatic brain injury, which caused lingering challenges, and his left arm remains impaired. As a result of his injuries, the U.S. Marine Corps ultimately medically separated Michael Gretzon from service. In addition to his physical injuries, he knew almost all of the servicemembers who were killed in this attack. Most were close friends of his, people he served with from his very first days in the Marine Corps boot camp. It is no exaggeration to say that he lost a large part of his support group when the IED detonated on August 26. So, as he grapples with the physical and emotional injuries from this terrorist attack, he cannot call the people he would be most likely to reach out to, because they are gone.

The government anticipates that numerous family members of the 13 servicemembers killed at Abbey Gate will provide firsthand accounts of the incomprehensible and permanent loss each of them endured as a result of the ISIS-K's attack, either via written statement or by speaking at the sentencing hearing. Only those family members, many of whom were present for trial, can fully articulate the impact that Sharifullah's conduct has had on them and on so many others.

*Crocus Hall and other attacks.* While no victims of Sharifullah's other attacks testified at trial, and none of them will provide victim impact statements, the Court should not lose sight of the carnage he wrought in Afghanistan and beyond. In particular, the Crocus Hall attack in Moscow was one of the deadliest attacks that Sharifullah participated in. And he did not simply participate, he had a subordinate prepare a video to teach the attackers to fire AK-47 rifles and spoke to the attackers over Telegram, while the attack was underway. ISIS-K released a video

filmed while the attack was being carried out that depicts one attacker cutting the throat of a victim lying on the floor. The attackers can also be seen shooting AK-47-style rifles. ISIS-K proudly proclaimed that 500 people were either killed or wounded in this attack. GX 9-30.

## III. Statutory Maximum & Guidelines Range

The jury convicted Sharifullah of conspiracy to provide material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, for his conduct as a member of ISIS-K from 2016 through March 2025. *See* ECF No. 18 at 5 (indictment); ECF No. 218 (verdict). The jury deadlocked on the enhanced death-results offense, meaning the statutory maximum sentence is 20 years. *See* 18 U.S.C. § 2339B(a)(1). The maximum term of supervised release is life. *See id.* §§ 2332b(g)(5)(B)(i), 3583(j).

The United States has no objections to the PSR, which correctly calculates Sharifullah's offense level of 58 (capped at 43) and a criminal history category of VI, resulting in a Guidelines range of life imprisonment (capped at the twenty-year statutory maximum). PSR ¶¶ 66-74, 93-94.

As set forth in Paragraphs 66 to 74 of the PSR, the following Guidelines provisions apply:

- Base offense level of 43, because the offense involved death "caused intentionally or knowingly," pursuant to U.S.S.G. §§ 2M5.3(c)(1) and 2A1.1(a);

- A 12-level enhancement (and a mandatory criminal history category of VI), because the offense involved, or was intended to promote, a federal crime of terrorism, pursuant to U.S.S.G. § 3A1.4;

- A 3-level enhancement, because Sharifullah was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(b).

In their informal objections to the PSR, the defense contests neither the first-degree murder cross reference nor the terrorism enhancement, which alone would dictate an offense level of 55 (reduced to 43) and criminal history category of VI. The terrorism enhancement serves the important purpose of "punishing more harshly than other criminals those whose wrongs served an

end more terrible than other crimes." *United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008). Sharifullah's admissions to the Polish journalist and to the FBI establish that he was well aware of ISIS's "terrorist purpose" and "intended to advance that purpose in providing material support." *See United States v. Chandia*, 675 F.3d 329, 340 (4th Cir. 2012). Indeed, Sharifullah joined ISIS-K to retaliate against the United States for its invasion of Afghanistan—"to catch the crusaders and kill them." GX 11-1T at 10. He joined ISIS-K to kill infidels, and he chose targets to avenge how he perceived Muslims were being treated by other religions. *See, e.g.*, *id.* at 6-8, 26. For years, Sharifullah did just that, carrying out numerous lethal attacks to further ISIS-K's mission.

In their informal objections to the PSR, the defense instead challenges only (a) the designation of the victims of the Abbey Gate attack as "victims" under the Crime Victims Rights Act and Mandatory Victims Restitution Act and (b) the application of the manager or supervisor enhancement. Both arguments fail.[1]

### A. The Abbey Gate Victims are "Victims" Under the Crime Victims Rights Act and Mandatory Victims Restitution Act.

Sharifullah's challenge to the designation of the Abbey Gate victims as "victims" under the Crime Victims Rights Act ("CVRA") and Mandatory Victims Restitution Act ("MVRA") fails for three independent reasons. First, the CVRA bars a defendant from challenging a victim designation under that statute. Second, on the merits, the Abbey Gate victims plainly satisfy the CVRA and MVRA "victim" definitions because Sharifullah's conspiracy to provide material support to ISIS-K directly and proximately caused their deaths and injuries. Third, even were it

[1] The defense has communicated its position to the government that both surviving servicemembers and the family members of those killed at Abbey Gate are not entitled to speak at sentencing. As noted herein, numerous Abbey Gate victims will be traveling from across the country to speak at sentencing.

otherwise, the Court could and should consider the Abbey Gate victim impact statements as relevant to Sharifullah's "background, character, and conduct" under 18 U.S.C. § 3661.

1. The CVRA bars Sharifullah from challenging a victim designation under that statute.

As a threshold matter, "[a] person accused of the crime may not obtain any form of relief under" the CVRA. *See* 18 U.S.C. § 3771(d)(1). The statute therefore "explicitly bars" Sharifullah "from raising a challenge" to whether the Abbey Gate victims "qualify as victims under the CVRA." *See United States v. Smith*, 2025 WL 3459685, at *1 (D. Colo. Dec. 2, 2025); *United States v. Lampley*, 2020 WL 4044986, at *2 (E.D. Tex. July 16, 2020).

2. The Abbey Gate Victims are "Victims" because Sharifullah's Conspiracy to Provide Material Support Directly and Proximately Caused Their Deaths and Injuries.

The CVRA, MVRA, and the Victim and Witness Protection Act ("VWPA") all define a victim as "a person directly and proximately harmed as a result of the commission of" an "offense." *See* 18 U.S.C. §§ 3663(a)(2) (VWPA), 3663A(a)(2) (MVRA), 3771(e)(2)(A) (CVRA). As Sharifullah agrees, courts therefore "analyze cases interpreting the relevant language from the VWPA, MVRA, and CVRA interchangeably." *See, e.g.*, *United States v. Ruiz-Lopez*, 53 F.4th 400, 404 n.2 (6th Cir. 2022); *United States v. Credit Suisse AG*, 2014 WL 5026739, at *3 (E.D. Va. Sept. 29, 2014) ("[G]iven the similarity between the statutory text of the CVRA and the VWPA, a 'victim' under the VWPA is the same as a 'crime victim' under the CVRA.").

In assessing victim status, courts apply "a preponderance of the evidence" standard. *See United States v. Henoud*, 81 F.3d 484, 490 (4th Cir. 1996); *United States v. Boeing Co.*, 617 F. Supp. 3d 502, 514 (N.D. Tex. 2022). An individual constitutes a "victim" under the CVRA and MVRA if "the conduct underlying at least one of the elements of the offense [was] a but-for cause of the 'crime victim's' harm, and the harm [was] 'a reasonably foreseeable consequence of the

criminal conduct.'" *Credit Suisse AG*, 2014 WL 5026739, at *4. In other words, the offense must be "the 'but for' and 'proximate cause'" of harm. *See id.*

When it comes to conspiracies, the Fourth Circuit has time and again emphasized that all who suffered "losses flowing from [a] conspiracy" constitute "'victim[s].'" *See, e.g.*, *United States v. Plumley*, 993 F.2d 1140, 1142 & n.2 (4th Cir. 1993) (per curiam). In *Plumley*, a defendant convicted of conspiracy to commit bank robbery claimed that a bank robbed by a co-conspirator was not her "'victim'" because she did not cause it direct harm. *Id.* The Fourth Circuit squarely rejected that contention, explaining that victims include all those directly harmed "during" and "in furtherance of the conspiracy." *Id.*

Likewise, in *United States v. Henoud*, the Fourth Circuit made clear that "victims" encompass all those whose harm "result[ed] from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme." *See* 81 F.3d 484, 488-89 (4th Cir. 1996). Applying that standard, the Fourth Circuit held that parties "not specifically named in the indictment" nevertheless constituted "victims" because their harm was caused by "conduct underlying the offense of conviction," *i.e.*, the "scheme or conspiracy." *Id.*

The Fourth Circuit reached a similar conclusion in *United States v. Newsome*. 322 F.3d 328 (4th Cir. 2003). Newsome was convicted of conspiring to cut down and steal black cherry trees from a national forest but acquitted "of the one substantive count of theft alleged against him." *Id.* at 332. At sentencing, the district court imposed "$248,459.53" in restitution under the MVRA—representing the loss caused by the entire conspiracy—despite finding that Newsome "was not involved in any particular theft." *Id.* The Fourth Circuit affirmed, reasoning that the MVRA "'victim'" definition dictates that "losses caused by a conspiracy include 'not only those resulting from the defendant's individual actions but also others caused by the conspiracy itself.'"

*Id.* at 341. Thus, "[b]ecause the district court found that the *conspiracy* caused the United States to lose 95 black cherry trees and that the loss amounted to $248,459.53, the court properly ordered Dallas Newsome to pay the full amount." *Id.* at 342.

Other courts have also recognized the broad scope of "victims" in conspiracy cases. For instance, the D.C. Circuit vacated a district court's determination that the murdered leader of "an organization dedicated to ending the production of coca within the region under the drug conspiracy's direct control" did not constitute a "victim" of the defendant's "drug conspiracy." *In re de Henriquez*, 2015 WL 10692637, at *1 (D.C. Cir. Oct. 16, 2015) (per curiam). All that is required for "victim" status, the court explained, is a "connection" between "the overall conspiracy to manufacture and/or distribute cocaine" and "the murder." *Id.* at *2; *see also United States v. Giraldo-Serna*, 4-cr-114 (D.D.C. Mar. 14, 2016), ECF No. 543 (granting victim status on remand). In a similar vein, another court found that the "passengers and crew" on crashed "737 Max" planes constituted "'victims'" of Boeing's "conspiracy to defraud the FAA" by withholding safety information. *United States v. Boeing Co.*, 2022 WL 13829875, at *6-9 (N.D. Tex. Oct. 21, 2022).

The Abbey Gate victims plainly satisfy the CVRA and MVRA "victim" definitions because Sharifullah's conspiracy to provide material to support ISIS-K was "the 'but for' and 'proximate cause'" of their death and injury. *See Credit Suisse AG*, 2014 WL 5026739, at *4. Indeed, in denying Sharifullah's motion for judgment of acquittal, this Court already found that the trial evidence sufficed to find *beyond a reasonable doubt* that "Sharifullah participated in a conspiracy to provide material support to ISIS-K that actually and proximately caused the Abbey Gate deaths." *See* ECF No. 237 at 12-16. The evidence thus more than suffices to make the same finding that the Abbey Gate victims were "directly and proximately harmed as a result of the

commission of" Sharifullah's "offense" under the lower preponderance standard, satisfying the statutory "victim" definitions. *See* 18 U.S.C. §§ 3663A(a)(2), 3771(e)(2)(A).

Sharifullah's cited cases only confirm that all harmed by his conspiracy to provide material support to ISIS-K constitute "victims." *See United States v. Davenport*, 445 F.3d 366, 373-74 (4th Cir. 2006); *United States v. Blake*, 81 F.3d 498, 506-07 (4th Cir. 1996); *United States v. Cornett*, 515 F. Supp. 3d 367, 370-73 (E.D.N.C. 2021). Each case denied "victim" status as to *substantive* offenses that did not "include as an element a scheme, conspiracy, or pattern of criminal activity." *See Blake*, 81 F.3d at 506 ("fraudulent use of unauthorized access devices"); *Davenport*, 445 F.3d at 373-74 (same); *Cornett*, 515 F. Supp. 3d at 371 ("making a false statement during purchase of a firearm and possession of a firearm by a prohibited person"). Here, by contrast, Sharifullah's "conviction" obviously includes "conspiracy . . . as an element of the offense"—meaning that all those harmed by any "act taken in furtherance of" the "conspiracy" constitute "victims of his offense of conviction." *See Blake*, 81 F.3d at 506.

Nor does the jury's inability to reach a verdict on the death-results offense limit the scope of victims of Sharifullah's conspiracy conviction. To the contrary, even an outright "acquittal" on some counts does not preclude responsibility for the entire harm caused by a conspiracy. *See, e.g.*, *United States v. Jinwright*, 683 F.3d 471, 475, 484-86 (4th Cir. 2012); *Newsome*, 322 F.3d at 332, 341-42. In *Jinwright*, the Fourth Circuit upheld restitution "based on tax loss amounts for 1998–2008" for a defendant convicted of tax conspiracy despite the defendant's "acquit[al]" on "three additional counts of tax evasion for the years 2002–2004." *See* 683 F.3d at 475, 484-86. The court explained that "a district court is authorized to include in restitution the 'losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme.'" *Id.* at 486. The district court's finding that the "conduct underlying" the

defendant's "conspiracy conviction" began in "1998" thus supported restitution even for years on which the jury acquitted. *See id.* Likewise, in *Newsome*, the Fourth Circuit upheld the defendant's responsibility for all harms caused by the "conspiracy" despite his acquittal on the sole substantive count with which he was charged and the district court's finding he was not involved in any specific thefts. *See* 322 F.3d at 332, 341-42. If acquittal did not preclude victim status in *Jinwright* and *Newsome*, a split verdict certainly does nothing to aid Sharifullah.[2]

*United States v. Shamo* is directly on point. 2020 WL 7027730 (D. Utah Nov. 30, 2020), *aff'd*, 36 F.4th 1067 (10th Cir. 2022). There, a jury convicted the defendant of continuing criminal enterprise, drug conspiracy, and drug distribution but "hung on the death resulting charge." *Id.* at *1, *3. Yet, recognizing that the split verdict has no bearing on victim status, the court imposed restitution for two victims after finding by a "preponderance of the evidence" that the conspiracy caused their deaths by drug overdose. *See id.* at *3. So, too, here: The fact that the jury could not reach a verdict on the death-results offense does nothing to preclude this Court from finding by a preponderance that Sharifullah's conspiracy to provide material support to ISIS-K caused deaths and injuries to the Abbey Gate victims.

3. Alternatively, the Court may consider the Abbey Gate victim impact statements as relevant to Sharifullah's conduct and character under 18 U.S.C. § 3661.

Even if the Abbey Gate victims do not constitute "victims" under the CVRA, this Court should still consider their impact statements at sentencing. "The only limitations on a court's discretion to consider any relevant materials at an initial sentencing or in modifying that sentence

[2] Sharifullah's apparent position that the split verdict restricts who may qualify as a "victim" is also difficult to square with his prior contention that a "hung count is a nonevent, because a jury speaks only through its verdict, and a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jury did return." ECF No. 228 at 8.

are those set forth by Congress in a statute or by the Constitution." *Concepcion v. United States*, 597 U.S. 481, 494 (2022). "At an initial sentencing, Congress has provided generally that '[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense' when deciding what sentence to impose." *Id.* (quoting 18 U.S.C. § 3661). Thus, while "the CVRA *requires* district courts to allow certain individuals to be heard in criminal proceedings, it does not *prohibit* [other] individuals from being heard or otherwise limit a judge's discretion to consider relevant material at sentencing." *See, e.g.*, *United States v. Brown*, 2023 WL 1267185, at *2 (4th Cir. Jan. 31, 2023) (per curiam) (emphasis added); *United States v. Myers*, 402 F. App'x 844, 845 (4th Cir. 2010) (per curiam).

Recognizing that broad "discretion," the Fourth Circuit in *Brown* found it unnecessary to "resolve" whether victims "f[e]ll within the CVRA's definition of 'crime victim.'" 2023 WL 1267185, at *2. Whether or not the victims met the CVRA definition, the district court properly considered their "statements" under § 3661 as "relevant to the nature, circumstances, and seriousness of Brown's violation conduct." *Id.* Likewise, in *Myers*, the Fourth Circuit held that—without regard for CVRA status—a victim's "unsworn statement at sentencing" was "relevant to Myers's background, character, and conduct, and . . . thus admissible for the purpose of imposing an appropriate sentence" under 18 U.S.C. § 3661. 402 F. App'x at 845. And, notably, even in the sole case cited by Sharifullah denying CVRA status, the district court "[n]evertheless" permitted the victim to be heard at sentencing under § 3661. *See Cornett*, 515 F. Supp. 3d at 373; *see also Credit Suisse AG*, 2014 WL 5026739, at *5 (similar).

As in *Brown*, *Myers*, and *Cornett*, the Abbey Gate victim impact statements shed light on Sharifullah's "background, character, and conduct." 18 U.S.C. § 3661. The Court should therefore consider them "for the purpose of imposing an appropriate sentence" regardless of

"whether" the Abbey Gate victims constitute "crime victim[s] under 18 U.S.C. § 3771." *See, e.g.*, *Meyers*, 402 F. App'x at 845; *United States v. Bendann*, 180 F.4th 147, 158 (4th Cir. 2026) ("Harm to the student's immediate family—like the mother's harms here—fits comfortably within the capacious bucket of information relating to Bendann's conduct.").

All told, Sharifullah's contention that the Abbey Gate victims do not constitute "victims" under the CVRA is statutorily barred, meritless, and irrelevant because courts invariably consider impact statements under § 3661 without regard for whether victims meet the statutory definition.

**B. The Three-Level Manager or Supervisor Enhancement Applies.**

The Court should reject Sharifullah's challenge to the three-level "manager or supervisor" enhancement. *See* PSR ¶ 62 (citing U.S.S.G. § 3B1.1(b)). The enhancement applies when "the defendant made decisions that reflected his management or supervision of the criminal activities of at least one other person." *See United States v. Steffen*, 741 F.3d 411, 416 (4th Cir. 2013). Such is the case when a defendant makes a "decision regarding the manner in which another participant in the conspiracy was to conduct the conspiracy's business." *See id.* Likewise when the defendant decides "where" and "when" actions will be performed. *See United States v. Otuya*, 720 F.3d 183, 192-93 (4th Cir. 2013); *United States v. Cabrera-Beltran*, 660 F.3d 742, 756 (4th Cir. 2011) ("making decisions about where and when to transport drugs and money"). Or when a defendant "provide[s]" the materials required for criminal conduct. *See United States v. Oliver*, 133 F.4th 329, 339 (4th Cir.), *cert. denied*, 146 S. Ct. 239 (2025).

Sharifullah claims that he was a mere "messenger" rather than a manager or supervisor. He sells himself short. In many attacks, to be sure, he *claims* to have acted only as a "liaison" or "middle"-man between ISIS-K leadership and subordinates carrying out attacks on the ground. *See, e.g.*, GX 20-40T at 26-31; GX 20-41T at 1-12. But in others, he forthrightly acknowledges

his role: "I was guiding them, for example the things that they would say, for example to go today, at what hour do they go and at what hour do they come." GX 20-66T at 1. Such "management decision[s]," *Steffen*, 741 F.3d at 416, regarding "where" and "when" actions will be performed are the hallmark of a manager or supervisor, *Otuya*, 720 F.3d at 193. Confirming as much, when assigned to make a video teaching the Moscow attackers how to use an AK-47, Sharifullah delegated that task to another ISIS-K member he told how to make the video, *see* GX 20-36T at 1-5—the prototypical act of a manager or supervisor, *see United States v. Rubio*, 182 F.4th 702, 706 (7th Cir. 2026) ("It is enough to . . . 'delegat[e] tasks such as delivery or payment'"). In addition to "provid[ing]" the video, *see Oliver*, 133 F.4th at 339, Sharifullah also provided "instruct[ion]" to the Moscow attackers as they carried out the massacre, *see Steffen*, 741 F.3d at 416; GX 20-36T at 4-9. He therefore easily clears the manager or supervisor bar.

While the trial evidence alone supports the enhancement, Adil's statements to the FBI about Sharifullah put the enhancement's applicability beyond doubt. "It is well established that a court may, for purposes of sentencing, consider 'any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy.'" *United States v. Mondragon*, 860 F.3d 227, 233 (4th Cir. 2017). "Moreover, the defendant bears 'an affirmative duty' to show 'that the information in the presentence report is unreliable and articulate the reasons why the facts contained therein are untrue or inaccurate.'" *Id.* Here, Sharifullah has not even "attempt[ed] to make this showing," *see id.*, instead merely lodging a blanket objection "to the veracity of much of Adil's statements to the FBI." Even had Sharifullah met his burden to cast Adil's veracity into doubt, the reliability of his statements is confirmed by Sharifullah's many references to Adil's participation in attacks, *see, e.g.*, Ex. 20-40T at 17-26, 32; Ex. 20-41T at 3, and by Adil's knowledge of the details of Sharifullah's role in the conspiracy.

Adil, for instance, knew that Sharifullah participated in the Moscow, Marshal Fahim University, and NDS Department 90 attacks; was previously incarcerated in Pul-e-Charkhi prison; and that one of Sharifullah's most successful attacks was on a bus carrying "Filipino" workers in Kabul. Adil also made clear that Sharifullah was an ISIS-K "Amir" who ordered attacks, selected targets, and approved Adil's plans for the 2022 attack on the Taliban Police Chief in Badakhshan and the rocket attack on Uzbekistan, easily satisfying the manager or supervisor standard.

## IV. The § 3553(a) Factors Require a Statutory Maximum Sentence of 20 Years' Imprisonment.

After calculating the appropriate advisory Guidelines range, a sentencing court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors set forth in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

As described more fully herein, based on the particularly egregious facts and circumstances of this case, only a 20-year term of imprisonment serves the factors set forth in section 3553(a).

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of the offense require a 20-year sentence. As set forth in the PSR, Sharifullah contributed to the deaths of hundreds of innocent people. Sharifullah did not

merely sympathize with a violent ideology but swore an oath to ISIS-K in early adulthood and for the next decade did almost nothing but work on behalf of ISIS-K to kill its perceived enemies. He never disavowed his allegiance to the group and continued to move up the ranks within ISIS-K. Since 2016, the only impediment to Sharifullah's support of lethal ISIS-K attacks was his incarceration, first in 2019 in Afghanistan and again in 2025 when he was arrested in Pakistan.

Similarly, Sharifullah's history and characteristics weigh in favor of a 20-year sentence. He has a demonstrated history of engaging in unspeakable violence with absolutely no remorse from the time he was a teenager. While in Afghan custody from 2019 to 2021, he bragged about the attacks he carried out on ISIS-K's behalf to a Polish journalist. And after being given a new lease on life when the Taliban emptied the prison that he was held in, Sharifullah immediately returned to ISIS-K to participate in the deadly attack at Abbey Gate on August 26, 2021.

From there, Sharifullah only took on a greater role within ISIS-K, planning and overseeing more deadly attacks. And when he was about to be detained by the Pakistanis in February 2025, his final acts on behalf of ISIS-K were to contact Shukrullah, a senior ISIS-K member, to tell him he was about to be arrested, and then to erase all the information from his electronic devices. There can be little doubt that he still views himself as a proud member of ISIS-K.

Demonstrating his continued willingness to engage in violent acts, Sharifullah made violent, graphic threats against his brother-in-law in a monitored phone call from the Alexandria Detention Center. *See, e.g.,* PSR at ¶ 92 (Sharifullah swore that he would carry out the threats after his release even if it took 100 years and directed his sister to tell his brother-in-law to buy his funeral shroud and keep it by his bedside in preparation for death).

### B. To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment

Few, if any, offenses are more serious than ones that result in the deaths of and injuries to hundreds of innocent civilians. A sentence of 20 years imprisonment is necessary to reflect that fact and to promote respect for the law. The fact that the United States government and the FBI worked so diligently to gain custody of Sharifullah and bring him back to this country to face these charges demonstrates how seriously our government views this conduct, and how no terrorist anywhere in the world should ever feel safe from the reach of the United States.

The seriousness of the offense is also manifest in the tragic consequences the victims face. Many victims lost their lives. The survivors of Sharifullah's carnage were left with physical injuries. *See, e.g.,* PSR at 29 ("I have been living with tiny metal fragments in my head"); *id.* at 26 (victim describing hearing loss, memory loss, and a weak physical condition after the attack). Victims were left with continuing emotional suffering. *Id.* at 29 (victim describing helplessness, anxiety, grief, and social isolation). Most tragically, many faced lasting and heartbreaking collateral consequences. *Id.* at 27 ("When my family heard the news of the terrorist attack and learned that I had been injured, my wife fell unconscious with shock for several days."); *id.* (victim describing that his incapacitation meant he lost his job and was "no longer able to bear the financial burden of my children's education [and] [m]y daughter had to give up her studies. . . My son was also forced to discontinue his studies and start working to help support the family.").

A 20-year term of imprisonment will also provide just punishment. Sharifullah chose a path that led to unspeakable violence and shattered innumerable lives. There is simply no basis to impose anything other than the maximum penalty in this case.

### C. To Afford Adequate Deterrence to Criminal Conduct

A 20-year sentence is necessary to provide specific deterrence to this defendant. Sharifullah is a hardened ISIS-K member, who has terrorized others for the majority of his adult life. A guidelines-range, maximum sentence is needed to specifically deter Sharifullah's future conduct. Indeed, the evidence at trial established that Sharifullah's prior two-year imprisonment served as no deterrent at all. Within weeks of his release from prison in August 2021, he helped carry out the devastating attack at Abbey Gate that killed 13 servicemembers and hundreds of Afghan civilians and wounded countless others.

So too is a 20-year sentence necessary for general deterrence. A sentence of 20-years of imprisonment will demonstrate that the United States will not tolerate anyone who provides material support to designated foreign terrorist organizations.

### D. To Protect the Public from Further Crimes of the Defendant

A sentence of 20 years of imprisonment is also necessary to protect the public from further crimes of this defendant. There is nothing in Sharifullah's past to suggest that he is anything but a continuing threat to the public. He has embraced violence. He is a member of a deadly terrorist organization. And the fact that he threatened a family member while awaiting trial in this case demonstrates, if anything more is needed, that this is a defendant who remains committed to violence. He should be separated from the public for as long as possible.

### E. The Guidelines range and the need to avoid unwarranted sentencing disparities.

A sentence of 20 years imprisonment is the *only* sentence with the Guidelines range. *See* 18 U.S.C. § 3553(a)(4), (a)(6); *Gall v. United States*, 552 U.S. 38, 54 (2007) (A court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" when it "correctly calculated and carefully reviewed the Guidelines range."). Nothing in Sharifullah's

background or conduct comes close to warranting the downward variance required to impose anything less than a 20-year sentence.

## V. <u>The Applicable § 3553(a) Factors Warrant a Life Term of Supervised Release.</u>

The authorized term of supervised release for a violation of 18 U.S.C. § 2339B "is any term of years or life." *See* 18 U.S.C. §§ 2332b(g)(5)(B)(i), 3583(j). In imposing a term of supervised release, a Court must weigh all of the 18 U.S.C. § 3553(a) factors except for § 3553(a)(2)(A), retribution, and § 3553(a)(3), the kinds of sentence available, which it may not consider. *See* 18 U.S.C. § 3583(c); *Esteras v. United States*, 606 U.S. 185, 204 (2025). Prior to imposing a term of supervised release, a district court must conduct an "individualized assessment" of the need for supervision. U.S.S.G. §§ 5D1.1(b), 5D1.2(a). Additionally, when "the defendant is an alien facing post-incarceration removal, a sentencing 'court ordinarily should not impose a term of supervised release.'" *United States v. Aplicano-Oyuela*, 792 F.3d 416, 423 (4th Cir. 2015) (quoting U.S.S.G. § 5D1.1(c)). A court should, however, impose a term of supervised release on a removable alien when warranted by the § 3553(a) factors. *See id.* In such circumstances, a court must make clear that it "is aware of Guidelines section 5D1.1(c)" and explain why the "defendant's specific circumstances and the § 3553(a) factors" warrant a term of supervised release. *See id.* at 424.

Here, for the reasons described above, the need for deterrence and to protect the public requires a life term of supervised release. The applicable § 3553(a) factors likewise support imposition of the special conditions of supervised release recommended by the PSR, such as surrendering for removal from the United States, remaining outside the United States if removed, and not communicating with individuals associated with ISIS. *See* PSR at 23. In imposing the term of supervised release, the Court should also (1) ensure that it orally imposes all discretionary conditions; (2) make clear it conducted an "individualized assessment"; and (3) state that it is

aware of U.S.S.G. § 5D1.1(c) and that it finds that deterrence and protection of the public require a life term of supervised release and the recommended special conditions.

## VI. Conclusion

The nature and circumstances of Sharifullah's offense, as well as the value of general deterrence, warrant a long jail sentence in this case. Beyond that, however, the need to protect the public from this defendant calls for an even longer one.

As the facts set forth above amply demonstrate, Sharifullah is a hardened terrorist whose violent criminal activity ended only when he was arrested in Pakistan and turned over to the FBI. Yet even if Sharifullah had been arrested in 2016, after the Nepal bus attack, and not in 2025, his Guideline sentencing range would still be Life in prison, and the government would still be seeking the statutory maximum penalty.

That 2016 attack encapsulates what it means to provide material support to a designated foreign terrorist organization. Sharifullah pledged bayat, an oath of allegiance, to ISIS-K. He knew that this attack was to be carried out on behalf of ISIS-K against security guards that he seemingly believed were working at the United States Embassy. The material support that he provided to ISIS-K was about as substantial as it gets—transporting the suicide bomber and an IED to the attack site just prior to the explosion that killed approximately a dozen innocents whose sole transgression, in Sharifullah's eyes, was daring to work for a western government.

Yet sadly, Sharifullah was only getting started in 2016. There were many more innocent victims yet to be targeted by this defendant on behalf of ISIS-K. Among them were 13 U.S. servicemembers killed in the line of duty as well as numerous servicemembers who were badly injured in the terrorist attack at Abbey Gate.

Sharifullah willingly chose to provide material support to ISIS-K. Indeed, he gave himself to the terrorist organization for nearly his entire adult life. He was proud of that membership. He

was respected within ISIS-K. He moved up in the ranks. Significantly, during all of those hours of FBI interviews, Sharifullah never disavowed that oath of allegiance that he made to ISIS-K. He knew that he was talking to the FBI. He knew that they had come all the way from the United States because of the seriousness of his crimes. Yet even armed with that knowledge, he simply could not reject an organization that he had served so faithfully for nearly ten years. There is only one inescapable conclusion from that fact. Sharifullah remains a proud member of ISIS-K. He is still a committed terrorist. He has no regrets for all of the harm that he has caused.

Through his conduct, Mohammad Sharifullah attempted to strike at the heart of the safety of our nation. There is no antidote to the unfathomable bloodlust and attraction to depravity deep within him. As a result, only a long term of imprisonment can promote respect for the law; reflect the seriousness of the offense; afford adequate deterrence to criminal conduct; protect the community; and provide just punishment for his offense.

The Court should impose a sentence of 20 years' imprisonment, followed by a life term of supervised release.

Respectfully submitted,

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

By: /s/

John T. Gibbs
Virginia Bar Number 40380
Avi Panth
Virginia Bar Number 92450
Reed Sawyers
D.C. Bar Number 90018498
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3982
John.Gibbs@usdoj.gov

John A. Eisenberg
Assistant Attorney General for National Security

Ryan D. White
D.C. Bar Number 1655918
Trial Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, D.C. 20530
Phone: (202) 514-0849
Fax: (202) 514-8714
Ryan.White@usdoj.gov