IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:25-CR-143 |
| | ) | |
| MOHAMMAD SHARIFULLAH<br>Defendant. | )<br>) | |
| | ) | |

MR. SHARIFULLAH'S POSITION ON SENTENCING

Born in a region of the world that has suffered generations of armed conflict and instability, Mr. Sharifullah was raised in poverty during a war and came of age in a community where children were regularly recruited to join armed Islamic militant groups. He is now detained in a foreign land, facing sentencing for conspiring to provide material support to a foreign terrorist organization, ISIS-K, one of the many armed Islamic militant groups that operates in his country. The conduct he stands convicted of is agreeing to provide material support to a foreign terrorist group with other foreign actors, in a foreign country, against foreign victims.

The offense of conviction is serious and undoubtedly warrants a significant sentence. Nonetheless, this Court should vary below the applicable guideline range and the statutory maximum sentence authorized by law to account for Mr. Sharifullah's role in ISIS-K (he was never a leader or other powerful figure), the incredibly harsh conditions of confinement he faced when detained for this exact conduct in both Pakistan and Afghanistan, and the apparently ongoing detention of

his wife and four young children by the notorious Pakistani intelligence service, the ISI. The Court should also consider the unduly harsh and mentally debilitating conditions of the Bureau of Prisons' ("BOP") administrative maximum facility in Florence, Colorado ("Florence ADX"), where it is likely Mr. Sharifullah will serve his sentence, which condemns inmates to near-permanent solitary confinement. Finally, the Court should also take into account the difficult childhood Mr. Sharifullah faced, and the innate trauma of being born in a region riddled by generations of conflict.

For the reasons that follow, the defense submits that a sentence of 17 years (204 months), followed by a term of supervised release is sufficient, but not greater than necessary to serve the goals of sentencing.

I. *Mr. Sharifullah was born in a country riddled by decades of armed conflic*t.

Born in Afghanistan in the late 1990s, Mohammad Sharifullah was raised in a region marred by decades and decades of war. *See* PBS News, *A historical timeline of Afghanistan* (Aug. 30, 2021).[1] When he was a toddler in 2001, the United States invaded Afghanistan and began its longest war, spanning 19 years of armed conflict. Carter Malkasian, *The American War in Afghanistan: A History* (Oxford Univ. Press 2021) at 5. As one scholar has noted, "[t]he harm inflicted by three decades of war on the people and the country of Afghanistan have been cumulative." M. Siddieq Noorzoy, "Afghanistan's Children: The Tragic Victims of 30 Years of War" Middle East Institute (December 2009).[2] Though statistics are "difficult to find[,]" and much

---

[1] Available at: https://www.pbs.org/newshour/politics/asia-jan-june11-timeline-afghanistan.

[2] Available at: Afghanistan's Children: The Tragic Victims of 30 Years of War - Middle East Institute

of the available data "are estimates[,]" in the decade after the Soviet invasion in 1979, it is estimated that 1.8 million civilians were killed, 1.5 million civilians were disabled, and 7.5 million civilians became refugees. *Id*. By 2009, eight years after the start of the war with the United States, when Mr. Sharifullah was in his mid-adolescence, it was estimated that "over 100,000" Afghans had already lost their lives with many others disabled. *Id*.

Mr. Sharifullah and his family, like many others, suffered from decades of instability and violence in their homeland. From a modest background, his father, who passed away approximately 6 years ago from a heart condition that required surgery the family could not afford, worked as a carpenter building furniture. Pre-Sentence Report ("PSR") at ¶ 96. His mother, who is still alive, though unwell, took care of the children and their home. *Id*. For the first years of Mr. Sharifullah's life, his home lacked both running water and electricity. The family got their water from a local well or from the house of an uncle. *Id*. Food was limited; some days the family ate a single meal a day. *Id*. While the family was never starving, they were also never full. *Id*.

When Mr. Sharifullah was approximately two years old, the family fled Afghanistan, seeking refuge in Iran. PSR at ¶ 97. In 1999, Iran housed approximately 1.3 million Afghan refugees. United States Committee for Refugees and Immigrations, *World Refugee Survey 2000-Iran* (June 1, 2000).[3] While some

[3] Available at: https://www.refworld.org/reference/annualreport/uscri/2000/en/29752

Afghan refugees had lived in Iran for almost two decades, by the time Mr. Sharifullah's family immigrated, any welcome that had been previously extended disappeared. *Id*. Afghans in Iran "long occupied the lowest rung of the socio-economic ladder [,]" but by 1999 "their situation deteriorated further[.]" *Id*. Around the time of the arrival of Mr. Sharifullah's family, Iran declined to register new arrivals, attempted to round up and confine refugees in camps, set deadlines for refugees to leave the country, engaged in summary deportations, and passed laws hindering refugees' ability to work. *Id*.

Unsurprisingly, the family lived in poverty in Iran. PSR at ¶ 97. Mr. Sharifullah's parents worked as street peddlers selling gum and chocolate but struggled to feed their children. *Id*. They were unwelcome and discriminated against. After four hard years in Iran, the family returned to Afghanistan. *Id*.

On return to Afghanistan, Mr. Sharifullah's family continued to struggle financially—they moved into a new home with no furniture, no running water, and no electricity. *Id*. Though only 6 or 7 years old, Mr. Sharifullah began to work to help support his family. *Id*. at ¶ 98. At his first job, at an informal taxi stand, he helped would-be passengers find the appropriate car. *Id*. He later worked ferrying items in a hand-pulled cart at a bazaar, and then with his father as a carpenter. *Id*.

Because he began working as a small child, Mr. Sharifullah's education was limited. *Id*. For what time he was in school, he worked half the day and studied the other half. *Id*. In the 6th or 7th grade, when he was 12 or 13 years old, Mr. Sharifullah left school to work full-time. *Id*.

In his late teens, the government alleges, Mr. Sharifullah joined ISIS-K. That a young man from a disadvantaged background in Afghanistan would join an armed Islamic militant group is not remarkable. As one journalist has explained, "[i]n a country that has experienced nearly endless conflict for more than 30 years, Afghan children have regularly been recruited, joining militant groups ranging from the Taliban and the Haqqani network, to state-backed militias, and local and national police forces." Priyanka Boghani, *Why Afghanistan's Children Are Used as Spies and Suicide Bombers,* (Nov. 17, 2015).[4]

II. *This Court's sentence should account for the time Mr. Sharifullah spent in Afghan and Pakistani custody, and the continued detention of his wife and children.*

As a young adult in 2019, Islamic Republic forces arrested Mr. Sharifullah for participation in ISIS-K—the same conduct for which this Court will now sentence him. *See* PSR at 2. Such cases were investigated by the National Directorate of Security ("NDS"), an intelligence agency that was responsible, among other things, for investigating national security cases. U.S. Dept. of State, *2019 Country Reports on Human Rights Practices: Afghanistan*, at 1 (2019).[5] NDS had a facility in Kabul where Mr. Sharifullah was detained before he was transferred to Pul-e-Charkhi prison. *See id*. Mr. Sharifullah was held in Afghan custody for roughly two years, before his release in 2021. *See* PSR at 2.

---

[4] Available at: https://www.pbs.org/wgbh/frontline/article/why-afghanistans-children-are-used-as-spies-and-suicide-bombers/

[5] Available at: https://www.state.gov/wp-content/uploads/2020/03/AFGHANISTAN-2019-HUMAN-RIGHTS-REPORT.pdf

Later, after his release from prison and while living in Pakistan with his family, Mr. Sharifullah was arrested by the Pakistani Inter-Service Intelligence Agency ("ISI"), along with his wife who was approximately eight months pregnant, and his three young children.[6] *See* PSR at 2. He remained in the custody of the ISI until he was turned over to the United States. *Id.* As far as counsel knows, almost a year and half later, Mr. Sharifullah's wife and now four young children remain detained in Pakistani custody.

Though he was twice held in custody for the same conduct this Court will punish him for, the more than two years Mr. Sharifullah spent in custody in both Afghanistan and Pakistan will not be credited by the BOP. The Court, however, "retain[s] residual authority to reduce defendants' sentences based on previous time served related to their offenses." *United States v. Hankton*, 875 F.3d 786, 792 (5th Cir. 2017) (citing U.S.S.G. § 5G1.3(b)). To account for this uncredited time, along with the harsh conditions of confinement he endured, as well as the detention of his wife and four young children—forms of punishment not contemplated in the recommended guideline range nor the statutory maximum issued by Congress—Mr. Sharifullah asks this Court to vary below the 20-year guideline range (which is also the statutory maximum). PSR at ¶ 106.

There is no doubt that the conditions of confinement in Afghanistan were harsh. As Professor Michael Semple testified at trial, torture has been a "constant

[6] All of the children are under ten years of age.

between all the regimes in the five decades of conflict" in Afghanistan. Professor Semple, Trial Transcripts Apr. 27, 2026, at 20. Though the Islamic Republic made efforts to change the culture of torture, the use of torture remained through the fall of the Republic, particularly if you were "picked up" by the intelligence agency, NDS. *Id*. at 23.

Indeed, at the time of Mr. Sharifullah's detention by NDS, Afghanistan faced significant human rights issues including arbitrary detention, extrajudicial killings by security forces, forced disappearances by government agents, and use of torture. *Id*. at 1-2. NDS had a documented record of using torture and inhumane treatment on detainees. *See* United Nations Assistance Mission in Afghanistan, *Treatment of Conflict-Related Detainees in Afghanistan: Preventing Torture and Ill-treatment under the Anit-Torture Law* at 3 (April 2019) (observing that documented instances of torture decreased from almost one-third to approximately 20 percent of cases between 2018 and 2019). Between 2017 and 2018, U.N. investigators found that approximately 40 percent of NDS detainees in Kabul gave credible and reliable reports of torture or ill treatment. *Id.* at 13.[7] During Mr. Sharifullah's detention, NDS detainees remained subject to torture and inhumane treatment, especially in NDS's counter terrorism department. *Id*. at 3. During that time, detainees credibly reported beatings, threats, and use of stress positions. *Id*. at 13-14. As he maintains, ECF No. 156, Exhibit 1, there is no doubt that Mr. Sharifullah faced harsh conditions

[7]Accounting for 40.7 percent of detainees interviewed in general NDS detention facilities and 39 percent of individuals held in an NDS counter-terrorism facility. *Id.*

of confinement while in the custody of NDS.

After his detention by NDS, Mr. Sharifullah was transferred to Pul-e-Charkhi prison. Pul-e-Charkhi has had a reputation for brutality "since it was first constructed in 1973." Dan Lamothe, "Here's what it looks like in Afghanistan's largest—and still incomplete—prison" Washington Post (Dec. 28, 2014);[8] *see also* Associated Press, "Once inmates, Taliban now in charge of a Kabul prison" (Sept. 14, 2021) (" Pul-e-Charkhi had a long, disturbing history of violence, mass executions and torture. Mass graves and torture cells were uncovered dating from the Soviet-backed governments of the late 1970s and 1980s").[9] Though there were certainly reports of abuse and torture during the period of Mr. Sharifullah's detention, the facility was also extremely overcrowded with poor conditions. *Id.* Built to house 5,000 inmates, the prison was "often packed with more than 10,000." Associated Press, "Once inmates, Taliban now in charge of a Kabul prison" (Sept. 14, 2021).

---

[8] Available at: https://www.washingtonpost.com/news/checkpoint/wp/2014/10/28/heres-what-it-looks-like-in-afghanistans-largest-and-still-incomplete-prison

[9] Available at: https://www.aljazeera.com/gallery/2021/9/14/inmates-taliban-charge-kabul-prison



*A view of a cell at Pul-e-Charkhi prison. Reuters, "Once filled with Taliban inmates, Kabul prison now abandoned" (Sept. 15, 2021).*[10]

Likewise, though shorter in duration, Mr. Sharifullah's detention by the ISI, along with the continued detention of his family, is unduly harsh, and served the goals of just punishment, deterrence, and retribution. According to Professor Semple's expert testimony at trial, ISI is known for the use of physical torture, as well as their use of psychological torture techniques. Professor Semple, Trial Transcripts Apr. 27, 2026, at 26. The ISI have:

> "established a reputation where they have absolute, unquestioned power of life or death over people who are in their detention. It's because when somebody is --you know, they're hooded, and they are taken off by the ISI. They're well aware that they may not get out alive, and their relatives may never know what happened to them. Or if they do re-

[10] Available at: https://www.reuters.com/news/picture/once-filled-with-taliban-inmates-kabul-p-idINRTXH7O32/

> emerge, it may be a long time later, or they know that they may be shot and dumped in a ditch."

*Id*. at 27. And, threats against detainees' family members are a recognized technique employed by ISI. *Id*.

Professor Semple's testimony is consistent with U.S. State Department reports that note Pakistan faces "significant human rights issues" including unlawful or arbitrary killing, and "torture or cruel, inhuman, or degrading treatment or punishment[.]" U.S. Dept. of State, *2024 Country Reports on Human Rights Practices: Afghanistan*, at 1 (2024).[11] Reports indicate that security forces, including ISI "tortured and abused individuals in custody." *Id*. at 21-22 (reporting 20 people died in police custody due to torture between a six-month period from January to June); *see also* Human Rights Commission of Pakistan, State of Human Rights in 2024 at 37 (2024)[12] (explaining reports of torture and deaths in police custody were frequent); Secunder Kermani, *Pakistani intelligence accused of torture in crackdown on dissent*, BBC (June 2021)[13] (describing torture and kidnappings most likely perpetrated by ISI against government dissidents).

According to documents provided in discovery, Pakistani officials stated Mr. Sharifullah's family was "taken into custody because Pakistan had learned that the defendant would only speak when he was with his wife." That is, in line with their

[11] Available at: https://www.state.gov/wp-content/uploads/2025/07/624521_PAKISTAN-2024-HUMAN-RIGHTS-REPORT.pdf
[12] Available at: https://hrcp-web.org/hrcpweb/wp-content/uploads/2020/09/2025-State-of-Human-Rights-in-2024-REV.pdf
[13] Available at: https://www.bbc.com/news/world-asia-57241981

known practice, the ISI used the coercive detention of Mr. Sharifullah's family and the inherent threats to their safety to extract a confession. They physically mistreated Mr. Sharifullah and threatened him as well. ECF No. 156, Exhibit 1.

The time Mr. Sharifullah has already spent in custody, for the same conduct that forms the basis of this prosecution, the harsh conditions of confinement he was exposed to, and the lengthy, and continued detention of his wife and 4 young children are all punishments not accounted for in the guidelines, or the statutory maximum issued by Congress. These harsh punishments should be weighed alongside the goals of just punishment, retribution, and deterrence; each alone and together support a sentence below the statutory maximum authorized by law.

III. *Mr. Sharifullah was convicted of conspiring to provide material support to a terrorist group in a foreign land, with foreign actors, against foreign interest*s.

At bottom, the conviction rendered by the jury is a conclusion that Mr. Sharifullah was a member of ISIS-K and that he conspired to provide his resources or support to that organization during the relevant time period. *See* ECF No. 218. Beyond Abbey Gate, where the jury was specifically asked if a death from that attack resulted from the charged conspiracy, the jury was not asked to find, nor did they find that Mr. Sharifullah's support included any specific attack.[14] *Id.*

The government does not claim and there is no evidence to support the conclusion that Mr. Sharifullah was a leader in ISIS-K, or that he ever assumed a leadership position in the organization. The government posits that as the years

[14] Indeed, at trial the government only adduced evidence of two attacks, the attack at Abbey gate and the attack against the Nepalese contractors.

progressed he "led" attacks and functioned as a manager or supervisor, but a review of the statements Mr. Sharifullah made to the FBI, if they are even true, demonstrates that he was a conduit for messages passed between different actors in the organization. PSR at 31.

Mr. Sharifullah was taken from Pakistan, brought to the United States for prosecution, and convicted of being one of the thousands of men in Afghanistan who have joined an armed militant Islamist group. He was convicted of conspiring to provide his support to that group, in Afghanistan, which is now ruled by the Taliban, an armed Islamist militant movement that "now controls all the organs" of the state of Afghanistan. Professor Semple, Trial Transcripts Apr. 27, 2026, at 13. And as the trial testimony made clear, the Taliban movement and ISIS-K are just two of the many armed Islamic militant groups operating in the region, including the Pakistani Taliban, Hezb-e Islami, and Al Qaeda, among others. *Id*. at 37-39; *see also*, Trial Testimony of Bruce Hoffman.

During the past decade, including the dates of the charged conspiracy, there have been numerous terror attacks in Afghanistan linked to groups other than ISIS-K.[15] The Taliban, ISIS-K, and other armed groups, used terror tactics, like suicide

[15] *See e.g*. Hamid Shalizi, "Taliban claim suicide attack on contractor camp in Kabul" Reuters, (Jan. 4, 2016) available at: Taliban claim suicide attack on contractor camp in Kabul | Reuters (describing a truck bomb attack that wounded 30); Ayaz Gul, " Taliban Attack on Afghan Media Group Widely Condemned" Voice of America (Jan. 21 2016) available at: Taliban Attack on Afghan Media Group Widely Condemned (Suicide bombing against media group left at least 7 dead and 24 wounded); Mujib Mashal, "Taliban Bombing Kills at Least 20 at Kabul Police Station" New York Times (Feb. 1, 2016) available at: Taliban Bombing Kills at Least 20 at Kabul Police Station - The New York Times (suicide bombing targeting

bombings. *Id.* In the past ten years, it was the Taliban that had the most "fighters" in Afghanistan and caused the most carnage of any of the major militant groups in the country (including ISIS-K). Professor Semple, Trial Transcripts Apr. 27, 2026 at 13 & 37.

The government has not and cannot bring the thousands of individuals in Afghanistan who support armed militant groups, or were involved in terror attacks, to the United States for prosecution. To be sure, that is not why Mr. Sharifullah was brought to this District. He was brought here because the government believed he participated in the Abbey Gate attack, a theory which it was unable to prove at trial. Now, Mr. Sharifullah comes before this court for sentencing having been convicted of conspiring to support a foreign terrorist group in foreign lands, with foreign actors,

police killed 20 officers and left 29 people wounded); Sune Engel Ramussen, "Taliban suicide bombings kill Afghan civilians," The Guardian (Feb. 27, 2016) available at: Taliban suicide bombings kill Afghan civilians | Afghanistan | The Guardian (Taliban suicide bomber on motorcycle kills 13 and wounds 40); Bill Roggio, "Taliban strikes US base in eastern Afghanistan" Long War Journal (Apr. 24, 2017) available at: Taliban strikes US base in eastern Afghanistan - FDD's Long War Journal (Taliban claimed responsibility for suicide bombing attack outside US base); "Suicide blast kills at least 5 near bank, U.S. embassy" CBS (Aug. 29, 2017) available at: Suicide blast kills at least 5 near bank, U.S. embassy - CBS News ( A Taliban claimed suicide bombing near a bank killed 5 and wounded 9); Associated Press, "Taliban Launch Wave of Attacks in Afghanistan, Killing 74" NBC News (Oct. 17, 2017) available at: Taliban Launch Wave of Attacks in Afghanistan, Killing 74 (outlining wave of Taliban attacks that killed at least 74 people); Associated Press, "At least 10 Dead After Insurgent Attack, Roadside Blast in Afghanistan" Radio Free Europe (Feb. 22, 2018) available at: At Least 10 Dead After Insurgent Attack, Roadside Blast In Afghanistan (Taliban attack on local police that left at least 8 dead); Radio Azadi, "Suicide Car-Bomb Attack Kills At Least three in Kabul" Radio Free Europe (Mar. 17, 2018) available at: Suicide Car-Bomb Attack Kills At Least Three In Kabul (Taliban claimed responsibility for a suicide car-bomb attack that targeted a foreign security compound in Kabul).

against foreign interests, in a region rife with armed conflict. The nature of the offense conduct weighs against a sentence at the statutory maximum prescribed by law.

IV. *Objections to the Presentence Report.*

Mr. Sharifullah lodged numerous objections to the offense conduct section, written by the government and included in the Presentence Report ("PSR"). As laid out in the addendum, he maintains and renews those objections, and addresses a few specific objections below. PSR at 27-35.

A. *Manager Enhancement.*

Mr. Sharifullah objects to the factual assertion that he was a "manager" and the resulting enhancement. PSR ¶¶ 34-35. That said, he is cognizant that regardless of the 3-point enhancement his total offense level remains at a 43, with resulting guideline of 20 years imprisonment and that the Court need not resolve disputes that "will not affect sentencing[.]" Fed. R. Crim. Pro. 32(i)(3)(B).

B. *Victims of the Offense of Conviction.*

A large part of the trial in this case was devoted to the question of whether Mr. Sharifullah was criminally responsible for the deaths at Abbey Gate. Specifically, the jury received a Special Verdict Form that directed them to determine whether the government proved that a death resulted from Mr. Sharifullah's offense conduct. ECF No. 218. The jury was unable to find Mr. Sharifullah guilty of that element. *Id.* Consequently, while the victims of the Abbey Gate attack, survivors, and their families are certainly victims of an offense, they are not victims of the offense of conviction. The jury did not reach a verdict on the enhanced penalty that only applied

if "the death of either a U.S. Service member or an Afghan civilian at the Hamid Karzai International Airport on August 26, 2021, resulted from that conspiracy." ECF No. 218. Thus, there is no conviction for any alleged conduct related to the Abbey Gate attack. As he maintained at trial, and as noted in his objections to the offense conduct section of the PSR, *see* PSR at 27-36, Mr. Sharifullah maintains that he had no role whatsoever in the attack at Abbey Gate. As such, Mr. Sharifullah respectfully objects to any Abbey Gate victims speaking at the sentencing hearing and to any restitution arising from that attack.[16]

The parties agree that the relevant statutes define a "victim" as a person directly and proximately harmed as a result of the commission of the offense. *See* ECF No. 238 at 16, *see also* 18 U.S.C.A. § 3663A (restitution can only be ordered for a person directly and proximately harmed or "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."); 18 U.S.C.A. § 3771 (a crime victim "means a person directly and proximately harmed as a result of the commission of a Federal offense[.]"); *see also* *United States v. Cornett*, 515 F. Supp. 3d 367, 370–71 (E.D.N.C. 2021) (citing *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996); *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006) *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708 (2008)) ( Though the Fourth Circuit "has not interpreted the definition of a

[16] To date, Mr. Sharifullah has not received any restitution requests from Abbey Gate victims.

"crime victim" under the CVRA…it has construed identical language of the Victim and Witness Protection Act of 1982 ("VWPA") and the Mandatory Victims Restitution Act of 1986 ("MVRA"), and held that a person is "directly and proximately harmed" when the harm results "from conduct underlying an element of the offense of conviction.").

Relying on two out-of-circuit district court opinions, the government posits that Mr. Sharifullah cannot object under the Crime Victims Right Act ("CVRA."). ECF No. 238 at 16 (citing *United States v. Smith*, 2025 WL 3459685, at *1 (D. Colo. Dec. 2, 2025); *United States v. Lampley*, 2020 WL 4044986, at *2 (E.D. Tex. July 16, 2020)). This argument is not one endorsed by the government in previous litigation concerning the CVRA, or the other courts in this district and circuit that have considered whether an individual qualifies as a victim under the CVRA. *See e.g., United States v. Sharp*, 463 F. Supp. 2d 556, 561 (E.D. Va. 2006) (granting defendant's motion to deny admission of statement at sentencing because declarant was not a "victim" for purposes of the CVRA); *see also United States v. Myers*, 402 F. App'x 844, 845 (4th Cir. 2010) (unpublished) (finding defendant's ex-wife's statements admissible for the purpose of "imposing an appropriate sentence under 18 U.S.C. § 3661[,]" and not reaching whether the ex-wife qualified as a victim under 18 U.S.C. § 3771, with no implication that defendants lack standing to challenge designation); *United States v. Brown*, 2023 WL 1267185, at *2 (4th Cir. Jan. 31, 2023) (where the defendant grounded his challenge in whether an individual qualified as a victim under the "CVRA" which the court did not resolve because the victims statements

were relevant to the defendants conduct, with no mention of the claim being barred).

Second, applying the relevant standards, the Abbey Gate survivors and family members—while assuredly victims in the colloquial sense—were not directly and proximately harmed by the offense of conviction. As discussed above, no jury verdict supports this conclusion, and Mr. Sharifullah maintains that he had no role in the Abbey Gate attack.

Relying on a number of conspiracy cases, the government notes that all those who suffer loss flowing from a conspiracy are victims of a crime, regardless of "whether the defendant is convicted for each criminal act within that scheme." ECF No. 238 at 17, citing *United States v. Henoud*, 81 F.3d 484, 488 (4th Cir. 1996). But the cases the government cites are inapposite. First, a number of the cases the government relies on address victim liability for acts committed in furtherance of a conspiracy. *See e.g.*, *Henoud*, 81 F.3d 484; *United States v. Plumley*, 993 F.2d 1140, 1142 (4th Cir. 1993); *United States v. Newsome*, 322 F.3d 328, 335–36 (4th Cir. 2003). Here, though the jury convicted Mr. Sharifullah of a general conspiracy to provide material support, there is no non-confession evidence that he was involved in the Abbey Gate attack.

In *Henoud*, where the defendant was convicted of an overseas call-selling conspiracy, the Court upheld a restitution order to telephone companies not named in the indictment, in excess of the loss indicated in the indictment. 81 F.3d 484 at 486. In so holding, the Court explained that:

> "The jury implicitly found the existence of the scheme based upon its guilty verdict for all fourteen counts of criminal activity charged in the

> indictment. The acts comprising the scheme to defraud therefore constitute the conduct underlying the offense of conviction and establish "the outer limits of [the] restitution order." *Stouffer,* 986 F.2d at 928. And the district court's inclusion of any loss to any victim caused by the scheme to defraud would satisfy *Hughey* 's requirement of focusing only upon the specific conduct underlying the offense of conviction."

*Id*. at 489. Here, there was no implicit finding by the jury that Mr. Sharifullah's conspiracy encompassed the Abbey Gate attack. *Cf. United States v. Plumley*, 993 F.2d 1140, 1142 (4th Cir. 1993) (restitution order appropriate where defendant conspired with co-defendant to rob the bank, provided weapons for the robbery, and was the getaway driver "because as a member of the conspiracy, Plumley was liable for all of the actions of her co-conspirators in furtherance of the conspiracy.). On the contrary, the jury was specifically asked this question and could not return a verdict. The Fourth Circuit has specifically tethered "victim" status to the "specific conduct of which the defendant is convicted." *Henoud*, 81 F.3d at 488.

No evidence at trial linked Mr. Sharifullah to the attack, besides his own statements made while his family was detained by Pakistani authorities known to torture detainees. Moreover, defense witnesses at trial directly contradicted the government's theory of liability, as did the government's utter lack of evidence corroborating Mr. Sharifullah was even in Kabul the day of the attack, much less that he was in the vicinity of the airport to scout a route. Accordingly, the government has not shown that Abbey Gate victims were directly and proximately harmed as a result of this offense, and thus they are not "victims" for the purposes of the offense of conviction.

Finally, though it is true that this Court has broad discretion to hear

information concerning "the background, character and conduct of a person" in considering an appropriate sentence, 18 U.S.C.A. § 3661, such statements must be relevant to the defendant's character or conduct. *See United States v. Brown*, No. 22-4449, 2023 WL 1267185, at *2 (4th Cir. Jan. 31, 2023) (explaining that the statements of family members of deceased victim "were relevant to the nature, circumstances, and seriousness of Brown's violation conduct, as well as the magnitude of his breach of trust in violating the terms of his release."). Here no victim impact statement could possibly provide relevant information concerning Mr. Sharifullah's "conduct," because of course there is not a single piece of evidence tying him to that attack, besides his own statements. Any other statements regarding the magnitude of the Abbey Gate attack are not tethered to Mr. Sharifullah's character or background, because they all rest on an assumption that he was somehow involved in that attack, a premise the government did not prove at trial, and that the defense maintains is false.

The jury was specifically asked if Mr. Sharifullah's conspiracy "directly harmed" the victims of Abbey Gate, and a conviction was not returned. Mr. Sharifullah maintains that he had no part in the attack, as the evidence presented at trial demonstrated. As a result, though certainly victims in the broader sense of the word, those injured and killed at Abbey Gate attack, survivors, and their families are not victims of the offense of conviction.

V. *The conditions of confinement Mr. Sharifullah will face in the United States will serve the goals of just punishment, retribution, and promote respect for the law.*

A 204-month sentence will serve the more punitive goals of sentencing, especially when coupled with other aspects of Mr. Sharifullah's sentence, including his capture in a foreign land, the restrictive conditions of his pre and post-trial detention, his likely detention at ADX Florence, as well as his detention by immigration authorities following the expiration of any sentence this Court issues.

First, Mr. Sharifullah was brought to the United States and this District for the sole purpose of prosecution. This matters for two reasons: First, the fact that he was caught in a foreign land and brought to this country itself is an effective and powerful deterrent, mitigating against the need to impose a lengthy prison term for a deterrent effect. Second, incarceration is objectively more punitive for a noncitizen defendant, like Mr. Sharifullah. Unlike most federal defendants, Mr. Sharifullah's entire family lives abroad, in Afghanistan or in detention in Pakistan. *See* PSR at ¶ 101. His family, even if not detained, have no ability to visit him or send him mail or commissary money. Consequently, Mr. Sharifullah will serve his sentence isolated from his family. Mr. Sharifullah's isolation from his family is a significant factor for this Court's consideration. Family support and contact is well-recognized as an important source of support and rehabilitation for inmates, so much so that it is codified in federal law. *See* 18 U.S.C. § 3621(b); *see also*, First Step Act of 2018, S. Bill 756, Sec. 601 (amending 18 U.S.C. § 3621(b) to include 500 driving mile guidance).

Second, since Mr. Sharifullah was brought to the United States for prosecution,

the Department of Justice implemented a set of special restrictions, Special Administrative Measures, or SAMs, regulating his contact with other people. Under the SAMs, Mr. Sharifullah may not have contact with anyone who is not a member of his legal defense team or a member of his immediate family. Those with whom he is permitted to have contact first must be approved for such contact, including his lawyers, their employees and his immediate family. Those who are approved must follow a set of rules governing their contact with Mr. Sharifullah.

Mr. Sharifullah may not have contact with other inmates at the jail (or any jail).[17] He is held in isolation in a single cell and has been since his arrest by the FBI in March of 2025. The SAMs are administered by the DOJ. In short, the DOJ has exercised essentially unilateral control over Mr. Sharifullah's communications and human contact since he arrived in the U.S. and will continue to do so for the foreseeable future.

Third, even though, per the Classification Counselor at the Alexandria Detention Center, Mr. Sharifullah "has maintained good conduct and has not incurred any disciplinary infractions during his incarceration [,]" PSR at ¶ 6, he will most likely serve his sentence at USP Florence ADX. This means any sentence this Court imposes will be served under the extremely difficult, if not inhumane conditions, of solitary confinement at the Supermax facility. *See* M. Binelli, *Inside*

---

[17] This provision in particular is problematic for Mr. Sharifullah's future placement within the BOP system. If Mr. Sharifullah is forbidden to have any contact with other inmates, it may follow that the BOP has no choice but to put him in solitary confinement at Florence ADX.

*America's Toughest Federal Prison*, N.Y. Times (Mar. 26, 2015)[18]. Inmates at ADX spend 23 hours a day in solitary confinement, in 12-by-7 foot cells with solid doors to prevent prisoners from seeing each other. *Id*. Meals are delivered through a slot, the same slot through which all human interactions take place, whether it be with a guard, psychiatric or religious figure. *Id*.

As an Amnesty International Reprot notes, the United States "stands virtually alone in the world in incarcerating thousands of prisoners in long term or indefinite solitary confinement, defined by the UN Special Rapporteur on Torture and other Cruel, Inhuman or Degrading Treatment or Punishment as "the physical and social isolation of individuals who are confined to their cells for 22 to 24 hours a day"." Amnesty Internation, Entombed: Isolation in the US Federal Prison System (July 14, 2014) (concluding conditions at Florence Supermax are "unacceptably harsh. ").[19] It is almost impossible to overstate the draconian nature of the conditions under which Mr. Sharifullah will likely have to serve his sentence. In the words of one former warden of USP Florence ADX, Robert Hood:

> "This place is not designed for humanity," he recalled. "When it's 23 hours a day in a room with a slit of a window where you can't even see the Rocky Mountains — let's be candid here. It's not designed for rehabilitation. Period. End of story."

*Id*. (quoting R. Hood, warden of USP Florence ADX from 2002 to 2005).

---

[18] Available at: https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html

[19] Available at: https://www.amnestyusa.org/reports/entombed-isolation-in-the-us-federal-prison-system/

Decades worth of research on solitary confinement demonstrates that the social isolation caused by such conditions increases the prevalence of depression, anxiety, psychosis, paranoia, and suicidal behavior. *See* Craig Haney, The Science of Solitary: Expanding the Harmfulness Narrative, 115 NW. U. L. Rev. 211 (2020); *see also* Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 J. Law & Policy 325, 331 (2006) ("Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium."). The SAMs along with Mr. Sharifullah's likely placement in ADX Florence, are punitive measures above and beyond any sentence this Court may impose, and serve the goals of just punishment, retribution and deterrence.

Fourth, an immigration detainer has been lodged against Mr. Sharifullah and any sentence this Court imposes will be followed by what could be a lengthy period of administrative detention.[20] Though immigration custody is civil detention rather than criminal incarceration, the "similarities" between the two "are too strong to ignore." *United States v. Estrada-Mederos,* 784 F.3d 1086, 1091 (7th Cir. 2015) (internal citations and quotations omitted).

The hardships attendant to Mr. Sharifullah's imprisonment, unlike the usual defendant, are not accounted for in guidelines or the statutory maximum sentence. His continued detention in isolation, in a foreign land with limited ability to speak with his family—or with anyone—are singular punishments that warrant a sentence

[20] Presumably immigration authorities will have to determine if Mr. Sharifullah can be deported to Afghanistan, and if not, what third party country would take him.

below the statutory maximum.

VI. *Conclusion.*

For all the above stated reasons it is respectfully requested that the Court issue a 17-year sentence, followed by a term of supervised release.

Dated: September 9, 2026.

Respectfully Submitted,

By Counsel,

_________/s/______________

Geremy C. Kamens
Va. Bar No. 41596
Federal Public Defender
Lauren E. S. Rosen
VA Bar No: 98540
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800
(703) 600-0880 (fax)
Lauren_Rosen@fd.org
Geremy_Kamens@fd.org